J. Noah Hagey, Esq. (SBN: 262331)
  hagey@braunhagey.com
J. Tobias Rowe, Esq. (SBN: 305596)
  rowe@braunhagey.com
Rebecca B. Horton, Esq. (SBN: 308052)
  horton@braunhagey.com
BRAUNHAGEY & BORDEN LLP
220 Sansome Street, 2nd Floor
San Francisco, CA 94104
Telephone:  (415) 599-0210
Facsimile:  (415) 276-1808

ATTORNEYS FOR PLAINTIFF
STONE BREWING CO., LLC

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STONE BREWING CO., LLC,<br><br>        Plaintiff,<br><br>        v.<br><br>MILLERCOORS LLC, and DOES 1 through 25, inclusive,<br><br>        Defendants. | Case No. 18-cv-0331-BEN-JMA<br><br>**PLAINTIFF STONE BREWING CO., LLC'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>**Date:**  August 13, 2018<br>**Time:**  10:30 a.m.<br>**Judge:** Hon. Roger T. Benitez<br><br>**Complaint filed:** February 12, 2018 |

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................1

STATEMENT OF FACTS .................................................................................3

    A.   Plaintiff's STONE® Mark and Goodwill ...............................................3

    B.   STONE®'s Reputation, Goodwill and Delivery of Great Beer ...........4

        1.   Critical Acclaim for STONE® Beer and Business ...................4

        2.   STONE®'s Massive Social Media Presence.............................5

        3.   STONE®'s Sales at Retailers, Bars and Restaurants Across the United States and Globally ...................................................5

    C.   Defendant's Struggle to Promote Keystone's Fizzy Yellow Beer .......6

        1.   Keystone's Brand..........................................................................6

        2.   Keystone's Waning Sales ............................................................6

        3.   Keystone's Failed PTO Application for "STONES" ................7

    D.   Sales and Industry Overlap .....................................................................8

    E.   Defendant's Rebrand of Keystone as "STONE" .................................8

    F.   Defendant's Plan to Escalate Infringement........................................10

        1.   Sales Uptick After Keystone's Infringement.........................10

        2.   Strategic Marketing of Infringing "STONE" Rebrand............11

    G.   Consumers Are Confused by Defendant's Infringing "STONE" Beer ........................................................................................11

    H.   Scientific Survey of Consumers Shows Overwhelming Confusion ...12

    I.   Defendant's Infringement Is Accelerating.........................................13

    J.   Stone is Suffering Long Term Irreparable Harm ...............................14

ARGUMENT ....................................................................................................15

I.   THE TRUE STONE® HAS A STRONG LIKELIHOOD OF SUCCESS ON ITS TRADEMARK INFRINGEMENT CLAIM...................................15

    A.   Stone's Incontestable STONE® Mark................................................16

    B.   Defendant's Attempt to Misappropriate "STONE" Creates Obvious Likelihood of Confusion ......................................................17

        1.   Strength of Mark: The STONE® Mark is Rock Solid.............17

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

2.     Relatedness of Goods: Beer and Beer .......................................19

3.     Similarity of Marks: STONE® Beer versus "STONE" Beer...21

4.     Marketing Channels: Plaintiff and Defendant Utilize Nearly Identical Marketing Channels........................................22

5.     Defendant's "STONE" Rebrand Creates Actual Confusion ....22

6.     Defendant's Rebrand to Infringe on STONE® is Willful and Intentional ..........................................................................26

7.     Defendant's Expansion of Product Line Infringes Upon Plaintiff's Protected Mark........................................................28

II.    STONE WILL SUFFER IRREPARABLE HARM IF DEFENDANT IS NOT ENJOINED FROM CONTINUED INFRINGMENT .......................28

III.   BALANCE OF THE EQUITIES TIPS DECIDEDLY IN FAVOR OF PROTECTING STONE'S ONE-OF-A-KIND BRAND ...........................33

IV.    INJUNCTIVE RELIEF IS IN THE PUBLIC'S INTEREST.......................33

V.     NO BOND IS REQUIRED IN THIS CASE.................................................34

CONCLUSION..........................................................................................35

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF AUTHORITIES

## CASES

*2Die4Kourt v. Hillair Capital Management, LLC*,
  2016 WL 4487895 (C.D. Cal. Aug. 23, 2016) ................................................ 28, 33

*2Die4Kourt v. Hillair Capital Mgmt., LLC*,
  692 F. App'x 366 (9th Cir. 2017) ............................................................................ 34

*Adidas Am., Inc. v. Skechers USA, Inc.*,
  No. 16-35204, 2018 WL 2142648 (9th Cir. May 10, 2018) ..................... 25, 31, 32

*AMF, Inc. v. Sleekcraft Boats*,
  599 F.2d 341 (9th Cir. 1979) .....................................................................passim

*Anheuser-Busch, Inc. v. Customer Co.*,
  947 F. Supp. 422 (N.D. Cal. 1996) ................................................................. 19, 22

*Applied Information Sciences Corp. v. eBay*,
  511 F.3d 966 (9th Cir. 2007) ...................................................................................... 16

*Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.*,
  457 F.3d 1062 (9th Cir. 2006) ............................................................................... 24

*Aurora World, Inc. v. Ty Inc.*,
  719 F. Supp. 2d 1115 (C.D. Cal. 2009) ................................................................ 34

*Beer Nuts, Inc. v. Clover Foods Co.*,
  805 F.2d 920 (10th Cir. 1986) ............................................................................... 24

*Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*,
  174 F.3d 1036 (9th Cir. 1999) ................................................................. 17, 21, 22

*Brooklyn Brewery Corp. v. Black Ops Brewing, Inc.*,
  156 F. Supp. 3d 1173 (E.D. Cal. 2016) ............................................................... 21

*Clamp Mfg. Co., Inc. v. Enco Mfg. Co., Inc.*,
  870 F. 2d 512 (9th Cir. 1989) ........................................................................ 17, 18

*Clicks Billiards Inc. v. Sixshooters. Inc.*,
  251 F.3d 1252 (9th Cir. 2001) ............................................................................... 23

*CSC Brands LP v. Herdez Corp.*,
  191 F. Supp. 2d 1145 (E.D. Cal. 2001) ............................................................... 16

*CytoSport, Inc. v. Vital Pharm., Inc.*,
   617 F. Supp. 2d 1051 (E.D. Cal. 2009) ...............................................24, 25, 26, 33

*Dr. Seuss Enter., L.P. v. Penguin Books, U.S.A.*,
   109 F.3d 1394 (9th Cir. 1997) ................................................................................ 33

*E. & J. Gallo Winery v. Grenade Beverage LLC*,
   2014 WL 5489076 (E.D. Cal. Sept. 8, 2014) ......................................................... 30

*E & J Gallo Winery v. Gallo Cattle Co.*,
   967 F.2d 1280 (9th Cir. 1992) ................................................................................ 19

*Fiji Water Co., LLC v. Fiji Mineral Water USA, LLC*,
   741 F.Supp.2d 1165 (S.D. Cal. 2010) .............................................................. 19, 25

*Fleischmann Distilling Corp. v. Maier Brewing Co.*,
   314 F.2d 149 (9th Cir. 1963) ............................................................................ 19, 20

*GoTo.com, Inc. v. Walt Disney Co.*,
   202 F.3d 1199 (9th Cir. 2000) ................................................................................ 21

*Guinness United Distillers & Vintners B.V. v. Anheuser–Busch, Inc.*,
   2002 WL 1543817 (S.D.N.Y. July 12, 2002)......................................................... 19

*Hansen Beverage Co. v. Cytosport, Inc.*,
   No. CV 09-0031-VBF(AGRX), 2009 WL 5104260 (C.D. Cal. Nov. 4, 2009) ..... 16

*Herb Reed Enters., LLC v. Florida Entm't Mgmt, Inc.*,
   736 F. 3d 1239 (9th Cir. 2013) ............................................................................... 28

*HM Elecs., Inc. v. R.F. Techs., Inc.*,
   No. 12-CV-2884-MMA (WMC), 2013 WL 12074966 (S.D. Cal. Oct. 3, 2013) .. 23

*Hokto Kinoko Co. v. Concord Farms, Inc.*,
   738 F.3d 1085 (9th Cir. 2013) ................................................................................ 26

*Interstellar Starship Servs. v. Epix, Inc.*,
   184 F.3d 1107 (9th Cir. 1999) ................................................................................ 16

*KP Permanent Make-Up, Inc. v. Lasting Impression, Inc.*,
   543 U.S. 111 (2004)................................................................................................. 15

*Maxim Integrated Prod., Inc. v. Quintana*,
   654 F. Supp. 2d 1024 (N.D. Cal. 2009)................................................................... 24

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

*Ocean Garden, Inc. v. Marktrade Co.*,
  953 F.2d 500 (9th Cir. 1991) ............................................................ 33

*Official Airline Guides, Inc. v. Goss*,
  6 F.3d 1385 (9th Cir. 1993) ............................................................. 26

*Pacific Rollforming, LLC v. Trakloc Intern., LLC*,
  2007 WL 4181258 (S.D. Cal. 2007) ................................................ 35

*Plasticolor Molded Prod* v. *Ford Motor Co.*,
  698 F. Supp. 199 (C.D. Cal. 1988) ............................................ 27, 28

*Playboy Enterprises, Inc. v. Netscape Commc'ns Corp.*,
  354 F.3d 1020 (9th Cir. 2004) ......................................................... 24

*Pom Wonderful LLC v. Hubbard*,
  775 F.3d 1118 (9th Cir. 2014) .................................................... 15, 20

*SquirtCo. v. Seven-Up Co.*,
  628 F.2d 1086 (8th Cir. 1980) ......................................................... 26

*Starbucks Corp. v. Heller*,
  2014 WL 6685662 (C.D. Cal. Nov. 26, 2014) ................................. 30

*Stone Creek, Inc. v. Omnia Italian Design, Inc.*,
  875 F.3d 426 (9th Cir. 2017) ................................................ 21, 22, 26

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
  240 F.3d 832 (9th Cir. 2001) ........................................................... 29

*Thane Int'l, Inc. v. Trek Bicycle Corp.*,
  305 F.3d 894 (9th Cir. 2002) ................................................ 24, 25, 26

*Triad Systems Corp. v. Southeastern Exp. Co.*,
  64 F.3d 1330 (9th Cir. 1995) ........................................................... 33

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
  505 U.S. 763 (1992) .................................................................... 17, 18

*Van de Kamp v. Tahoe Reg'l Planning Agency*,
  766 F.2d 1319 (9th Cir. 1985) ......................................................... 34

*Warner Bros. Entm't v. Glob. Asylum, Inc.*,
  No. CV 12-9547 PSG CWX, 2012 WL 6951315 (C.D. Cal. Dec. 10, 2012) ........ 16

Case No. 18-cv-0331-BEN-JMA
PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

*YKK Corp. v. Jungwoo Zipper Co., Ltd.*,
   213 F. Supp. 2d 1195 (C.D. Cal. 2002) ................................................. 22

**STATUTES**

15 U.S.C. § 1116(a) ............................................................. 1, 15

15 U.S.C.A. § 1115(b) ........................................................ 16, 17

**RULES**

Fed. Rule of Evid. 408 ................................................................ 8

Fed. Rule of Civ. Proc. 65(b) ............................................... 1, 15

**OTHER AUTHORITIES**

4 McCarthy on Trademarks and Unfair Competition § 23:18 ................................... 24

4 McCarthy on Trademarks and Unfair Competition § 30:2, 30-10 ......................... 29

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Stone Brewing Co., LLC ("Stone" or "Plaintiff") hereby moves for a preliminary injunction pursuant to 15 U.S.C. § 1116(a) and Fed. Rule of Civ. Proc. 65(b) against Defendant MillerCoors LLC ("Defendant") to enjoin its ongoing infringement of Stone's incontestable STONE® federal trademark.

