UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STONE BREWING CO., LLC,<br><br>        Plaintiff/Counterclaim-Defendant,<br><br>v.<br><br>MILLERCOORS LLC,<br><br>        Defendant/Counterclaim-Plaintiff. | Case No.: 3:18-cv-00331-BEN-JMA<br><br>**ORDER:**<br><br>**(1) DENYING MOTION FOR PRELIMINARY INJUNCTION, and**<br><br>**(2) DENYING AMENDED MOTION TO DISMISS COUNTERCLAIMS**<br><br>**[Doc. No. 28, 30.]** |

In this trademark infringement case, Plaintiff/Counterclaim-Defendant STONE BREWING CO., LLC, ("Stone") seeks a preliminary injunction against Defendant/Counterclaim-Plaintiff MILLERCOORS LLC ("Miller") enjoining it from using the STONE® mark in connection with KEYSTONE beer products. In addition, Stone moves to dismiss Miller's four counterclaims asserted against it.

For the reasons stated below, the Court DENIES Stone's request for a preliminary injunction. In addition, the Court DENIES Stone's motion to dismiss Miller's counterclaims.

///

///

I.    **Factual Background**

Plaintiff Stone is a San Diego-based craft brewer that has sold its artisanal Stone® beers nationwide for over two decades.  (Doc. No. 1 ¶ 17.)

From the beginning, Stone developed and maintained its trademark and brand. Stone's founders applied for the STONE® mark on July 29, 1997.  *Id*. at 4.  The mark was registered without objection on June 23, 1998, under U.S. Registration No. 2,168,093.  *Id*.  Roughly ten years later, on or about June 28, 2008, the Patent Trade Office ("PTO") recognized Stone's continuous use of the brand accepted and granted Stone's Combined Declaration of Use and Incontestability application, making the STONE® incontestable.  *Id*.  Today, every Stone beer proudly bears the registered incontestable trademark STONE®. *Id*. ¶ 20.

Defendant Molson Coors is a multinational beer conglomerate formed after a series of mergers involving Coors, Miller, and Canadian brewing giant Molson.  In the United States, Molson Coors operates through its subsidiary, Defendant Miller.  Among the dozens of brands in its portfolio, Miller has sold domestic lager brand Keystone since 1989. *Id*. at 33.

The Keystone line of beers consists of Keystone, Keystone Ice, and Keystone Light.  (Doc. No. 44 at 1.)  Since its inception, Miller and its predecessors have sold its "Keystone" sub-premium beer brand in cans with a primary KEYSTONE mark and prominent imagery of the Colorado Rocky Mountains.  (Doc. No. 1 at 34.)  The name "Keystone" is the name of a popular ski resort town founded in the 1970s in Colorado. The mountain range depicted on the can is styled after the Wilson Peak located in the Rockies.  *Id*.

From 1989 through today, Keystone cans have been updated from time to time but have always prominently featured the KEYSTONE® mark.  For at least the past twenty-three years, Keystone packaging and advertising have also borne the nickname 'STONES.'  (Doc. No. 44 at 1.)

Miller undertook efforts to 'refresh' its KEYSTONE image by introducing an updated can and package design, in or around April 2017. *Id.* ¶ 38. Miller also began acquiring various independent craft beer breweries like *Saint Archer Brewing*, through its craft beer holding entity, *Tenth and Blake Beer Company*, to expand its holdings and reduce competition. *Id.* ¶ 38.

Miller's 'refreshed' can design took "KEYSTONE" and separated "KEY" and "STONE" onto separate lines. (Doc. No. 30-1 at 10.) Its 'refreshed' packaging emphasized "STONE" rather than "KEYSTONE" *Id.* Similar advertising campaigns began to feature the redesigned Keystone can often accompanied by slogans or taglines such as the August 2017 campaign "Hunt the STONE." *Id.*

Since introducing the 'refreshed' can and package design, Keystone Light has gone from Miller's worst, to its best-selling beer of the entire Keystone line.

At this same time, Stone noticed a discernable drop in its sales as current and potential purchasers were allegedly confused by Keystone's new can and packaging. For example, in December 2017, a consumer reached out to Stone to inquire about the brewery's new "STONE LITE" product – a non-existent beer that appears only in Miller's advertising. (Doc. No. 1 ¶ 66.)

In the high-velocity beer market, where consumers make quick decisions between a proliferating array of brands, the effects of even initial confusion are likely to be momentous. *Id.* ¶ 63. To further complicate matters, in many areas of the country, STONE® and KEYSTONE® use identical distribution and marketing channels. *Id.* ¶ 64.

Stone filed suit in this matter out of concern for its brand reputation. These same concerns led it to file the current motions for preliminary injunction and dismissal of the counterclaims.