## INTRODUCTION

Plaintiff Stone seeks a preliminary injunction barring Defendant MillerCoors from continuing to use Stone's incontestable and highly distinctive STONE® mark on its Keystone Light beer cans and related marketing material.  Keystone's adoption of Stone's name is causing actual and irreparable consumer confusion, with a scientific study finding that more than 43% of beer consumers are confused by the new label, with over 25% net confusion.

Stone is an Escondido, California craft brewery twice recognized by *Beer Advocate* as the "All Time Top Brewery on Planet Earth." Its award-winning distinctive hoppy and "bitter" beer has been sold for over twenty years under the incontestable STONE® federal trademark.  In April 2017, Defendant MillerCoors, one of the world's largest beer manufacturers, decided to refresh its flagging "Keystone" brand by separating the "KEY" from "STONE" on the front of its beer cans, effectively adopting Stone's mark as its own:



**Traditional Keystone Can**
(Pre-2017)

**Rebranded Keystone Can**
(Post-2017)

Defendant knew that adopting Stone's house mark would cause widespread confusion.  In fact, much like counterfeiters hoping to knock off a quality brand, that

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

1   was the whole point.  Defendant also knew for certain that taking Stone's name
2   would violate U.S. trademark law.  Almost a decade ago, the U.S. Patent and
3   Trademark Office ("PTO") *expressly rejected* Defendant's application to register the
4   term "STONES" because doing so was "extremely likely" to cause "[c]onfusion as to
5   source of origin or sponsorship" with Plaintiff's registered STONE® mark.  *In re.*
6   *Trademark Application No. 77284994 – STONES*, PTO Dkt. No. 4060KE-1027
7   (Dec. 3, 2007) (Request for Judicial Notice ("RJN"), Ex. 7). Defendant conceded
8   defeat and promptly abandoned the application, and then abandoned a similar
9   application a few years later.

10        Defendant's rebranding is wreaking havoc in the market and already has
11   allowed Keystone's sales to skyrocket as consumers associate it with STONE®.  A
12   preliminary injunction is necessary to halt this onslaught and protect one of
13   California's most prized craft beer brands from permanent injury.  All relevant
14   factors support such preliminary relief:

15        •     STONE® is a federally-registered, incontestable trademark used on all
16   of Stone's beer with recognized secondary meaning and over twenty years of
17   continuous use at tens of thousands of retailers, pubs, bars, restaurants and liquor
18   stores across the country.

19        •     Defendant's willful use of the exact same mark on the front of its
20   Keystone beer and in related marketing is causing actual consumer confusion, and a
21   scientific, controlled study of beer drinkers establishes a staggering degree of market
22   confusion attributable to Defendant's infringement.

23        •     The balance of hardships and public interest decidedly weigh in Stone's
24   favor to prevent Defendant's deliberate counterfeiting of the STONE® mark and to
25   stop further irreparable injury and lost goodwill caused by Stone's involuntary
26   association with one of the world's most disfavored light beers, *i.e.*, *Keystone Light*.

27        Stone has attempted in vein to address these issues with Defendant without
28   success.  It now respectfully seeks entry of the appended [Proposed] Order to compel

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

1  Defendant to cease using "STONE" apart from "KEY" on its beer cans and

2  marketing materials.

3  **STATEMENT OF FACTS**

4         The following facts are set forth in the appended Declaration of Plaintiff's

5  President and Co-Founder, Steve Wagner (the "STONE Decl."), the Expert Report

6  and Declaration of Professor Dave Stewart, Ph.D. (the "Stewart Decl."), Stone's

7  Request for Judicial Notice (the "RJN"), and Defendant's own admissions in its

8  Answer and Counterclaims (Dkt. 19, the "Answer").

9  **A.   Plaintiff's STONE® Mark and Goodwill**

10        Since brewing its first STONE® beer in 1996, Stone's house mark has become

11  one of the most recognizable and beloved craft beer brands in the U.S.  (STONE

12  Decl. at ¶¶ 2, 12-14.) In addition to dozens of awards and accolades, Stone is the

13  only brewery to have been awarded the title of "All-Time Top Brewery on Planet

14  Earth" by BeerAdvocate magazine – not once, *but twice*.  (*Id.* at ¶ 29.) The STONE®

15  brand and its beer are a national and international icon that embody the spirit of its

16  Gargoyle mascot, known for a vigilant commitment to quality, sustainability and the

17  art of brewing.  (*Id.* at ¶ 32.) And for protecting the company against corporate

18  invaders like MillerCoors. (*Id.* at ¶ 4.)

19        The name STONE® is an original creation, much like Stone's pathbreaking

20  beers.  (STONE Decl. at ¶ 3.)  In the early 1990s, Stone's founders Steve Wagner and

21  Greg Koch tried out countless monikers looking for one name that would embody the

22  ethos of their beer brainchild—brewing bold, interesting, and truly independent craft

23  beers. (*Id.*)  The founders struck upon STONE® because it conveyed a solid and

24  simple brand message, embodying the founders' desire to focus on the fundamentals

25  of brewing great beer.  (*Id.*) Further, it represented a blank slate, having no pre-

26  existing association with the category.  (*Id.*)

27        The founders promptly applied for the STONE mark, which was published for

28  opposition on July 29, 1997.  (RJN at Ex. 3.) Following examiner review, the PTO

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

1  registered the mark without objection on June 23, 1998 under U.S. Registration No.
2  2,168,093.  (RJN at Ex. 1.)

3       Ten years later, in 2008, the PTO recognized Stone's continuous use of the
4  brand when it accepted Stone's Combined Declaration of Use and Incontestability.
5  (RJN at Ex. 4.) On that date, the STONE® mark became "incontestable" as a matter
6  of law, further insulating Stone from copycats and placing companies like Defendant
7  on notice of Stone's rights.  Since then, Stone has registered numerous other
8  STONE-formative marks to help protect the expansion of its brand.

9       **B.    STONE®'s Reputation, Goodwill and Delivery of Great Beer**

10      Stone's reputation for independence and pugnaciously hoppy beer are as
11  distinctive as its STONE® mark.  (STONE Decl. at ¶ 32.)  The brewery has achieved
12  acclaim and recognition in virtually every category possible, from beer aficionados
13  to critics to ordinary consumers.

14           **1.    Critical Acclaim for STONE® Beer and Business**

15      Stone is the eighth-largest independent craft brewer in the United States.
16  (STONE Decl. at ¶ 12.)  STONE® beer repeatedly is awarded grand prizes in local,
17  national and international competitions.  (*Id*. at ¶ 28.)  In 2009, the brewery was
18  awarded the lofty distinction of "All Time Top Brewery on Planet Earth" by *Beer*
19  *Advocate* magazine, besting domestic and international competition, including
20  Trappist brewers in Belgium.  (*Id*. at ¶ 29.)  Then, in a first for *Beer Advocate*, Stone
21  was awarded the honor for a second time, in 2010.  (*Id*.)  (Stone currently is
22  recognized as the publication's "No. 1 All-Time Top Brewer.")

23      Stone's business and approach to marketing STONE® beer have kept pace and
24  helped support its reputation.  For the past twelve years, Stone has been named as
25  one of San Diego Business Journal's "Top 100 Fastest Growing Private Companies,"
26  a distinction it also enjoys on Inc. magazine's list of the 5000 Fastest-Growing
27  Private Companies.  (STONE Decl. at ¶¶ 19-20.) The brewery's unique brand and
28  approach to the trade is widely recognized among industry observers, including by

1  publications such as *The New York Times*, *The Wall Street Journal*, *The Economist,*
2  *USA Today*, and *Time* magazine, among others.  (*Id.* at ¶ 30.)

3          ### 2.   STONE®'s Massive Social Media Presence

4          In addition to its well-earned reputation, Stone maintains a loyal grassroots
5  STONE® fan base that is unrivaled by most other breweries in the United States.
6  Stone engages with beer drinkers across several social media platforms—Facebook,
7  Twitter and Instagram, to name a few.  (STONE Decl. at ¶ 37.)  Despite their
8  disparity in size, Stone engages far more consumers than Defendant MillerCoors.
9  Stone's official Twitter account (https://twitter.com/stonebrewing) has 273,000
10  followers, while Defendant's profile (https://twitter.com/MillerCoors) only has
11  25,000. (*Id.*) Defendant's Keystone brand does not even appear to have a Twitter
12  presence, though parody accounts with a handful of followers abound (*see, e.g.,*
13  https://twitter.com/relive_keystone).  (*Id.* at ¶ 6.)

14          ### 3.   STONE®'s Sales at Retailers, Bars and Restaurants Across the United States and Globally

15          STONE® beers are sold in thousands of retailers, bars, restaurants and liquor
16  stores throughout the country.  (STONE Decl. at ¶ 13.)  Fans purchase STONE® beer
17  in boutique grocers, major supermarkets, liquor stores, restaurants, pubs, bars, and
18  online in every state in the country.  (*Id.*)  In thousands of locations, STONE® is sold
19  in the same retailers and on the same aisle as Defendant's Keystone beer, including
20  at national chains like Kroger, Safeway, BevMo, Whole Foods, Food Lion, Rite Aid,
21  Publix, Wegmans, Lowes and Raleys and more.  (*Id.*)

22          STONE® also has gained notoriety as the first American craft brewer with the
23  temerity to independently build, own and operate a brewery in the thousand-year-old
24  heartland of beer, Berlin, Germany.  (STONE Decl. at ¶ 15.)  Fans from around the
25  country and world visit the brewery's headquarters in Escondido, where they can
26  enjoy dozens of unique varieties of STONE® beer.  (*Id.* at ¶ 18.)