**Procedural Background**

On February 12, 2018, Stone filed its Complaint against Defendant Molson Coors Brewing Company ("Molson"), and Defendant and Counter-Claimant Miller alleging (1)

Trademark Infringement; (2) False Designation of Origin; (3) Trademark Dilution; (4) Unfair Competition; and (5) Declaratory Relief.  (Doc. No. 1.)

On May 9, 2018, Stone filed an Amended Motion to Dismiss Counterclaims. ("Motion").  (Doc. No. 28.)  On July 2, 2018, Miller filed its Reply in Opposition to Motion to Dismiss Counterclaims.  (Doc. No. 41.)  Stone filed its Response in Support of its Motion to Dismiss Counterclaims.  (Doc. No. 53.)

On May 31, 2018, Stone filed a Motion for a Preliminary Injunction ("Prelim. Injunct.").  (Doc. No. 30.)  On July 30, 2018, Miller filed its opposition.  (Doc. No. 44.) On August 14, 2018, Stone filed its Response in Support of its Motion for Preliminary Injunction.  (Doc. No. 63.)

Pursuant to civil local rule 7.1.d.1, this Court finds these motions suitable for determination without oral argument.

## DISCUSSION

First, the Court will weigh each of the *Winter* factors to decide whether a preliminary injunction should be granted.  The Court will then consider the motion to dismiss Miller's counterclaims.

## I.    Preliminary Injunction

"A preliminary injunction is an extraordinary and drastic remedy" that is "never awarded as of right."  *Munaf v. Green*, 128 S. Ct. 2207, 2218 (2008).  It "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 376 (2008).  Additionally, mandatory injuctions, those going "beyond maintaining the status quo" are "particularly disfavored."  *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994).

### A. Likelihood of Success on the Merits

To prevail on a claim of trademark or trade name infringement, a plaintiff "must prove: (1) that it has a protectable ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion."  *Network Automation, Inc. v. Advanced Sys. Concepts*, 638 F.3d 1137, 1144 (9th Cir. 2011)

(quoting *Dep't of Parks & Rec. v. Bazaar Del Mundo, Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006)).

### 1. Stone Has a Protectable Ownership Interest Over Its Mark

Both registered and unregistered trade names and trademarks are protected under the Lanham Act. *Halicki Films, LLC v. Sanderson Sales and Mktg.*, 547 F.3d 1213, 1225-26 (9th Cir. 2008); *see also GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 n.3 (9th Cir. 2000). "It is axiomatic in trademark law that the standard test of ownership is priority of use." *Sengoku Works v. RMC Int'l*, 96 F.3d 1217, 1219 (9th Cir. 1996).

Here, it is indisputable that Stone holds a valid trademark in STONE® as it was registered by to Patent Trade Office ("PTO") without objection on June 23, 1998, under U.S. Registration No. 2,168,093. (Doc. No. 30-1 at 3-4.) Ten years later, in 2008, the PTO accepted Stone's Combined Declaration of Use and Incontestability making STONE® "incontestable" as a matter of law. *Id.*

Thus, Stone has a protectable ownership interest in the STONE® mark.

### 2. Likelihood of Confusion

In determining whether there is a likelihood of confusion, a court is to weigh the following factors: 1) *the strength of the mark*; 2) *proximity of the goods*; 3) *similarity of the marks*; 4) *evidence of actual confusion*; 5) *marketing channels used*; 6) *type of goods and the degree of care likely to be exercised by the purchaser*; 7) *the defendant's intent in selecting the mark*; and 8) *likelihood of expansion of the product lines*. *See AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979). The similarity of the marks, the proximity of the goods and marketing channels used constitute "the controlling troika in the *Sleekcraft* analysis." *GoTo.com*, 202 F.3d at 1205. However, the analysis is not to be considered in a mechanical fashion, and instead, the importance of each *Sleekcraft* factor will vary in each case. *Brookfield Communs. Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1055 n.16 (9th Cir. 1999). A plaintiff need not satisfy all the *Sleekcraft* factors. *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1125 (9th Cir. 2014).

///

## i. *Strength of Mark*

First, in considering the strength of a mark, the Court considers the mark's commercial and conceptual strength. *See M2 Software, Inc., a Delaware corporation v. Madacy Entm't, a corporation*, 421 F.3d 1073, 1080-81 (9th Cir. 2005). "Trademarks are categorized as generic, descriptive, suggestive, and arbitrary or fanciful." *Id*. at 1080 (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)). "A generic mark is the least distinctive, and an arbitrary or fanciful mark is the most distinctive." *Id*. (citing *GoTo.com, Inc.*, 202 F.3d at 1207). "[A] mark's conceptual strength is proportional to the mark's distinctiveness." *Id*.

Stone argues the STONE® mark is arbitrary and inherently distinctive in that it does not describe Stone's products and was chosen by Stone's founders simply because they liked the name. (Doc. No. 30-1 at 18.)