27
28

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

### C.   Defendant's Struggle to Promote Keystone's Fizzy Yellow Beer

Defendant's Keystone brand is the evil twin of all things STONE® stands for and holds dear:  distinctive taste, small batch craft preparation, environmental sustainability, iconoclastic irreverence and critical acclaim.  (STONE Decl. at ¶ 83.)

### 1.   Keystone's Brand

According to Defendant, Keystone was launched in 1989 under its "KEYSTONE" mark, which remains the brand's primary trademark.  Observers theorize that the brand was started as a means to offload lesser-quality Coors Light.  (STONE Decl. at ¶ 6.)  Critics are of a similar view.  Keystone historically has been sold as a bargain-basement, watered-down, low-alcohol light beer that has been described as "augmenting the typical stale/sour flavor profile [of light beer] with notes of brown bananas and green armpits." (*Id.*)  It maintains a rating of just 1.81 on *Beer Advocate*, which translates to "Awful" on the site's quality scale.  (*Id.*)

For almost thirty years, until its rebranding in April 2017, Defendant branded and sold Keystone beer using the KEYSTONE® mark on the front of its cans and packages as a single word, "KEYSTONE," in uniform typeface, font and color.  ((STONE Decl. at ¶ 48) (images illustrating the rebrand are appended for convenience as Demonstrative A).)

### 2.   Keystone's Waning Sales

As craft beer grew in popularity into the 2000s, MillerCoors saw its KEYSTONE brand (and others) lose market share. (STONE Decl. at ¶ 49.) Defendant tried various short-lived advertising campaigns to bolster the brand, all of which honed to Keystone's traditional logo and can, *i.e.*, featuring the "KEYSTONE" mark as a single word accompanied by the Colorado Rockies. (*Id.* at ¶ 48.)

At times, Defendant's packaging or print advertising included reference to beers within a case of KEYSTONE as "30 'Stones." Answer/CC at 12:27-28:17.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

1    Defendant's packaging, however, always prominently featured the full KEYSTONE

2    brand name as a single word, usually as a picture of the can itself.

3              **3.    Keystone's Failed PTO Application for "STONES"**

4              In 2007, Keystone attempted to register "STONES" as a standalone mark.

5    (RJN at Ex. 5.)  The PTO swiftly scuttled the effort, recognizing the strength and

6    priority of the STONE® mark.

7              In a lengthy opinion published in December 2007, the PTO rejected the

8    application due to the obvious likelihood of confusion with the incontestable

9    STONE® mark.  *In re Trademark Application No. 77284994 – STONES*, PTO Dkt.

10   No. 4060KE-1027 (Dec. 3, 2007) (RJN at Ex. 7).  The PTO carefully examined each

11   of the factors relevant to likelihood of confusion and correctly found that consumers

12   would be confused as to the source of the goods:

13              Since the respective marks are essentially identical, the
              only issue before the examining attorney is whether the ap-
14            plicant's goods are so related to the registrant's goods that
              confusion as to source of origin or sponsorship is likely to
15            occur. The examining attorney must conclude that they are
              so related, for it is foreseeable that customers of the appli-
16            cant might encounter the registrant's respective goods and
              mark in the marketplace given similar channels of trade
17            within which the identified goods travel. Specifically, it is
              likely that the applicant's beer and the registrant's beers
18            and ales will be marketed, advertised and ultimately sold or
              offered in the same or similar fashions.
19
              Confusion as to source of origin or sponsorship is ex-
20            tremely likely if [MillerCoors'] proposed mark is allowed
              to register. Registration is therefore refused by the examin-
21            ing attorney.

22   (*Id.*) Defendant did not dispute, contest or otherwise appeal the PTO's determination.

23   (*Id.* at Ex. 6.)  Rather, it abandoned the application.  (*Id.*)

24            In 2010, Defendant again attempted to tread onto Stone's name, this time in

25   connection with a catch-phrase, "HOLD MY STONES."  (RJN at Ex. 8.) Stone

26   notified the USPTO that it would oppose the registration.  (*Id.* at Ex. 9.) On

27

28

                                                          7                    Case No. 18-cv-0331-BEN-JMA
     PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
                    MOTION FOR PRELIMINARY INJUNCTION

1  November 9, 2010, Defendant acknowledged that further registration efforts would

2  be futile and permanently abandoned the application as of November 23, 2010.  (*Id*.)[1]

3      **D.**    **Sales and Industry Overlap**

4      Keystone and STONE® are sold in virtually all of the same channels and

5  enjoy significant industry and commercial overlap as national brands. The parties'

6  beers are sold in the same aisle at thousands of retailers, bars, restaurants and liquor

7  stores across the country.  STONE® and Keystone also share the same beer

8  distributors, and over fifty of Defendant's regional brand "houses" have distributed

9  STONE® beer alongside Keystone.  (*Id*. at ¶ 41.)

10      Stone and Keystone beers also appear at the same beer festivals and

11  conventions, such as the Great American Beer Festival in Denver, Colorado.  (*Id*. at ¶

12  42.) Last year STONE® was awarded gold for its STONE® "Witty Moron" brew in

13  the Belgian-Style Ale category.  (*Id*. at ¶ 31.) Defendant did not take home any

14  awards, either for its namesake brands or its two craft beers that also attended. (*Id*.)

15      Unsurprisingly, Defendant's corps of beer industry staff writers are fans of the

16  STONE® brand, acknowledging that Stone is a "nationally distributed brewer[],"

17  and one of "the biggest and most well-established craft brewers."  (*Id*. at ¶ 43.) Its

18  representatives consistently acknowledge that in the world of beer, there is only one

19  company that goes by the STONE® name, identifying Plaintiff simply as "Stone" in

20  its articles.  (*Id.* ("Stone plans this month to release a New England-inspired double

21  IPA called Nor'East Nod in large-format bottles as part of its 21st anniversary

22  series.").)

23      **E.**    **Defendant's Rebrand of Keystone as "STONE"**

24      After years of declining or stagnant sales, in 2017, Defendant's executives

25

26  [1] Stone is aware that Defendant has attempted to place before the Court the parties' privileged settlement communications related to Defendant's abandoned application

27  for the tagline.  Answer/CC at 15:12-17:18. The communications demonstrate commercial settlement discussions protected by Fed. R. of Evid. 408.  Moreover, during

28  the entire period, Stone maintained its opposition to the tagline, which Defendant abandoned.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

1  decided to fundamentally change the design of Keystone's beer can, logo and related

2  branding.  Defendant's representatives explained that consumer research showed that

3  beer drinkers "thought Keystone Light was a dying brand." (STONE Decl. ¶ 49.)

4  Rebranding Keystone would rejuvenate sales by "capturing the interest of

5  consumers" so as to "forg[e] a long-term relationship with them."  (*Id.*)  Even

6  Defendant's 2016 SEC Form-10K disclosed the upcoming change—"we are

7  implementing a range of new initiatives to boost our economy portfolio" which the

8  "Keystone family plans to unveil new packaging early this year." (RJN at Ex. 10.)

9      Defendant apparently believed that capturing the STONE® name would be

10  good for business.  In early 2017, Defendant quietly announced the rebrand through

11  an online video that has since been scrubbed from Defendant's "MillerCoors TV"

12  webpage after this suit was filed. (STONE Decl. at ¶ 50.) In the video, an archived

13  copy of which remains indirectly accessible online, Defendant's Economy Brand

14  Manager, Sean Robberson, stated that Defendant is "leaning in" to "Stone," and that

15  "through the packaging and turning media back on," this rebrand would "be big

16  business for all of us."  (*Id.*)

17      A short time later, in April 2017, Defendant published an online blog post

18  officially announcing the rebrand of Keystone to "STONE."  (STONE Decl. at ¶ 51.)

19  It stated that Keystone would be launching "a refreshing new look" and that the can

20  would be relabeled from its historic "Keystone" mark to a can that "plays up"

21  STONE.  (*Id.*)

22      Defendant described the rebrand as a "new design" and stated that it would be

23  accompanied by "new marketing" which would be used "across every touch point to

24  create a refreshed and bold brand experience."  (STONE Decl. at ¶ 51.)[2] Other than

25  Defendant's own promotion, this news was not picked up by major media sources.

26  (*Id.*)

27  _____

28  [2] The Article also stated that the "new packaging" would also extend to the Keystone Ice and Keystone Premium products. (*Id.*)

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

In July 2017, Defendant changed the Keystone Light Facebook profile to separate out the "KEY" and "STONE" on separate lines. (STONE Decl. at ¶ 52.) Thereafter, the photos posted on Facebook took on a marked shift.  In virtually every photograph posted, Keystone Light cans were positioned to emphasize "STONE," with significantly less visibility of the "LIGHT" component.  In most cases, "KEY" was entirely or mostly obscured. (STONE Decl. at ¶ 53; *see* Demonstrative A.iii.)

Similar advertising campaigns began to feature the redesigned Keystone can, often accompanied by slogans or taglines such as the August 2017 campaign to "Hunt the STONE."  (STONE Decl. at ¶ 54.) In images used with the campaign, Defendant strategically isolated its beer cans so that only "STONE" would be visible. (*Id.*; *see* Demonstrative A.iv.)

Defendant likewise encouraged Keystone consumers to begin calling the brand "Stone".  For example, Defendant's 2016 "Can Hunt" contest changed from challenging buyers to post images of a "mounted Northern Pike" to persuading consumers to refer to Keystone Light as "Stone." (*Id.* at ¶ 54; *see Demonstrative A.v.*)

## F.   Defendant's Plan to Escalate Infringement

### 1.   Sales Uptick After Keystone's Infringement

Defendant's executives lauded the success of Keystone's infringing rebrand, and ordered an acceleration in the distribution of "STONE" Keystone.  In September 2017, Defendant celebrated that "a quiet revolution was underway in Nielsen's weekly list of the top 10 growth brands in the beer industry."  (STONE Decl. at ¶ 49.) Namely, Keystone was now "the top economy brand on the list […] buoyed by a brand renovation." (*Id.*)

Thereafter, Defendant planned to move forward on all cylinders.  In October 2017, Defendant's CEO Gavin Hattersley previewed their strategy: "We're leaning in" and "We're confident we have the right plan to get to growth, and we're

1    continuing to execute with relentless focus."[3]  (STONE Decl. at ¶ 66.) After

2    November, Defendant substantially increased its social media activity.  (*Id.* at ¶¶ 51-

3    54.) Whereas Defendant had only averaged approximately four posts per month from

4    April 2017 through November 2017, Defendant made 10 posts to its Facebook

5    account in December 2017 alone, highlighting the infringing can and "STONE"-

6    centric taglines. (*Id.* at ¶ 19.)