Miller argues that the STONE® mark is weak, proffering historical details about "stone brewing"[1] as well as the number of iterations of STONE or STONES in trademark applications before 1996[2]. (Doc. No. 44 at 17.) While factually interesting and informative, it offers little more than conjecture to refute Stone's position.

The Court finds Stone's mark to be commercially strong and recognizable. Moreover, while it is both nationally and internationally known, it need not reach the level of worldwide profitability and recognition of other market icons like Apple or Starbucks in order to be considered a "strong" mark. (Doc. No. 30-1 at 18.) Next, the

---

[1] "The ancient art of stone brewing" is an internationally recognized method of brewing beer. Stone brewing is a process by which heated stones are added to unfermented beer-the result, known as "stone beer" (or "steinbier" pursuant to its German heritage) continues to be brewed around the world, including in Stone's old plant in San Marcos, California. (Doc. No. 44 at 17.)

[2] There were more than 2,700 instances of variations including STONE or STONES in trademark applications filed before 1996 (when Plaintiff submitted its application); combined, there are more than 20 STONE-formative marks in the alcohol sector with dates of first use predating Plaintiff's first use date. (Doc. No. 44 at 17.)

Court considers what level of protection the STONE® is entitled to based on its conceptual strength. As relevant here, "[a]n arbitrary mark consists of 'common words that have no connection with the actual product.' On the other hand, the less protected 'suggestive' category requires the exercise of some imagination to associate the mark with the good or service." *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1211 (9th Cir. 2012) (internal citations omitted).

STONE® may be considered a suggestive or possibly arbitrary mark. However, currently, the Court is unconvinced that STONE® is an arbitrary mark because the can and packaging incorporate more than just the letters STONE. For example, even a glancing look at the "Selection of Stone's Iconic Brews" in the Complaint show a large gargoyle perched ominously over the STONE® mark, aptly described as Stone's mascot. (See Doc. No. 1 at 7.) Stone's packaging appears to reflect the same. Taken together, strengthens the Court's finding that its mark is suggestive, not arbitrary. However, the Court agrees, especially considering the marks incontestability, STONE® is entitled to the strong protection afforded to suggestive marks.

Thus, this factor weighs in favor of Stone.

### ii. *Proximity of Goods*

Second, the Court considers the proximity of the goods. The party seeking a preliminary injunction "need not establish that the parties are direct competitors to satisfy the proximity or relatedness factor. Related goods (or services) are those 'which would be reasonably thought by the buying public to come from the same source if sold under the same mark.'" *Rearden*, 683 F.3d at 1212 (quoting *Sleekcraft*, 599 F.2d at 348 n.10). A Court may consider the parties to be competitors if they sell goods in the same industry or if their goods are complementary. *See id*.

Stone and Miller are both nationally known beer producers. Miller is a "mass production" conglomerate of breweries, while Stone is a small, but quickly rising independent brewer of artisan craft beers. Stone is not challenging all the beers that Miller produces, only the Keystone line—specifically, Keystone Light, or so-called

"STONE Light"—because they would be more likely to be confused by a consumer looking to purchase a STONE® beer than a Miller product.  Since *both* beers are distributed nationally, consumers may encounter *both* products in close proximity in stores or establishments serving *both* brands.  Since Stone and Miller *both* produce a beer which is distributed nationally, a consumer is likely to encounter *both* within close proximity of the other, making it is reasonable to consider Miller a direct competitor of Stone.

Thus, this factor weighs in favor of Stone.

### iii. *Similarity of the Marks*

Third, the Court considers the similarity of the marks.  The marks at issue, in this case, are a matter of perspective and weigh heavily on the products staging and the angle of the viewer.

Stone contends that Miller has rebranded "Keystone" beer so that its primary source identifier is "STONE."  (Doc. No. 30-1.)  It has instructed retailers to display the cans so that "KEY" is obscured.  *Id*.  Moreover, it has produced in-store displays on which only "STONE" is visible.  *Id*.  In doing so, Miller has adopted Stone's STONE® mark to market its identical product-beer which leads to consumer confusion.[3]  *Id*.

Miller does not contest Keystone Light cans have "STONE" prominently printed along the side in a large font.  (Doc. No. 44 at 20.)  However, what Stone conveniently fails to mention is that a consumer picking up, or even just looking at a Keystone can see the full name KEYSTONE Light (twice), as well as the bright-yellow house mark of

---

[3]    Stone alleges actual consumer response and survey responses evidence the confusion generated in the market by nature of Miller's rebrand.  (STONE Decl. at ¶ 61 ("I almost fell for it . . . It was with the cheaper beers as an individual can to buy.  I thought nice, a cheap stone, I'll try this one out. . ."); Stewart Decl. at ¶¶ 6-7.)