7                       **2.**       **Strategic Marketing of Infringing "STONE" Rebrand**

8          Only recently has Stone learned the sheer geographic scope of Defendant's

9    infringing marketing.  Going beyond product labeling and advertising, Defendant has

10    been using other mechanisms to drive home its "STONE"-centric rebrand.

11          On roadways, Defendant's delivery trucks and billboards highlight "STONE"

12    as a primary brand signifier, i.e., rather than the tiny "Keystone" that serves as a

13    footnote.  (STONE Decl. at ¶¶ 77-78; *see* Demonstrative A.vi.)

14          Keystone's suppliers, merchandisers, and retailers have been instructed to

15    display the rebranded cans with the "STONE" side facing outward.  The result is to

16    deconstruct the prior "KEYSTONE" brand and present Keystone light as "STONE"

17    to consumers browsing beer aisles and shelves, as seen in "candid" photos of

18    Keystone as it appears in retail stores.  (STONE Decl. at ¶¶ 69-76; *see* Demonstrative

19    A.vii.)

20        **G.**      **Consumers Are Confused by Defendant's Infringing "STONE"**
            **Beer**

21

22          Defendant's methodical efforts to co-opt Plaintiff's STONE® mark through its

23    new, unrecognizable "STONE" brand are causing confusion and have enabled

24    Defendant to siphon off the goodwill and reputation of Plaintiff's STONE® Marks.

25    Both before and after the filing of this action, Stone has heard from customers

26

27    [3] Mr. Hattersley had firsthand knowledge of the Keystone plan, having served as the

28    direct supervisor of the marketing team during the roll-out of the infringement campaign.  (STONE Decl. at ¶ 66.)

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

1   reporting confusion with Defendant's rebranded Keystone products.  (STONE Decl.

2   at ¶¶ 56-65.)

3       In December 2017, Stone received an email from a consumer asking: "Any

4   upcoming news regarding Stone Lite?"  (STONE Decl. at ¶ 56.)  For a brand that has

5   spent over 20 years adamant that it does not brew light beer, this was a stinging blow.

6   (*Id.* at ¶ 57.)  Thereafter, Stone has begun to discover the extent of the consumer

7   confusion that was occurring nationwide.  As detailed *infra*, consumers are using

8   social media to voice complaints, alerts and other surprises at Stone's apparent

9   launch of a light beer.  (*Id.* at ¶¶ 56-65.)

10       **H.**    **Scientific Survey of Consumers Shows Overwhelming Confusion**

11       In response to Defendant's action, Stone commissioned a well-regarded

12   marketing expert, Professor David Stewart, Ph.D., to design a controlled, scientific

13   survey to determine the precise level of confusion caused by Defendant's rebranding

14   of Keystone as "STONE."  (Stewart Decl. at ¶ 1.) Dr. Stewart designed a "Squirt"

15   survey (the "Survey") which asked targeted, non-suggestive questions of 501 beer

16   consumers using actual images and in-store displays as stimuli.  (*Id.* at ¶ 2.)  The

17   Survey used three third party beer brands as control groups, *Busch Light*, *Rolling*

18   *Rock* and *Pabst Blue Ribbon*, to distinguish any ambient or background confusion.

19   (*Id.* at ¶ 3.)

20       According to Dr. Stewart, the results show an extraordinary level of confusion

21   between the parties' competing "STONE" products and advertising:

22       •    43% of beer consumers report that Keystone's new beer label is likely

23   owned by, endorsed by or otherwise affiliated with Stone's incontestable STONE®

24   mark.  (*Id.* at ¶¶ 4-6.)

25       •    Keystone's new label produces "net confusion" of more than 25%

26   compared to other brands on the market.  (*Id.*)  This is substantially above the

27   threshold amount of 10-15% accepted in the Ninth Circuit, and far above all three

28   control brands.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

1    • Almost no net confusion was caused by Keystone's historic
2    "KEYSTONE" beer label, which had a net confusion score of only 4.7%, less than
3    the amount of confusion generated by the *Rolling Rock* control. (*Id.* at ¶ 6.)



**Net Confusion with STONE®**

16    • Existing STONE® beer consumers were just as likely to be confused as
17   non-STONE® beer drinkers by Defendant's use of the word "STONE". (*Id.*)
18    In his conclusion, Dr. Stewart opines that Defendant's new "STONE"-centric
19   beer can is causing a material and devastating shift in the way that beer drinkers
20   interact with Stone's brand, and that the STONE® mark is experiencing substantial
21   and long-term brand damage due to source confusion with Defendant's inferior
22   Keystone products. (*Id.* at ¶ 89.)

23   **I.    Defendant's Infringement Is Accelerating**

24    Defendant's rebranding campaign has gathered even more momentum in
25   recent weeks.  Two days after the filing of the lawsuit, Defendant reported in its 2017
26   SEC Form-10K that "[o]ur below premium brand volumes show a trend
27   improvement relative to recent years *led by the Keystone family*."  (RJN at Ex. 11

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

1  (emphasis added).)  During a call with investors and analysts, Defendant's CEO, Mr.

2  Hattersley specifically highlighted Keystone as having the best performance in eight

3  years. (STONE Decl. at ¶ 66.)

4      Defendant's exuberance for its newly adopted "STONE" cans is reflected on

5  store shelves.  Three weeks after this lawsuit, Defendant submitted a planogram

6  ("POG"), the visual plan which designates the placement of products on the shelves,

7  to retailers to reflect the continued intent to emphasize "STONE."  (STONE Decl. at

8  ¶ 69; *see* Demonstrative A.viii.)

9      In Defendant's Winter 2018 trade publication, Defendant announced the name

10  of the 2017 infringement campaign—"Owning the 'Stone'— disclosing that it would

11  be increasing its "equity-driven program" to co-opt the STONE mark, "through the

12  use of bold retail POS that (literally) breaks through."  (STONE Decl. at ¶ 79.)

13      Defendant also is in the process of using its size and control of the distributing

14  channels to saturate the market with its rebranded "STONE."  For example,

15  Defendant has disclosed the plans for a "STONE"-centric Summer 2018 marketing

16  campaign.  (STONE Decl. at ¶ 80.)

17    **J.    Stone is Suffering Long Term Irreparable Harm**

18      In many ways, the injury to Stone's brand is existential to the company.  Its

19  STONE® mark and goodwill are being counterfeited by one of the world's largest

20  beer companies – an effort designed to mislead consumers that Keystone is affiliated

21  with Stone.  Even now, consumers are reporting bewilderment at finding that Stone

22  has launched a light beer – a concept that is anathema to Stone's founding principles

23  and existence.  (STONE Decl. ¶¶ 56-65.) As noted by Stone's President and Co-

24  Founder, Steve Wagner: "We are everything that MillerCoors is not: craft-based, in-

25  dependent, focused on quality, iconoclastic, with founders still involved in the busi-

26  ness. We also hate light beer and have pledged to our fans that we will never sell

27  out."  (*Id*. ¶ 83.)

28

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

Stone's expert, Dr. Stewart, notes that the association with Keystone not only damages Stone's goodwill with existing consumers, but also undermines its relationship with potential new consumers – lost sales that will be almost impossible to quantify. (Stewart Decl. ¶ 89.) Indeed, consumers who have not consumed Stone in the past will increasingly be likely to mistake STONE® beer for some kind of line extension or outgrowth of Keystone's revamped "STONE" label.  Once it occurs, such "reverse confusion" will be impossible to fully repair.

## ARGUMENT

Courts are empowered "to grant injunctions, according to the principles of equity and upon such terms as the Court may deem reasonable" so as to prevent irreparable harm stemming from trademark infringement. 15 U.S.C. § 1116(a); FRCP 65(b).  A party seeking a preliminary injunction must make a "clear showing" of: (1) a likelihood of success on the merits, (2) a likelihood of irreparable injury to the plaintiff if injunctive relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) an advancement of the public interest. *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014).

As demonstrated below, Stone is entitled to injunctive relief because it is virtually certain to succeed on the merits, and Defendant's escalating infringement of the STONE® mark is causing irreparable and irreversible harm to Stone's trademark, goodwill and business.

## I.   THE TRUE STONE® HAS A STRONG LIKELIHOOD OF SUCCESS ON ITS TRADEMARK INFRINGEMENT CLAIM

To prevail on its trademark infringement claims, Stone must show: (1) that it owns a valid, protectable trademark, and (2) that Defendant's infringing mark is likely to "cause confusion, or to cause mistake, or deceive."  *KP Permanent Make-Up, Inc. v. Lasting Impression, Inc.*, 543 U.S. 111, 117 (2004).  Defendant's willful copying of the STONE® mark is a classic example of infringement under applicable Ninth Circuit precedent.  Moreover, the net confusion amongst beer drinkers

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

1  demonstrated in Stone's study of beer drinkers (25%) is significantly higher than the
2  10-15% minimum threshold accepted in the Ninth Circuit for issuance of a
3  preliminary injunction.  *See Warner Bros. Entm't v. Glob. Asylum, Inc.*, No. CV 12-
4  9547 PSG CWX, 2012 WL 6951315, at *9 (C.D. Cal. Dec. 10, 2012), *aff'd*, 544 F.
5  App'x 683 (9th Cir. 2013) (TRO granted where survey showed net confusion of 16-
6  24%); *Hansen Beverage Co. v. Cytosport, Inc.*, No. CV 09-0031-VBF(AGRX), 2009
7  WL 5104260, at *16 (C.D. Cal. Nov. 4, 2009) (12.5% net confusion; preliminary
8  injunction granted); *CSC Brands LP v. Herdez Corp.*, 191 F. Supp. 2d 1145, 1152
9  (E.D. Cal. 2001) (15% *gross* confusion; preliminary injunction granted).