Coors, printed on the can as well. *Id.* Moreover, as reflected by the Stone tweet that Miller cites in its Response, Stone was well aware of this fact.[4] *Id.*

After reviewing the parties' arguments and the products themselves, the Court finds there are more differences in the marks than similarities when considered in their entirety and as they appear in the marketplace.

Thus, this factor weighs in favor of Miller.

### iv. *Evidence of Actual Confusion*

Fourth, "a court conducting a trademark analysis should focus its attention on the relevant consuming public." *Rearden*, 683 F.3d at 1214. "The test for likelihood of confusion is whether a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks.'" *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1140 (9th Cir. 2002) (quoting *Dreamwerks Production Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998)). "Accordingly, trademark infringement protects only against mistaken purchasing decision and not against confusion generally." *Rearden*, 683 F.3d at 1214 (citation, quotation marks, and brackets omitted). Litigants may satisfy the likelihood of confusion by providing direct evidence of consumer confusion. Yet in *Rearden*, the Ninth Circuit concluded that non-consumer confusion may be relevant in three overlapping circumstances "where there is confusion on the part of (1) potential consumers; (2) non-consumers whose confusion could create an inference that consumers are likely to be confused; and (3) non-consumers whose confusion could influence consumers." *Id.*

First, Stone provides survey results showing (*what it alleges is*) conclusive proof of consumer confusion caused by Miller's intentional rebranding. To conduct the research, Stone commissioned Professor David Stewart, Ph.D. ("Stewart"). The professor

---

[4]    CTC Decl., Ex. 14 (Stone Brewing tweet: "[T]he pictures we show aren't important. … We know anyone, including a judge, is plenty able to turn a can & see the entirety of it for themselves."). (Doc. No. 44 at 20.)

designed a controlled, scientific survey to determine the precise level of confusion caused by Miller's rebranding of Keystone as "STONE." (Doc. No. 30-1 at 12.) Dr. Stewart's "Squirt" survey asked targeted, non-suggestive questions of 501 beer consumers using actual images and in-store displays as stimuli. *Id*. According to the results of the survey, an extraordinary level of confusion between the parties' competing "STONE" products and advertising existed. *Id*.

Miller contends that Stewart's survey is flawed because it fails to use actual images and typical Keystone packaging that was available for commercial purchase and subsequently photographed for use conducting the survey. (Doc. No. 44 at 12.) Miller commissioned Hal Poret ("Poret"), an expert who has conducted more than 1,000 surveys on consumer perceptions and opinions, to review Stewart's survey and to conduct its own study to determine consumer confusion. *Id*. at 13. Following Stewart's methodology, but using actual accurate and typical representations of the Keystone can and packaging, Poret redid the survey, finding that not only did the level of consumer confusion drop, in some cases, showed no likelihood of consumer confusion at all. *Id*. at 13-14. Such results are either neutral or slightly favor Miller.

Next, Stone also offered what it called "actual consumer statements of confusion." (Doc. No. 33-1 at 23.) The proffered consumer statements offered little more than conjecture and no support to Stone's claims of consumer confusion. Even assuming the statements were valid, a tweet showing a picture of a beer truck trailer with one of the doors rolled up (*likely due to the driver making a delivery*) so that the Miller product displayed on the side reflects "Stone" instead of "Keystone" is irrelevant and offers no support to a determination of consumer confusion. (*See* Doc. No. 44 at 24.)

Thus, both factors considered weigh even, if not slightly for Miller.

### *v. Marketing Channels Used*

Fifth, the Court considers the marketing channels used. "Convergent marketing channels increase the likelihood of confusion." *Sleekcraft*, 599 F.2d at 353. Both Stone and Miller sell through thousands of the same stores, restaurants, pubs and liquor stores.

(Doc. No. 30-1 at 22.) The products literally are seen on the same aisle. *Id*. Moreover, both Stone and Miller also advertise and sell merchandise through their corresponding websites, market via the same social media channels (including Facebook, Twitter, and Instagram), and use similar in-store displays and brand packaging. *Id*. However, "where both parties utilize the Internet," or some other "less obscure" channel to market the products at issue, "the Ninth Circuit has found this factor carries little weight in the likelihood of confusion calculation." *Hanginout, Inc. v. Google, Inc.*, 54 F. Supp. 3d 1109, 1127 (S.D. Cal. 2014) (quoting and finding controlling *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137 (9th Cir. 2011) and *Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020 (9th Cir. 2004)). Miller also notes that Stone concedes it has a "no-advertising policy," and does not pay for advertising in broadcast or print or billboards, whereas the Keystone franchise has historically and continuously targeted all those outlets. (Doc. No. 44 at 25.).

Thus, considering the aforementioned, this factor weighs even.