10  **A.    Stone's Incontestable STONE® Mark**

11  The Ninth Circuit has long recognized that the registration of a mark "on the
12  principal register in the patent and trademark office constitutes prima facie evidence
13  of the validity of the registered mark and of [the registrant's] exclusive right to use
14  the mark on the goods and services specified in the registration." *See, e.g.*,
15  *Interstellar Starship Servs. v. Epix, Inc.*, 184 F.3d 1107 (9th Cir. 1999); *Applied
16  Information Sciences Corp. v. eBay*, 511 F.3d 966 (9th Cir. 2007).  And, upon a
17  declaration of incontestability, "the registration shall be conclusive evidence of the
18  validity of the registered mark and of the registration of the mark, of the registrant's
19  ownership of the mark, and of the registrant's exclusive right to use the registered
20  mark in commerce."  15 U.S.C.A. § 1115(b).

21  Stone has carefully crafted and preserved its trademarks since first registering
22  the STONE® trademark with the U.S. Patent and Trademark Office in June 1998
23  under U.S. Registration No. 2168093.  The strength of Plaintiff's STONE® brand
24  and commercial success exponentially increased over the course of the next 10 years
25  and became incontestable in June 2008. (Stewart Decl. at ¶ 18; RJN at Ex. 4.)

26  As an incontestable mark, Plaintiff's STONE® Mark is afforded the gamut of
27  heightened protections—conclusive evidence of validity of the Mark, of Stone's
28  ownership of the mark, and exclusive right to use the registered mark in commerce.

15 U.S.C. § 1115(b); *Clamp Mfg. Co., Inc. v. Enco Mfg. Co., Inc.*, 870 F. 2d 512, 514 (9th Cir. 1989) ("incontestable status provides the mark with a conclusive presumption of validity").

### B.  Defendant's Attempt to Misappropriate "STONE" Creates Obvious Likelihood of Confusion

Stone also is likely to prevail on its claim that Defendant's use of "STONE" on its beer cans is likely to cause consumer confusion; in fact, evidence of actual confusion already exists.  Courts in the Ninth Circuit apply the eight-factor *Sleekcraft* factors from *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979): (1) strength of plaintiff's mark; (2) relatedness of the goods; (3) likely degree of purchaser care; (4) similarity of the marks; (5) evidence of actual confusion; (6) marketing channels used; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines.  599 F.2d at 348-49.  The relative importance of each factor is case-specific; the factors are "intended as an adaptable proxy for consumer confusion, not a rote checklist."  *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999).

Here, in addition to satisfying the other factors, the evidence of actual confusion and Stone's survey of beer drinkers demonstrates significant levels of confusion that courts in similar cases in this Circuit almost uniformly have enjoined at the preliminary injunction stage.  The same goes for the willful nature of Defendant's incursion on Plaintiff's STONE® territory, *i.e.*, its knowledge from prior experience before the PTO that adopting Stone's name would cause outright confusion amongst beer drinkers.

### 1.  Strength of Mark: The STONE® Mark is Rock Solid

The strength of a trademark is based on its distinctiveness.  *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768-69 (1992).  The spectrum of distinctiveness ranges from the weakest generic or descriptive marks, which merely describe the product being sold, to the strongest arbitrary or fanciful marks. *Two Pesos*, 505 U.S.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

1    at 768-69.  Arbitrary and fanciful marks are the strongest class of trademarks because

2    "their intrinsic nature serves to identify a particular source of a product," rather than

3    a quality of the product itself.  *Two Pesos*, 505 U.S. at 768-69.  As such, "arbitrary

4    marks merit the strongest protection" to preserve their source-identifying function

5    and resulting goodwill.  *FAZE Apparel, LLC v. Faze Clan, Inc.*, No. 2:18-cv-02052

6    RGK (JEMx), slip op. at 5 (C.D. Cal. May 22, 2018) (Where "Plaintiff's marks are

7    conceptually strong… any association consumers have between its marks and its

8    products is likely the result of goodwill meriting broad protection").  Further, if the

9    mark is incontestable, certain infringement defenses are not available, such as

10   arguing that the mark is merely descriptive.  *Clamp Mfg. Co., Inc*, 870 F. 2d at 514

11   ("incontestable status…prevents a defense to infringement on the grounds that the

12   mark is merely descriptive.")

13        As evidenced by the story of its origin, the STONE® Mark is arbitrary and

14   inherently distinctive. (STONE Decl. at ¶ 3.)  It does not describe Stone's products,

15   but was selected simply because Stone's founders Greg Koch and Steve Wagner

16   liked the name.  (*Id.*)  The goodwill attached to the STONE® mark is due entirely to

17   its association with Plaintiff and its brews.  *See FAZE Apparel,* slip op. at 5.

18   Accordingly, the STONE® Marks are classic arbitrary marks that serve solely as a

19   source identifier for Plaintiff's absurdly good beer.

20        In addition to its conceptual strength, the STONE® Mark's commercial

21   strength has grown exponentially since 1996 through Stone's substantial investments

22   in, and promotion of, its unapologetic brand—expanding from selling in all 50 states

23   to internationally, opening a Stone World Bistro & Gardens™ in Berlin, Germany,

24   and becoming the eighth largest independent craft brewer in the United States. (*Id.* at

25   ¶ 12.)  Because Plaintiff's STONE® Mark is conceptually and commercially strong,

26   this factor weighs in favor of a preliminary injunction as a matter of law.

27

28

## 2.    Relatedness of Goods: Beer and Beer

"Related goods are those products which would be reasonably thought by the buying public to come from the same source if sold under the same mark." *Sleekcraft*, 599 F.2d at 348 n. 10.  "Where goods are related or complementary, the danger of consumer confusion is heightened." *E & J Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1291 (9th Cir. 1992).  When it comes to alcoholic beverages, courts have held that consumers are likely to use a relatively low degree of care when selecting products, thus increasing the likelihood of confusion between related products using similar marks. *Fleischmann Distilling Corp. v. Maier Brewing Co.,* 314 F.2d 149, 159–60 (9th Cir. 1963) (the average consumer purchasing beer "would probably not concern himself about any such detail" such as who was "actually brewing and bottling" or "whether it was being produced under their supervision or pursuant to some other arrangement."); *Anheuser-Busch, Inc. v. Customer Co.*, 947 F. Supp. 422, 425 (N.D. Cal. 1996) ("because beer is a relatively inexpensive product, consumers are not likely to use great care in selecting beer"); *Guinness United Distillers & Vintners B.V. v. Anheuser–Busch, Inc.,* 2002 WL 1543817, at *6 (S.D.N.Y. July 12, 2002) ("high end" beer and Scotch whiskey constitute "relatively low cost products, and the average consumer is not likely to seek to identify the true manufacturer of these products."); *Fiji Water Co., LLC v. Fiji Mineral Water USA, LLC,* 741 F.Supp.2d 1165, 1180 (S.D. Cal. 2010)(even though considering "premium" beverages, "purchase is made on impulse by consumers while they are in store.").

Here, there is an even stronger likelihood of confusion.  Any beer consumer that walks into a grocery store and asks for "Stone" beer, is more likely to be directed to Stone's selection, which has born the STONE® mark since its inception, then they are to Defendant's Keystone beer.  This confusion is only magnified when applied to all beer drinking scenarios—in bars, at restaurants, at sports events, social occasions, and the list goes on.  In fact, actual beer consumers specifically identified

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

1  Defendant's rebranded emphasis of "STONE" on its cans as the cause of the false

2  association with Plaintiff's STONE® beer. (STONE Decl. at ¶¶ 56-65; Stewart Decl.

3  at ¶ 6.)

4  　　　The Ninth Circuit's analysis of confusion in the alcohol industry in

5  *Fleischmann Distilling Corp.* is instructive.  The Court contemplated the expected

6  experience of the average consumer when confronted with the alcoholic beverages—

7  "What are we to say about the same purchaser who starts for home on a hot evening

8  and decides to take home beer for refreshment? He stops at Ralphs and notes beer

9  bearing the label 'Black & White' in that store's stock. We think it to be plain that the

10  likelihood of confusion and mistake is present here" in that he would be likely to

11  believe "that the maker of the beer had some connection with the concern which had

12  produced the well known Black & White Scotch whisky."  *Id.*, 314 F.2d at 155, 59-

13  60.  As Justice Pope explained, "we are dealing here with operations in the alcoholic

14  beverage industry. It seems to us that necessarily the use on defendants' alcoholic

15  beverage of [plaintiff's] trademark would be likely to cause confusion or mistake or

16  to deceive purchasers as to the source of origin of such goods."  *Id.*, 314 F.2d at 156.

17  　　　The present case is much stronger than *Fleischmann*, which at least involved

18  different types of alcohol sold in different parts of a liquor store.  Here, both Stone

19  and MillerCoors are selling the same good (beer), through the same channels

20  (grocery, supermarket, bars, restaurants, liquor stores, online), using the same

21  distributors (over fifty of them), and using the same name ("STONE").

22  　　　Defendant is likely to argue that Stone's status as a craft brand somehow

23  insulates it from consumer confusion – but marketing evidence shows otherwise.

24  The Fleischmann court squarely rebuffed that analysis.  *Fleischmann Distilling*

25  *Corp.*, 314 F.2d at 159-60 (beer and whiskey are "so related as to fall within the

26  mischief which equity should prevent"); *see also*, *POM*, 775 F.3d at 1127 (even

27  "fruit-juice beverages and fruit-flavored energy drinks are sufficiently

28  complimentary and related").  Moreover, in this case, Dr. Stewart found that

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

consumers are readily willing to associate Stone with Defendant's "big beer" Keystone brand, mistakenly believing that there is a formal ownership, association or endorsement between the two companies.  (Stewart Decl. at ¶ 6.) Dr. Stewart notes that not only are a majority of Stone's consumers willing to associate the brands with each other, but that such source confusion will continue to occur.  (Stewart Decl. at ¶ 7 (Defendant's rebranded can generating more than 25% net confusion with Plaintiff's STONE® beer).)  As such, this *Sleekcraft* factor strongly favors Stone.

### 3.    Similarity of Marks: STONE® Beer versus "STONE" Beer

A "critical question in the likelihood-of-confusion analysis" is the similarity of the marks at issue.  *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000).  Similarity is tested on three levels: sight, sound and meaning, where the court weighs similarities between the marks more heavily than their differences. *Brooklyn Brewery Corp. v. Black Ops Brewing, Inc.*, 156 F. Supp. 3d 1173, 1179 (E.D. Cal. 2016); *GoTo.com, Inc.*, 202 F.3d at 1205. When, as here, a defendant is using identical marks "with identical products or services, likelihood of confusion would follow as a matter of course." *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 432 (9th Cir. 2017); *Brookfield Commc'ns Inc.*, 174 F.3d at 1056.