*vi.* <u>*Type of Goods and Degree of Care likely to be Exercised by the Purchaser*</u>

Sixth, the Court considers the type of good and degree of care likely to be exercised by purchasers. The lower the customer care the greater the likelihood of confusion. *Network Automation*, 638 F.3d at 1152 (citing *Playboy Enterprises, Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1028 (9th Cir. 2004)). "Consumer care for inexpensive products is expected to be quite low." *Playboy*, 354 F.3d at 1028. Moreover, when it comes to alcoholic beverages, courts have held that consumers are likely to use a relatively low degree of care when selecting products, thus increasing the likelihood of confusion between related products using similar marks. *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 967 F.2d 1280, 1291 (9th Cir. 1992).

Stone argues that in this case, there is an even stronger likelihood of confusion when a beer consumer walks into a grocery store and asks for a "Stone" beer, because he or she is more likely to be directed to the Stone selection, which carries the STONE® mark, than they are to a Miller-Keystone beer. (Doc. No. 33-1 at 19.) If upon asking a

consumer is referred to the STONE® products, Stone's argument about confusion is unclear.

In response to this factor, Miller notes that Stone pointedly danced around this issue and did not answer how much care consumers would exercise when looking to make a purchase of its products. However, even if it had, Miller argues there are sufficient differences in the cans, packaging, and price between Stone and Keystone that consumers would likely know the difference. The Court agrees.

Thus, this factor weighs in Miller's favor.

### vii. *Defendant's intent in Selecting the Marks*

Seventh, the Court considers Stone's intent in selecting its mark. The Ninth Circuit has previously "emphasized the minimal importance of the intent factor." *GoTo.com*, 202 F.3d at 1208 (citing *Brookfield Commc'ns*, 174 F.3d at 1059). Nonetheless, where "one party knowingly adopts a mark similar to another's ... courts presume that the defendant will accomplish its purpose and that the public will be deceived." *Acad. of Motion Picture Arts & Scis. v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1456 (9th Cir. 1991).

Stone argues that it is undisputed that Miller was aware of its trademark when it began selling its refreshed Keystone Light products. (Doc. No. 30-1 at 26.) Further, "knowing use" of a mark that is identical to that of the trademark owner constitutes "strong evidence of intentional infringement and the likelihood of confusion." *Plasticolor Molded Prod. V. Ford Motor Co.*, 698 F. Supp. 199, 201 (C.D. Cal. 1988). Equally important, proceeding to use a mark after being rejected by the PTO on likelihood-of-confusion grounds establishes intent to infringe under *Sleekcraft*.[5] *Id*.

Miller argues that it has demonstrated prior, continuous use of STONE and STONES in connection with Keystone beer dating back to at least 1995. (Doc. No. 44 at 27.) Stone's

---

[5] In 2007 and then again years later, Miller attempted to trademark similar iterations to the STONE® mark only to be rejected by the PTO which explained that confusion was "extremely likely" to occur. (Doc. No. 30-1 at 27.)

only "evidence" of bad intent boils down to two points, which are of questionable significance when considered in view of the fact that Miller is the senior user of the mark: (1) Miller was aware of Stone prior to 2017, and (2) Miller attempted (unsuccessfully) to register with the PTO its common law marks STONES and HOLD MY STONES nearly a decade ago. *Id.* Both points are true, and neither is evidence of bad intent. *Id.*

In this case, the Court notes that Miller was "aware" of Stone's STONE®, without more, "provides no direct evidence of [Miller's] judgment concerning likely confusion." *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1148 (9th Cir. 2002) ("inference from knowledge and similarity, however, does not add much in answering the ultimate question here, likelihood of confusion."). Neither side has produced enough evidence of Miller's intent in selecting to use what it refers to as its common law mark for more than a decade.

Thus, the Court cannot make a determination as to Miller's intent at this time. This factor is therefore neutral.

### viii. *Likelihood of Expansion of the Product Lines*

Eighth, the Court considers the likelihood of expansion of the plaintiff's product lines. "Inasmuch as a trademark owner is afforded greater protection against competing goods, a 'strong possibility' that either party may expand his business to compete with the other will weight in favor of finding that the present use is infringing. When goods are closely related, any expansion is likely to result in direct competition." *Sleekcraft*, 599 F.2d at 354 (citations omitted). "Where two companies are direct competitors, this factor is unimportant." *Network Automation*, 683 F.3d at 1153. Because the Court has found that Stone and Miller are direct competitors, *see* Part III.A.1.ii, "this factor is unimportant." *Network Automation*, 638 F.3d at 1153.

Thus, this factor weighs neutral.

### ix. *Stone's Trademark Infringement Claim*

As provided above, to prevail on a trademark infringement claim, a plaintiff "must prove: (1) that it has a protectable ownership interest in the mark; and (2) that the

defendant's use of the mark is likely to cause consumer confusion." *Network Automation*, 638 F.3d at 1144. The first element favors Stone because it has an incontestable trademark over STONE®. As to the second element, on balance the *Sleekcraft* factors moderately favor Stone.