Defendant has rebranded "Keystone" beer so that its primary source identifier is "STONE."  (STONE Decl. at ¶¶ 49-54.)  It has instructed retailers to display the cans so that "KEY" is obscured.  (*Id.* at ¶¶ 69-76.)  It has produced in-store displays on which only "STONE" is visible.  (*Id.* at ¶ 55.) In so doing, Defendant has adopted Plaintiff's STONE® Mark to market an identical product—beer.  Such copying is presumed to create a likelihood of confusion "as a matter of course." *Stone Creek*, 875 F.3d at 432.  But drawing such a presumptive conclusion is not even necessary in this case, since actual consumer response and survey responses evidence the confusion generated in the market by nature of Defendant's rebrand.  (STONE Decl. at ¶ 61 ("I almost fell for it…It was with the cheaper beers as an individual can to buy.  I thought nice, a cheap stone, I'll try this one out…"); Stewart Decl. at ¶¶ 6-7.)

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

### 4. Marketing Channels: Plaintiff and Defendant Utilize Nearly Identical Marketing Channels

STONE® and Keystone share the same channels of trade and distribution, easily satisfying *Sleekcraft's* notation that "Convergent marketing channels increase the likelihood of confusion." 599 F.2d at 353.[4]  Stone and Defendant both sell through thousands of the same stores, restaurants, pubs and liquor stores.  (Stewart Decl. ¶ 23.) The products literally are seen on the same aisle. (*Id.* ¶ 24.)  The brands also advertise and sell merchandise through their corresponding websites, market via the same social media channels (including Facebook, Twitter, and Instagram), and use similar in-store displays and brand packaging. (STONE Decl. at ¶¶ 27, 37, 39.) In fact, Defendant controls some of Stone's marketing channels by virtue of its affiliations with distribution houses through which Stone distributes its beer in certain regions.  (*Id.* at ¶ 27.)

This holistic overlap in marketing channels is more than sufficient to increase the risk, and reality, of consumer confusion, which the PTO itself recognized back in 2008 in denying Defendant's "STONES" application.  *In re Trademark Application No. 77284994 – STONES* ("it is foreseeable that customers of the applicant [Defendant] might encounter the registrant's [Stone] respective goods and mark in the marketplace given similar channels of trade within which the identified goods travel").  *See also Anheuser-Busch,* 947 F. Supp. at 425 (convergent marketing channels favored injunction where plaintiff's beer was "distributed through a broad range of supermarkets, liquor stores and convenience stores.").

This *Sleekcraft* factor weighs strongly in Stone's favor.

### 5. Defendant's "STONE" Rebrand Creates Actual Confusion

Although not required, evidence of actual confusion constitutes "proof positive" of the likelihood of confusion factor. *See E. & J. Gallo Winery*, 150 F.3d at

---

[4]  When parties offer and advertise competitive products in identical channels of trade, this factor weighs strongly in Plaintiff's favor. *YKK Corp. v. Jungwoo Zipper Co., Ltd.*, 213 F. Supp. 2d 1195, 1205 (C.D. Cal. 2002); *Brookfield Commc'ns, Inc.*, 174 F.3d at 1054 (direct competition is an "important" factor in favor of injunction).

1047 n.7; *Clicks Billiards Inc. v. Sixshooters. Inc.*, 251 F.3d 1252, 1265 (9th Cir. 2001). "In the Ninth Circuit, district courts often rely on three types of evidence to demonstrate actual confusion: (1) evidence of actual instances of confusion; (2) survey evidence; and (3) inferences arising from judicial comparison of the conflicting marks and the context of their use in the marketplace." *HM Elecs., Inc. v. R.F. Techs., Inc.*, No. 12-CV-2884-MMA (WMC), 2013 WL 12074966, at *5 (S.D. Cal. Oct. 3, 2013).

Here, there is both scientific and actual evidence of consumer confusion, conclusively weighing this factor in favor of injunction.

### a.    Actual Consumer Statements of Confusion

Beer consumers have shared their personal experiences of actual confusion in the market, constituting "persuasive proof" that future confusion will occur. *Sleekcraft,* 599 F.2d at 352. These consumer statements detailed how consumers were victims to initial interest confusion— "I legit almost bought one" and that a consumer saw Defendant's rebranded "STONE" can and was surprised that "stone has a light beer now?!" (*See* STONE Decl. ¶¶ 61-62.)

The consumer statements also illustrate the detrimental effect Defendant's infringement has and will have on Stone's goodwill and investment in the STONE® brand. Consumers have stated: "The first thing I thought when seeing them in the aisle was, "Stone's branding has gone to shit."; and "when I saw [Defendant's] can I immediately thought damn I didn't think Stone made light beer." (*Id*. ¶ 63.)

Particularly concerning is the consumer inquiry Stone received regarding its "Stone Lite" beer in December 2017. (*Id*. ¶ 56.) Such evidence of actual confusion supports issuance of a preliminary injunction, particularly given the market in which the parties compete. When goods are inexpensive, as alcoholic beverages are, "[p]urchasers are unlikely to bother to inform the trademark owner when they are confused about an inexpensive product." 4 McCarthy on Trademarks and Unfair Competition § 23:18 (5th ed.) (citing *Beer Nuts, Inc. v. Clover Foods Co.,* 805 F.2d

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

1   920, 928 (10th Cir. 1986)); *see also*, *Au-Tomotive Gold, Inc. v. Volkswagen of*

2   *America, Inc.*, 457 F.3d 1062, 1077 (9th Cir. 2006) (considering the fact that the case

3   "involves a national market and a low degree of consumer care," the challenge to the

4   extent of consumer confusion evidence was not "particularly noteworthy").

5       Coupled with survey evidence, this contemporaneous inquiry submitted

6   directly to Stone at the time Defendant was saturating the market with its infringing

7   "STONE" Light beer, indicates that confusion is occurring in the marketplace.

             **b.**      **Scientific Survey Evidence Shows Massive Confusion**

9       "Survey evidence may establish actual confusion" under the Lanham Act.

10   *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 902 (9th Cir. 2002).

11   Accordingly, "[s]urveys are commonly introduced as probative evidence of actual

12   confusion." *Playboy Enterprises, Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020,

13   1026 n. 28 (9th Cir. 2004). Though not required to prove infringement, survey

14   evidence is weighted heavily where available and is often dispositive. *See, e.g.,*

15   *Thane*, 305 F.3d 894 at 902 (plaintiff's survey showing 27.7% consumer confusion

16   was sufficient on its own to support finding of actual confusion; summary judgment

17   for defendant reversed).

18       At the preliminary injunction stage, survey evidence is more than sufficient to

19   establish the "actual confusion" factor of the *Sleekcraft* test. *CytoSport, Inc. v. Vital*

20   *Pharm., Inc.*, 617 F. Supp. 2d 1051, 1075–76 (E.D. Cal. 2009), *aff'd*, 348 F. App'x

21   288 (9th Cir. 2009) ("It is sufficient for a preliminary injunction motion that plaintiff

22   has proffered survey evidence as some evidence of actual confusion"). Indeed,

23   producing survey evidence far exceeds the minimum showing required to obtain

24   preliminary relief against infringement. *See, e.g., Maxim Integrated Prod., Inc. v.*

25   *Quintana*, 654 F. Supp. 2d 1024, 1035 (N.D. Cal. 2009) ("Since actual confusion is

26   difficult to prove, it is not necessary to do a survey before obtaining a preliminary

27   injunction") (granting preliminary injunction in absence of survey).

28

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

1     Courts in the Ninth Circuit focus on survey evidence of "net confusion,"

2   which is defined as the "measure of a mark's unique level of confusion above a

3   normal baseline." (Stewart Decl. ¶ 5; *see Thane*, 305 F.3d at 902 (crediting survey by

4   Dr. Stewart showing 27.7% net confusion attributable to defendant's mark).)  Using a

5   control group, the net confusion score eliminates ambient confusion and

6   "background noise" in order to isolate the unique level of confusion caused by the

7   infringing mark.  *See CytoSport,* 617 F. Supp. 2d at 1075 (deriving "net confusion"

8   score of 25.4%, granting preliminary injunction).

9     Net confusion scores of 20% and above are generally sufficient to establish

10  actual confusion.  *See Adidas Am., Inc. v. Skechers USA, Inc.*, No. 16-35204, 2018

11  WL 2142648, at *5 (9th Cir. May 10, 2018) (affirming preliminary injunction in part

12  where "actual confusion" evidence consisted of survey showing 20% confusion);

13  *Fiji*, 741 F. Supp. 2d at 1179 (preliminary injunction granted where sole "actual

14  confusion" evidence was survey showing 24.3% net confusion); *Thane*, 305 F.3d at

15  902 (survey showing 27.7% net confusion was sufficient on its own to support

16  finding of likely confusion at trial).  At the preliminary injunction stage, such levels

17  far exceed the minimum requirements for injunctive relief.  Indeed, confusion

18  between 10% and 15% has been deemed substantial for purposes of granting a

19  preliminary injunction when other *Sleekcraft* factors are present, as they are here.

20  *See CytoSport,* 617 F. Supp. 2d at 1076 ("courts [in the Ninth Circuit and elsewhere]

21  have accepted survey results well below the 25% net confusion, reported by plaintiff

22  here, to support a finding of likelihood of confusion") (collecting cases); additional

23  cases cited *supra* at pp. 18-19.

24    Dr. Stewart's *Squirt* survey shows an overwhelming likelihood of confusion

25  between the parties' brands.  Over 400 beer consumers took the survey, answering

26  non-leading questions in a controlled format.  Survey respondents viewed actual

27  images and in-store displays of STONE® and Keystone beer, as well as third party

28  beer brands being used as control stimuli.  (Stewart Decl. at ¶¶ 33-35.)

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

The results are summarized in Table 1, *supra* ("Net Confusion – 2018 Survey of Beer Drinkers").  It shows that 25% of beer consumers, on average, wrongly confuse Keystone's redesigned 2017 beer can and packaging with STONE® beer. (*Id*. ¶¶ 5-6.)  Conversely, Keystone's old, pre-2017/18 can design induced almost no unique confusion, with less than 5% of consumers reporting any association between Keystone and STONE®.  (*Id*. ¶ 6.) The same was true of other control brands, *Pabst Blue Ribbon* (negative confusion), *Busch Light* (negative confusion), *Rolling Rock* (9% confusion).  (*Id*.) Respondents' open-ended answers likewise supported these results, with consumers identifying the confusing similarity of Keystone's redesigned can with that of Stone.  (*Id*.)