The following factors favor Stone to varying degrees: (1) the strength of the mark; and (2) proximity of the goods. The similarity of the marks, proximity of the goods and marketing channels used are the most important factors, and two of them favor Stone. *GoTo.com Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000). The (3) marketing channel favor's Miller, as well as (6) the type and degree of care. The remaining factors are either equal or neutral making them insignificant to this analysis.

Taking all the factors into account, the Court finds that Stone's trademark infringement claim against Miller is moderately strong.

## B. Stone Has Not Shown A Likelihood of Suffering Irreparable Harm

A plaintiff must "demonstrate a likelihood of irreparable injury—not just a possibility—in order to obtain preliminary relief." *Winter*, 555 U.S. at 21, 129 S. Ct. 365. "Those seeking injunctive relief must proffer evidence sufficient to establish a likelihood of irreparable harm." *Herb Reed Enterprises, LLC v. Florida Entm't Mgmt., Inc.*, 736 F.3d 1239, 1251 (9th Cir. 2013). "Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm." *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001). "Loss of goodwill may include a change in the marketplace resulting from customers establishing relationships with low-cost infringers." *QBAS Co., Ltd. v. C. Walters Intercoastal Corp.*, 2010 WL 7785955, at *12 (C.D. Cal. Dec. 16, 2010).

Stone falls short of establishing that absent a preliminary injunction, it would suffer irreparable harm. Its claims of irreparable harm boil down to a loss of goodwill, which may qualify as irreparable harm. *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991). Yet Stone's arguments of

irreparable harm all overlap with its allegations that the Court found insufficient about the existence of actual confusion.[6]

Thus, because Stone is hard-pressed to demonstrate it would suffer any harm absent a preliminary injunction, it falls far short of demonstrating that it would suffer irreparable harm in the absence of the Court granting a preliminary injunction.

### C. The Remaining *Winter* Factors Do Not Favor Granting a Preliminary Injunction.

Stone has demonstrated that it has a moderately strong infringement claim against Miller, but not that it would suffer irreparable harm absent a preliminary injunction. This second finding alone is enough to deny Stone's request for a preliminary injunction because all of the *Winter* factors must be satisfied to grant a preliminary injunction. *Winter*, 555 U.S. at 20. Even considering the rest of Stone's arguments under the balancing of the equities and public interest factors of the *Winter* test, the Court would find Stone is not entitled to a preliminary injunction because Stone merely reiterates its largely unfounded consumer and non-consumer confusion allegations.

On the other hand, Miller does allege that it would be harmed by the Court's granting of a preliminary injunction against it because, for example, it would have to change the cans and packaging of the challenged "Keystone Light" product that it has been using for well over a year. (Doc. No. 44 at 18.) Though the Court has found that Stone's trademark infringement claim is moderately strong, this by no means suggests that the burden to Miller is irrelevant. Miller has not been found liable of trademark infringement. Lastly, neither party presents a persuasive argument on the fourth *Winter* factor: the public interest.

---

[6] Stone argues that it will suffer irreparable harm in the following area's if the Court does not grant its request for a preliminary injunction: (1) Diversion of Unknowable and Incalculable Sales; (2) Loss of Control Over the STONE® Brand; (3) Destruction of STONE®'s Hard-Earned Reputation and Goodwill; and (4) Miller causing Long-Term Reverse Confusion. (See Doc. No. 33-1 at 29-32.)

Therefore, the Court DENIES Stones Motion for Preliminary Injunction.

## II. Amended Motion to Dismiss Counterclaims

A motion to dismiss for failure to state a claim under Rule 12(b)(6) tests the legal sufficiency of a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). "A motion to dismiss a counterclaim brought pursuant to Federal Rule of Civil Procedure 12(b)(6) is analyzed under the same standard as a Rule 12(b)(6) motion to dismiss a plaintiff's complaint." *Leadership Studies, Inc. v. Blanchard Training & Dev., Inc.*, No. 15CV1831-WQH-KSC, 2017 WL 3315652, at *4 (S.D. Cal. Aug. 2, 2017). On a motion to dismiss, allegations of material fact are taken as true and construed in the light most favorable to the non-movant. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996). The Court, however, need not accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). Although a complaint need not allege detailed factual allegations, it must contain enough factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

If a court grants a motion to dismiss, leave to amend should be granted unless the pleading could not possibly be cured by the allegation of other facts. *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).

Furthermore, "on a motion to dismiss, several district courts within the Ninth Circuit have found that counterclaims for declaratory relief are improper if 'repetitious of issues already before the court via the complaint o[r] affirmative defenses.'" *Ketab Corp. v. Mesriani & Assocs.,* No. 2:14-cv-07241-RSWL (MRW), 2014 WL 8022874, at *9 (C.D. Cal. Dec. 4, 2014) (citing cases). *See also Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008) (affirming dismissal of declaratory judgment suit).