Even at the preliminary injunction stage, Stone has already produced evidence that would support a finding of consumer confusion at trial.  *See Thane*, *supra*.[5] Accordingly, both forms of confusion evidence (actual and survey) weigh heavily in Stone's favor.

### 6.    Defendant's Rebrand to Infringe on STONE® is Willful and Intentional

When an alleged infringer knowingly adopts a mark similar to another's, courts presume that the defendant can and did accomplish his purpose: that is, that the public will be deceived. *Sleekcraft Boats*, 599 F.2d at 354; *see also Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1394 (9th Cir. 1993) (noting that a plaintiff can likely prevail on its trademark infringement claim if it can prove intent); *Hokto Kinoko Co. v. Concord Farms, Inc.*, 738 F.3d 1085, 1098 (9th Cir. 2013). Accordingly, "knowing use" of a mark that is identical to that of the trademark owner constitutes "strong evidence of intentional infringement and likelihood of confusion."  *Plasticolor Molded Prod* v. *Ford Motor Co.,* 698 F. Supp. 199, 201 (C.D. Cal. 1988).  Equally important, proceeding to use a mark after being rejected

---

[5] In the *Squirt* survey format's namesake case, the Eighth Circuit held that a survey showing 25% confusion "was sufficient to support an inference of likelihood of confusion" at trial.  *SquirtCo. v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980).

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

by the PTO on likelihood-of-confusion grounds establishes intent to infringe under *Sleekcraft*. *FAZE Apparel*, slip op. at 2 (granting preliminary injunction where Defendant used an infringing mark after the PTO "twice rejected its applications because Defendant's proposed marks were confusingly similar to Plaintiff's marks").

Here, Defendant intentionally redesigned its Keystone beer can to emphasize "STONE" despite actual knowledge of Stone's incontestable STONE® trademark and products. In addition to competing against, reading about, and writing about Stone, over ten years ago, Defendant attempted to use "STONES" on its Keystone products and was expressly rejected by the PTO. The PTO's ruling, discussed at length *supra*, unequivocally put Defendant on notice that confusion was "extremely likely" to occur. (RJN at Ex. 7 ("Confusion as to source or sponsorship is extremely likely if [MillerCoors'] proposed mark ["STONES"] is allowed to register. Registration is therefore refused by the examining attorney.").) Defendant abandoned its application rather than losing a contest at the PTO. (*Id.* at Ex. 6.) And, a few years later, Defendant attempted to apply for a STONE-formative mark in connection with the tagline, "HOLD MY STONES." (*Id.* at Ex. 8.) Stone opposed the application and Defendant later abandoned it. (*Id.* at Ex. 9.)

In short, Defendant has been on notice for over a decade that using "STONE" on its beer cans would infringe Stone's mark. Defendant's representatives already were aware of Stone's soaring future as one of the "biggest and most-established craft brewers." (STONE Decl. at ¶ 43.) They also were aware of, and seeking to reverse, Keystone's lagging fortunes and diminished market share. (*Id.* ¶ 49.) Thus, in a highly orchestrated roll-out, in April 2017, Defendant adopted "STONE" as its brand signifier. In doing so, Defendant reasonably must have known that it would be usurping Stone's brand and goodwill – which it has successfully done. Keystone's sales have skyrocketed and the rebranded beer can is now one of Defendant's only growing beers. (*Id.*) Under such circumstances, Courts in this Circuit presume that "defendant can accomplish his purpose: that is, the public will be deceived."

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

*Sleekcraft*, 599 F.2d at 354.

### 7. Defendant's Expansion of Product Line Infringes Upon Plaintiff's Protected Mark

Finally, the expansion of business by a party to compete with the other weighs in favor of finding trademark infringement. *Sleekcraft Boats*, 599 F.2d at 354. Here, the parties already compete directly in the same channels and markets. Indeed, Defendant intends to only further inundate the market with its infringing goods. (STONE Decl. at ¶¶ 79-80.) Because the parties' product lines already overlap, confusion is likely and, indeed, occurring. Defendant's plans to further swamp Stone's mark through expanded offerings to "capture the Stone" only make clear that those efforts are accelerating.

In sum, every single factor under the Ninth Circuit's *Sleekcraft* test shows that confusion is likely and thus weighs in favor of granting a preliminary injunction.

## II. STONE WILL SUFFER IRREPARABLE HARM IF DEFENDANT IS NOT ENJOINED FROM CONTINUED INFRINGMENT

Stone is an iconic California brewery whose identity is being stolen by one of the world's biggest beer conglomerates. The STONE® mark is irreducibly linked to Stone's ethos of independence, craft and critically-acclaimed beer, among other characteristics. *See* Sections A, B. Defendant's ongoing misappropriation of Stone's trademark for its Keystone beer is eroding Stone's uniqueness and value in the market in ways that will never be capable of monetary remedy or compensation alone. This is the gravamen of irreparable harm, the loss of control over business reputation and damage to goodwill. *Herb Reed Enters., LLC v. Florida Entm't Mgmt, Inc.,* 736 F. 3d 1239, 1247 (9th Cir. 2013); *2Die4Kourt v. Hillair Capital Management, LLC*, 2016 WL 4487895, at *7 (C.D. Cal. Aug. 23, 2016), *aff'd* 2017 WL 2304376 (9th Cir. May 26, 2017); J. Thomas McCarty, McCarthy on Trademarks and Unfair Competition § 30:2, 30-10 (4th ed. 2016). Unless Defendant is enjoined from further willful infringement, Stone will continue to suffer irreparable harm in at least the following primary forms:

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

**Diversion of Unknowable and Incalculable Sales**

Stone will be irreparably harmed as Defendant's infringement diverts sales and attention away from the genuine STONE® brand. Diverted sales are a quintessential example of irreparable harm because they cannot be readily ascertained or reduced to money damages in retrospect. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm.") Dr. Stewart's survey demonstrates that an alarming proportion (25%) of beer drinkers mistake Defendant's re-branded Keystone can for STONE®. Indeed, the data confirm that existing STONE® drinkers are *just as likely* to be confused as consumers that have never purchased STONE® before. (Stewart Decl. ¶ 6.) Stone and Keystone are sold in close proximity to one another in stores across the United States. (STONE Decl. ¶ 27.) Not surprisingly, consumers have complained about being confused by Defendant's use of the "STONE" mark and contend to have been deceived into believing a false affiliation between the two brands. (STONE Decl. at ¶ 62 ("…I fell for it, buddy sent me a pic, and I replied: Holy s***, stone has a light beer now!?").)

Defendant also acknowledges that its sales have surged since it rebranded Keystone as "STONE." (STONE Decl. at ¶ 66.) The proximity of the parties' beers in the market, coupled with clear-cut evidence of actual confusion, compels the conclusion that Defendant's increased sales are attributable in part to its free-riding on the goodwill and reputation of the STONE® brand. Unless Defendant's infringement is enjoined, this free-riding will continue at an incalculable and irreparable cost to Stone and its brand.

**Loss of Control Over the STONE® Brand**

Stone will irreparably lose control of the STONE® mark's reputation as Defendant floods the market with infringing "STONE" branded beer. Irreparable harm is shown where defendant's infringement "confus[es] customers into believing that Plaintiff's business is somehow affiliated" with defendant or its products. *E. &*

1  *J. Gallo Winery v. Grenade Beverage LLC*, 2014 WL 5489076, at \*5 (E.D. Cal. Sept.

2  8, 2014) (granting summary judgment and permanent injunction for plaintiff).  The

3  same is true if plaintiff can demonstrate evidence of "perceived association" between

4  the Plaintiff's mark and the infringing product. *Starbucks Corp. v. Heller,* 2014 WL

5  6685662, at \*9 (C.D. Cal. Nov. 26, 2014).

6      Here, there is abundant evidence of actual confusion from Dr. Stewart's study

7  and consumer complaints.  This is a classic case of irreparable harm caused by

8  trademark infringement.  When consumers are deceived into thinking Defendant's

9  tepid Keystone beer is affiliated with or originates from the same source as Stone's

10 legendary craft brews, Stone loses control over whether their experience will be

11 positive or negative – *i.e.*, over the STONE® mark's reputation.  Years of effort and

12 investment in crafting some of the best beer in the world will be rendered irrelevant

13 as the quality (or lack thereof) of *Defendant's* beer becomes a determining factor in

14 consumers' experiences.  Stone's loss of control over its own reputation is by its

15 nature irreparable and impossible to compensate through money damages.

16      **Destruction of STONE®'s Hard-Earned Reputation and Goodwill**

17      Defendant's infringement is specifically destroying the unique reputation and

18 goodwill that Stone has cultivated under its premium STONE® brand.  As detailed

19 *supra*, the STONE® mark has been painstakingly constructed and loved by Stone

20 during its twenty-plus year history.  (*See* STONE Decl. §§ A-G.)  As a result of these

21 investments, Stone has enjoyed widespread critical acclaim and rapidly grown from a

22 start-up brewer into an international craft beer icon.  (*See, e.g.,* STONE Decl. ¶¶ 12-

23 20, 21-26, 28-31, 37-40.)  It has received extensive unpaid national and international

24 media coverage as a craft brewing phenomenon and established a reputation for

25 independence and excellence.  (*Id.* ¶¶ 28-31.)  STONE® is a valuable, one-of-a-kind

26 brand that enjoys a deep reservoir of goodwill, conferring myriad intangible benefits

27 on Stone.  *See Adidas*, 2018 WL 2142648, at \*5 (unsolicited media coverage, quality

28 control, and promotion of brand were sufficient to demonstrate a brand's "intangible

1   benefits" and goodwill that would be irreparably harmed absent injunction).

2       The irreparable harm to Stone's goodwill is painfully obvious.  STONE® is

3   synonymous with excellent craft beer.  By contrast, Keystone is a mass-produced

4   "value" brand whose flavor is a perennial subject of mockery and scorn among

5   consumers.  *See* Answer/CC at 10:20-22 (admitting that Keystone light is a "value"

6   brand); Section C, *supra* (describing negative consumer reactions).  By deceiving

7   consumers into thinking that its "STONE"-branded Keystone beer is somehow

8   related to STONE®, Defendant is directly attacking Stone's hard-earned reputation

9   for quality.  Such "harm to advertising efforts and goodwill constitute 'intangible

10  injuries' that warrant injunctive protection."  *Adidas*, 2018 WL 2142648, at *5

11  (affirming preliminary injunction where plaintiff had "built a specific reputation

12  around [its product] with intangible benefits" and "customer surveys demonstrate

13  that those intangible benefits will be harmed if [defendant's infringing product] stays

14  on the market because consumers will be confused about the source of the

15  [product].").