In Miller's answer to Stone's complaint, it included four counterclaims for (1)

Declaratory relief regarding Miller's "Prior-Use" and right to use "STONE and STONES to advertise Keystone Beer"; (2) Declaratory relief that Stone's trademark is "unenforceable" due to "laches"; (3) Declaratory relief of "non-infringement" based on Miller's "Prior-Use" of "STONE or STONES in its Keystone advertising; and (4) Declaratory relief from Stone's incontestable STONE® trademark based on Miller's supposed common law "exclusive right to use the Stone Mark." (See Doc. No. 28 at 1-2.)

## A. Counterclaims 1 - 3

Stone argues that Miller's claims for declaratory relief are "mirror images" of other substantive causes of action. Thus, the request for a declaration that Miller's "Prior-Use" and right to use "STONE and STONES" to advertise "Keystone Beer," presents issues that arise in connection with the claims of Stone that Miller has infringed both. Similarly, parallel are Miller's claims two and three to matters raised by Stone in the Complaint.

Miller has offered enough justification in its response to why its claims are not redundant or why the same issues should be presented to the Court and a jury. Thus, certain claims against Miller would be decided by a jury, while those for declaratory relief would be presented to the Court. However, Stone has not shown that such parallel issues could not potentially be resolved at a trial through an appropriate management process. For example, the jury could be asked to provide an advisory opinion that the Court would consider. It could also be asked to do so if Stone elected not to present its claims at trial. This illustrates why "it is very difficult to determine whether the declaratory judgment counterclaims really are redundant prior to trial." *Stickrath v. Globalstar, Inc.,* No. C07-1941 THE, 2008 WL 2050990, at *5 (N.D. Cal. May 13, 2008).

For the foregoing reasons, the Motion to Dismiss Counterclaims is DENIED as to Counts One, Two and Three, without prejudice to its renewal, based on further developments in this action.

///

## B. Counterclaim 4

As to Count four, Miller seeks declaratory relief from Stone's incontestable STONE® trademark based on Miller's supposed common law "exclusive right to use the Stone Mark." (Doc. No. 28 at 2.) Stone contends that Miller's claim fails because it does not plead a necessary element for the enjoyment of an "exclusive" trademark right by not alleging (or admitting) that the parties' competing uses are incompatible. *Id*. Furthermore, it must also be dismissed because it violates any reasonable application of the statute of limitations or laches.

First, Stone's contention that Miller must abide by a heightened pleading standard as set forth in *Hydro-Dynamics, Inc. v. George Putnam & Co., Inc*. as well as Rule 8's plausibility standard is unavailing. (*See Hydro-Dynamics, Inc. v. George Putnam & Co., Inc.*, 811 F.2d 1470, 1473 (Fed. Cir. 1987); see also Fed. R. Civ. Proc. 8.

Under Rule 8's liberal pleading standard as reflected in *Twombly*, to establish a senior common-law right in a mark registered by a junior user, a party must show that (1) its use of the mark began before the mark's registration and publication; and (2) there has been continuing use since that time. *Casual Corner Assocs., Inc. v. Casual Stores of Nevada, Inc.*, 4932 F.2d 709, 712 (9th Cir. 1974). (Doc. No. 41 at 17.)

In this case, Miller offered evidence reflecting that in 1995 (a year before Stone submitted its application) it was using STONE in connection with Keystone beer.[7] *Id*. Moreover, Miller asserted that since at least 1995, STONES "has always appeared" on Keystone Outer Packaging.[8] *Id*.

While Stone remains focused on arguing that dismissal is necessary because Miller fails to demonstrate "Continuous Use" and "Likelihood of Confusion," in support of

---

[7] Miller included a photo of Keystone Light Outer Packaging from 1995 as well as a close-up of the copyright date stamped on the package. (Doc. No. 41 at 17.)
[8] In addition to the packaging, the averment that on information and belief Coors used 'STONE in ads dating back to 1992-1993 plausibly demonstrates that Miller is entitled to relief on this issue. *Id*.

counterclaim 4, at this early stage in the proceedings, the Court finds Miller has alleged enough facts and evidence to satisfy Rule 8 requirements and survive dismissal on this point.

Next, Stone argues that Miller's delay in bringing its "Common Law" Counterclaim is fatal without identifying the specific legal basis for its argument. (Doc. No. 28 at 19.) While it appears, Stone is alleging the claim is barred by the statute of limitations or laches, Stone does not respond to this observation in its reply to the opposition. (Doc. No. 53.) Accordingly, Miller submits arguments focused on the statute of limitations and/or the doctrine of laches. (Doc. No. 28 at 14-20.)

Any statute of limitations argument asserted by Stone would be premature. The Court need not resolve this dispute now. Trademark infringement is an ongoing injury, so "the statute of limitations is conceivably only a bar to monetary relief for the period outside the statute of limitations; [a] plaintiff is free to pursue monetary and equitable relief for the time within the limitations period." *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 837 (9th Cir. 2002) (citing *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 953-54 (9th Cir. 2001); *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 821-22 (7th Cir. 1999); 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 31.33 (4th ed. 2001)). Thus, while the statute of limitations may be relevant to Miller's counterclaims at a later stage in this case, it does not operate to bar them in their entirety.

Any laches argument asserted by Stone would also be premature. This equitable defense bars the claims of a plaintiff who "with full knowledge of the facts, acquiesces in a transaction and sleeps upon his rights." *Danjaq LLC*, 263 F.3d at 950-51 (internal quotation marks omitted). A defendant asserting laches must establish both unreasonable delay by the plaintiff and prejudice to himself. *Id.* In addition, in the trademark context, the Court considers the following non-exhaustive factors in determining whether laches applies: (1) the strength and value of trademark rights asserted, (2) plaintiff's diligence in enforcing the mark, (3) the harm to the senior user if relief is denied, (4) good faith ignorance by a junior user, (5) competition between senior and junior users, and (6) the

extent of the harm suffered by a junior user because of a senior user's delay. *See E-Sys., Inc. v. Monitek, Inc.*, 720 F.2d 604, 607 (9th Cir. 1983) (citing *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 293 F. Supp. 892, 917 (S.D.N.Y. 1968), *affirmed and modified*, 433 F.2d 686, 703-704 (2d Cir. 1970)). Because of the fact-intensive nature of this inquiry, it is rarely susceptible to resolution at summary judgment, *see Bratton v. Bethlehem Steel Corp.*, 649 F.2d 658, 666-67 (9th Cir. 1980), let alone at the pleading stage. *Kourtis v. Cameron*, 419 F.3d 989, 1000 (9th Cir. 2005) *abrogated on other grounds by Taylor v. Sturgell*, 553 U.S. 880 (2008) (noting that resolution of a laches defense at the pleading stage is even more difficult than at summary judgment "because the defendant must rely exclusively upon the factual allegations set forth in the complaint").

Laches nevertheless may be applied here for two reasons. First, it would be argued that Stone has unreasonably delayed bringing this suit because it has "known of Miller's existence and its use of the STONE® common law mark for many years. (Doc. No. 28 at 2.) As Stone notes, however, the fact that it has known of Miller's existence for many years does not necessarily imply that it has known of Miller's *infringement* for many years. (Doc. No. 41 at 17.) Construing all inferences in Miller's favor, *see Seven Arts*, 733 F.3d at 1254, this allegation alone is insufficient to establish Stone's laches defense as a matter of law.

Second, laches may apply here because Miller had constructive knowledge of Stone's use of its mark "at least as early as July 29, 1997, when it filed its trademark application with the USPTO," or as of June 23, 1998, when the registration issued. (Doc. No. 28 at 20.) Stone is incorrect, however, that Miller was placed on constructive notice by the July 29, 1997, filing of the trademark application. Miller alleges it used the mark before the application was filed (Doc. No. 41 at 3-4), and the Lanham Act specifically provides that prior users are not put on constructive notice by the filing of a trademark *application*. 15 U.S.C. § 1057(c)(1). Stone is correct that the *issuance* of the '486 Registration placed Miller on constructive notice of its mark. 15 U.S.C. § 1072

("Registration of a mark on the principal register ... shall be constructive notice of the registrant's claim of ownership thereof."). Constructive notice alone, however, is insufficient to establish a laches defense as a matter of law. *See, e.g., E-Sys*, 720 F.2d at 607 (where plaintiff filed infringement action six years after receiving constructive notice through trademark registration, laches would not apply if defendant's encroachment had "been minimal, or its growth slow and steady"). As noted above, the Court cannot apply the laches doctrine without considering a factual record far beyond what is alleged in Miller's Counterclaim.

In sum, Miller's counterclaims are not, at this stage, barred by the statute of limitations or by the doctrine of laches. Accordingly, the Stone's motion is DENIED on these grounds.

For the foregoing reasons, the Motion to Dismiss Counterclaim is DENIED as to Count Four, without prejudice to its renewal, based on further developments.

## CONCLUSION

For the reasons state above, the Court **DENIES** Stone's motion for a preliminary injunction. The Court further **DENIES** Stone's motion to dismiss Miller's counterclaims.

**IT IS SO ORDERED.**

Dated: March 26, 2019

Hon. Roger T. Benitez
United States District Judge

3:18-cv-00331-BEN-JMA