16      Marketing science confirms that, when a conflict arises between a premium

17  brand like STONE® and inferior knock-off like Defendant's "STONE" beer, the

18  mere presence of the knock-off in the market destroys some of the goodwill

19  belonging to the senior user.  (Stewart Decl. ¶¶ 84-88.)  When consumers are

20  actually deceived in large numbers, as they are here, the harm to STONE® is

21  compounded.  Because such harm to a brand's goodwill is by its nature intangible

22  and incalculable (*see Adidas*, *supra*), Defendant's erosion of the premium STONE®

23  brand will cause irreparable harm.

24  **Defendant is Causing Long-Term Reverse Confusion**

25      Stone also faces irreparable harm because Defendant is usurping Stone's

26  chance to make a first impression on consumers with its acclaimed STONE® beer,

27  rather than Defendant's inferior substitute.  This species of harm is sometimes

28  referred to as "reverse confusion."  *See FAZE Apparel*, slip op. at 5 ("Reverse

31                                              Case No. 18-cv-0331-BEN-JMA

1  confusion occurs where the 'trademark infringer so saturates the market with
2  promotion of his trademark that consumers come to believe that the infringer, rather
3  than the plaintiff, is the source of the trademarked product'") (preliminary injunction
4  granted).  Defendant's titanic marketing and distribution machine is saturating the
5  market with infringing "STONE"-branded Keystone beer, materially contributing to
6  Defendant's $11 billion in annual sales. (RJN Ex. 11 at p. 43.)  For context,
7  Defendant spent $1.3 billion on advertising in 2017, dwarfing Stone's *total annual*
8  *sales* many times over.  (RJN Ex. 11 at p. 156.) Though STONE® is a strong and
9  growing brand, it has not yet converted every beer drinker in America.  As
10 Defendant's nationwide sales and advertising blitz continues, thousands of beer
11 drinkers who have not yet encountered Stone's impeccable brews will learn to
12 associate the "STONE" mark with Keystone, rather than the true STONE®.
13 (STONE Decl. at ¶¶ 82-88.) As such "reverse confusion" occurs, Stone is
14 permanently deprived of its chance to properly introduce these consumers to the
15 STONE® brand.

16     Nor is Defendant ashamed of its misappropriation; rather, its infringement is
17 ongoing and getting worse.  Defendant intends to increase its infringing conduct as
18 evident by its Summer 2018 and Winter 2018 and marketing programs, *i.e.*, as part of
19 a cynical farce to "own the Stone".  (STONE Decl. at ¶¶ 79-80.)  The upcoming
20 iteration of Defendant's "Can Hunt" series, using the "STONE" mark, will only
21 serve to further flood the market and create false and misleading associations among
22 consumers.  (*Id.*)

23     Defendant's escalating infringement, coupled with the confusion evidence
24 provided by Stone, establish that Stone faces loss of control over its STONE® Marks
25 and the dissipation of the consumer goodwill it has spent over 20 years developing.
26 *See CytoSport,* 617 F. Supp. 2d at 1081.  Accordingly, the evidence is clear that
27 absent an injunction, Stone's brand will be irreparably harmed.

28

### III. BALANCE OF THE EQUITIES TIPS DECIDEDLY IN FAVOR OF PROTECTING STONE'S ONE-OF-A-KIND BRAND

When considering the balance of equities, a defendant "cannot complain of the harm that will befall [him] when properly forced to desist from [his] infringing activities." *Triad Systems Corp. v. Southeastern Exp. Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995); *see also*, *Ocean Garden, Inc. v. Marktrade Co.*, 953 F.2d 500, 508 (9th Cir. 1991) ("Given the above six [*Sleekcraft*] factors [favoring the plaintiff], the balance of hardships tips sharply in [plaintiff's] favor and it would have been an abuse of discretion for the district court not to grant the preliminary injunction."); *Dr. Seuss Enter., L.P. v. Penguin Books, U.S.A.*, 109 F.3d 1394, 1406 (9th Cir. 1997) (plaintiff's substantial goodwill outweighed defendant's expense). Further, and importantly, "when the plaintiff submits substantial evidence that the defendant intentionally infringed upon the plaintiff's trademarks, the potential damage to the defendant's business resulting from the preliminary injunction does not affect the court's equity analysis." *2Die4Kourt,* 2016 WL 4487895, at *10.

Defendant's deliberate campaign to undermine Plaintiff's STONE® Marks is inflicting serious harm upon the business and brand that Stone has built over more than a decade. By contrast, any hardship that Defendant would suffer as a result of a preliminary injunction is a self-inflicted injury entitled to little or no weight. Defendant has embarked on a deliberate campaign to co-opt Plaintiff's STONE® name. Having been on notice of the incontestable STONE marks since 2007, Stone knowingly risked an injunction when it abandoned the longstanding name and brand of its "Keystone" beer in an effort to "Own the STONE" – i.e., to "own" the incontestable STONE® trademark that Stone has held for twenty years. As such, Defendant's expense is not substantial, considering the willfulness of its infringement and in comparison to the extent of the harm that Stone faces.

### IV. INJUNCTIVE RELIEF IS IN THE PUBLIC'S INTEREST

Lastly, Courts look to determine if an injunction is in the public interest. "When a trademark is said to have been infringed, what is actually infringed is the

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

1  right of the public to be free of confusion and the synonymous right of the trademark

2  owner to control his products' reputation." *FAZE Apparel*, slip op. at 10.

3  Consequently, "'[t]he likelihood of confusion to consumers is [a] critical factor in

4  our consideration' of harm to the public, as '[t]he public has an interest in avoiding

5  confusion between two companies' products." *Aurora World, Inc. v. Ty Inc.*, 719 F.

6  Supp. 2d 1115, 1127 (C.D. Cal. 2009).

7       Here, enjoining Defendant's willful and intentional infringement inherently

8  serves the public interest.  As evidenced above, consumers have and will continue to

9  be confused by Defendant's rebrand campaign.  Further, by nature of Defendant's

10  own statements, Defendant intends to "leverage" off the sales from the infringing

11  rebrand so as to further distribute its infringing products and compound the existing

12  confusion among consumers.  In light of the public's right not to be deceived or

13  confused, and Defendant's intent to continue confusing consumers, the public

14  interest strongly supports the issuance of an injunction.

15  **V.     NO BOND IS REQUIRED IN THIS CASE**

16       The Court has discretion under Rule 65(c) to consider the requirement of bond

17  as part of a grant of preliminary injunction.  In the trademark context, Courts usually

18  demur against setting any security requirement given that "[t]he likelihood of success

19  on the merits, as found by the district court, tips in favor of a minimal bond or no

20  bond at all." *2Die4Kourt v. Hillair Capital Mgmt., LLC*, 692 F. App'x 366, 369 (9th

21  Cir. 2017) (court granted preliminary injunction and did not impose a bond due to

22  strong likelihood of success on the merits); *see also, Van de Kamp v. Tahoe Reg'l*

23  *Planning Agency*, 766 F.2d 1319, 1326 (9th Cir. 1985).

24       Here, bond not only is unwarranted, it would be unduly punitive.  Defendant

25  MillerCoors deliberately chose to rebrand itself on the STONE® mark in willful

26  derogation of Stone's incontestable trademark and with clear prior knowledge that

27  the USPTO would consider such action to be a direct infringement of Stone's rights.

28  *See, e.g., In re Trademark Application No. 77284994 – STONES*.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

As a multi-billion dollar behemoth, MillerCoors should not be incentivized to intentionally tread upon long-respected property rights, only to request "security" from the much smaller rights holder in exchange for preventing further irreparable harm. *Pacific Rollforming, LLC v. Trakloc Intern., LLC,* 2007 WL 4181258 at *1-2 (S.D. Cal. 2007) (central to bond amount consideration is, "the applicant's resources" where the "court should not impose a bond in an amount so high that it 'would risk denying [a claimant]… access to judicial review.'").

Further, Stone's requested preliminary injunction is reasonable and narrowly tailored to avoid undue expense and burden upon Defendant. Stone's [Proposed] Order would allow Defendant a one-month sell-off period so that it can reasonably sell-through and dispose of existing inventory in stock or on shelf. Any remaining unused cans or packaging can be stored and/or recycled pending final adjudication of this matter.

## **CONCLUSION**

For the foregoing reasons, Plaintiff Stone makes one simple request—that Defendant put the "Key" back in "Keystone." Accordingly, Stone requests that this Court issue an injunction against Defendant's use and isolation of "STONE" in its brand packaging, as detailed in the [Proposed] Order. This simple measure will halt Defendant's impermissible, and irrefutably intentional attempt to usurp Plaintiff's incontestable STONE® Mark and curtail the consumer confusion and irreparable harm currently occurring to Plaintiff's STONE® Mark.

Dated: May 31, 2018         Respectfully Submitted,

BRAUNHAGEY & BORDEN LLP

By: /s/ J. Noah Hagey
       J. Noah Hagey

*Attorneys for Plaintiff Stone Brewing Co., LLC*

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

# DEMONSTRATIVE A

### i.   Comparison of Keystone Cans



(Wagner Decl., Ex. 14)

### ii.   Evolution of Keystone Can Design



(Wagner Decl., Ex. 14)

### iii.     August 2017 Facebook Post



(Wagner Decl., Ex. 19)

### iv.     2017 Contest Ad



(Wagner Decl., Ex. 19)

### v.      Comparison of Keystone "Can Hunt" Cans



(Wagner Decl., Exs. 20, 21)

### vi.     Keystone's Delivery Truck and Billboard Emphasizing Stone



(Wagner Decl., Exs. 39-40)

### vii.    Strategic Shelving Instructions Showing "Stone" Only



(Wagner Decl., Exs. 36, 38)

viii.    **March 2018 Planogram**



(Wagner Decl., Ex. 33)

ix.    **"Owning the Stone" Campaign**



(Wagner Decl., Ex. 41)

x.    **Summer 2018 Campaign**

(Wagner Decl., Ex. 42)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 31st day of May, 2018, I electronically transmitted the foregoing PLAINTIFF STONE BREWING CO., LLC'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION to the Clerk's office using the CM/ECF system, which will send a notice of filing to all counsel of record.

<u>s/J. Noah Hagey</u>
J. Noah Hagey

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION