

FILED

FEB 2 5 2020

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

STONE BREWING CO., LLC,

        Plaintiff / Counterclaim Defendant,

v.

MILLERCOORS LLC,

        Defendant / Counterclaim Plaintiff.

Case No.: 3:18-cv-00331-BEN-LL

**ORDER:**

**(1) DENYING PLAINTIFF'S MOTION TO PRECLUDE TESTIMONY BY MICHAEL KALLENBERGER;**

**(2) DENYING PLAINTIFF'S MOTION TO PRECLUDE TESTIMONY BY MARK J. HOSFIELD**

**(3) DENYING DEFENDANT'S MOTION TO EXCLUDE EXPERT TESTIMONY OF CARRIE L. DISTLER;**

**(4) DENYING PLAINTIFF'S MOTION TO PRECLUDE TESTIMONY BY HEIDI HARRIS;**

**(5) DENYING DEFENDANT'S MOTION TO EXCLUDE EXPERT TESTIMONY OF DAVID W. STEWART; and**

1

**(6) DENYING PLAINTIFF'S
MOTION TO PRECLUDE
TESTIMONY BY EITHER HAL
PORET OR JEFFERY A. STEC**

**[ECF Nos. 153, 157, 159, 162, 164, 168.]**

Before the Court is Plaintiff Stone Brewing Co., LLC's ("Plaintiff") and Defendant MillerCoors LLC's six Motions to Preclude/Exclude Testimony of Expert Witnesses. All motions having been fully briefed, and the Court has considered all the arguments presented in the foregoing motions, even those not discussed in this Order. To the extent that an argument is not acknowledged in this Order, it is rejected.

## BACKGROUND

Plaintiff Stone is a San Diego-based craft brewer that has sold its artisanal STONE® beers nationwide for over two decades. (Doc. No. 1 ¶ 17.)

From the beginning, Stone developed and maintained its trademark and brand. Stone's founders applied for the STONE® mark on July 29, 1997. *Id.* at 4. The mark was registered without objection on June 23, 1998, under U.S. Registration No. 2,168,093. *Id.* Roughly ten years later, on or about June 28, 2008, the Patent Trade Office ("PTO") recognized Stone's continuous use of the brand accepted and granted Stone's Combined Declaration of Use and Incontestability application, making the STONE® incontestable. *Id.* Today, every Stone beer bears the registered incontestable trademark STONE®. *Id.* ¶ 20.

Defendant Molson Coors is a multinational beer conglomerate formed after a series of mergers involving Coors, Miller, and Canadian brewing giant Molson. In the United States, Molson Coors operates through its subsidiary, Defendant Miller. Among the dozens of brands in its portfolio, Miller has sold domestic lager brand Keystone since 1989. *Id.* at 33.

1      The Keystone line of beers consists of Keystone, Keystone Ice, and Keystone

2   Light. (Doc. No. 44 at 1.)  Since its inception, Miller and its predecessors have sold its

3   "Keystone" sub-premium beer brand in cans with a primary KEYSTONE mark and

4   prominent imagery of the Colorado Rocky Mountains. (Doc. No. 1 at 34.)  The name

5   "Keystone" is the name of a popular ski resort town founded in the 1970s in Colorado.

6   The mountain range depicted on the can is styled after the Wilson Peak located in the

7   Rockies. *Id.*

8      From 1989 through today, Keystone cans have been updated from time to time but

9   have always prominently featured the KEYSTONE® mark.  For at least the past twenty-

10  three years, Keystone packaging and advertising have also borne the nickname

11  'STONES.'  (Doc. No. 44 at 1.)

12      Miller undertook efforts to 'refresh' its KEYSTONE image by introducing an

13  updated can and package design, in or around April 2017.  *Id.* ¶ 38.  Miller also began

14  acquiring various independent craft beer breweries like *Saint Archer Brewing*, through its

15  craft beer holding entity, *Tenth and Blake Beer Company*, to expand its holdings and

16  reduce competition.  *Id.* ¶ 38.

17      Miller's 'refreshed' can design took "KEYSTONE" and separated "KEY" and

18  "STONE" onto separate lines. (Doc. No. 30-1 at 10.)  Its 'refreshed' packaging

19  emphasized "STONE" rather than "KEYSTONE" *Id*.  Similar advertising campaigns

20  began to feature the redesigned Keystone can often accompanied by slogans or taglines

21  such as the August 2017 campaign "Hunt the STONE." *Id.*

22      Since introducing the 'refreshed' can and package design, Keystone Light has gone

23  from Miller's worst, to its best-selling beer of the entire Keystone line.  At this same

24  time, Stone noticed a discernable drop in its sales as current and potential purchasers

25  were allegedly confused by Keystone's new can and packaging.  To further complicate

26  matters, in many areas of the country, STONE® and KEYSTONE® use identical

27  distribution and marketing channels.  *Id.* ¶ 64.

28      Stone filed suit in this matter out of concern for its brand reputation.

# LEGAL STANDARD

Federal Rule of Evidence 702 establishes several requirements for admissibility of expert opinion evidence: (1) the witness must be sufficiently qualified as an expert by knowledge, skill, experience, training, or education; (2) the scientific, technical, or other specialized knowledge must assist the trier of fact" either "to understand the evidence" or "to determine a fact in issue"; (3) the testimony must be "based on sufficient facts and data"; (4) the testimony must be "the product of reliable principles and methods"; and (5) the expert must reliably apply the principles and methods to the facts of the case. Fed. R. Evid. 702.

Under *Daubert* and its progeny, the trial court is tasked with assuring that expert testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (citation and quotation marks omitted). Shaky but admissible evidence is to be attacked by cross-examination, contrary evidence, and careful instruction on the burden of proof, not exclusion. *Daubert*, 509 U.S. at 596. The judge is "to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). In its role as gatekeeper, the trial court "is not tasked with deciding whether the expert is right or wrong, just whether his [or her] testimony has substance such that it would be helpful to a jury."

The tests for admissibility in general, and reliability, are flexible. *Primiano*, 598 F.3d at 564. The Supreme Court has provided several factors to determine reliability: (1) whether a theory or technique is testable; (2) whether it has been published in peer reviewed literature; (3) the error rate of the theory or technique; and (4) whether it has been generally accepted in the relevant scientific community. *Mukjtar v. Cal. State*

4

1 │ *Univ.*, 299 F.3d 1053, 1064 (9th Cir. 2002) (summarizing *Daubert*, 509 U.S. at 592-94),

2 │ *overruled on other grounds by Estate of Barabin v. Asten Johnson, Inc.*, 740 F.3d 457,

3 │ 460 (9th Cir. 2014). These factors are meant to be "helpful, not definitive." *Kumho Tire*

4 │ *Co. v. Carmichael*, 526 U.S. 137, 151 (1999). The court" has discretion to decide how to

5 │ test an expert's reliability as well as whether the testimony is reliable, based on the

6 │ particular circumstances of the particular case." *Primiano*, 598 F.3d at 564 (citations and

7 │ quotation marks omitted). "[T]he test under *Daubert* is not the correctness of [experts']

8 │ conclusions but the soundness of [their] methodology." *Daubert v. Merrell Dow*

9 │ *Pharmaceuticals, Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995). Once the threshold

10 │ established by Rule 702 is met, the expert may testify, and the fact finder decides how

11 │ much weight to give that testimony. *Primiano*, 598 F.3d at 565.

12 │　　　After admissibility is established to the court's satisfaction, attacks aimed at the

13 │ weight of the evidence are the province of the fact finder, not the judge. *Pyramid Techs.,*

14 │ *Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 814 (9th Cir. 2014). The court should not

15 │ make credibility determinations that are reserved for the jury. *Id.*

16 │ **DISCUSSION**

17 │ **I.** **PLAINTIFF'S MOTION TO PRECLUDE TESTIMONY BY EXPERT**
18 │ **MICHAEL KALLENBERGER**

19 │ **A.** **Testimony Regarding Stone's Supposed Intentions in Bringing Suit**

20 │　　　Plaintiff seeks to preclude the Defendant from presenting purported expert

21 │ testimony from Mr. Kallenberger ("Kallenberger") (a purported beer industry expert),

22 │ regarding Plaintiff's motivations and intent in bringing this lawsuit. (Doc. No. 153 at 1.)

23 │ At issue is whether Defendant is permitted to offer opinion testimony regarding

24 │ Plaintiff's intent and/or motivation for suing, and whether Kallenberger is qualified to

25 │

26 │

27 │

28 │

opine on such.[1] Plaintiff contends that Kallenberger's testimony is irrelevant and outside the scope of his expertise. *See Id.* at 2.

Defendant argues Plaintiff placed its motivation and intent in filing this lawsuit in contention when it "sought to portray itself as having an 'awesome' reputation as an iconoclast and upstart brewery challenging the dominance of the large domestic brewers." (Doc. No. 196 at 2.) Thus, Kallenberger is merely responding to those assertions based on his expertise in the field.[2] *Id.*

Plaintiff contends that a party's "motivation for bringing [] suit is irrelevant." *Hill v. MacMillan/McGraw-Hill Sch. Co.*, 164 F.3d 630 (9th Cir. 1998) (excluding evidence of press coverage at trial because "the merits of [plaintiff's] claims stand independent from her reasons for asserting them"); *see also, Collins v. Del Taco, Inc.*, No. EDCV 03-128-SGL, 2005 WL 3789357, at *3 (C.D. Cal. Feb. 24, 2005) (stating that plaintiff's motivations in bringing ADA suit are not relevant to the issues of the case). (Doc. No. 153 at 3.) "Thus, a plaintiff's subjective motivation for bringing suit is irrelevant to the underlying merits of the case." (Doc. No. 153 at 3.)

In response, Defendant argues that Plaintiff's reliance on a 20-year old, unpublished case is improper, and even if it was not, "courts in the Ninth Circuit have allowed such expert testimony about the actions and motivations of a party when based on industry experience and the review of record evidence. *United Food and Commercial Workers Local 1776 v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1194 (N.D. Cal.

---

[1]   "In his report, Kallenberger claims that '[t]he very fact that Stone Brewing is filing this lawsuit and has produced an almost five-minute YouTube video promoting the fact, appears to be an attempt to reinforce Stone Brewing's image.... This is marketing, pure and simple." (Doc. No. 153 at 2.)

[2]   "Kallenberger is appropriately responding to those assertions based on his knowledge of the craft beer industry, Stone Brewing's past and current role in the industry, and internal documents showing that the lawsuit, code named 'Project Gargoyle,' was a key component of Stone Brewing's marketing strategy, generating $2.4 million in free publicity for the company." (Doc. No. 196 at 2.)

2017) (allowing expert testimony about "intent" of parties based on a review of record evidence and public-facing statements made where an expert had insights due to experience in the industry). (Doc. No. 196 at 3.) Here, to the extent that Defendant asserts Plaintiff's citation to *Hill v. MacMillan/McGraw-Hill Sch.* Co., 164 F.3d 630 (9th Cir. 1998) (unpublished) violates Ninth Circuit Rule 36-3(c), Defendant is correct.

Next, Plaintiff asserts that "experts are not qualified or permitted to opine regarding a party's intent or motivation in bringing suit." (Doc. No. 153 at 3.) Specifically, "[T]he opinions of [expert] witnesses on the intent, motives, or states of mind of corporations, regulatory agencies and others have no basis in any relevant body of knowledge or expertise."[3] *In re Rezulin*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004). Furthermore, Plaintiff proclaims that since Kallenberger is not a lawyer, he is "unqualified to provide a legal opinion regarding the legitimacy of or basis for Stone's claims" since expert witnesses "cannot provide legal opinions." *See United States v. Boulware*, 558 F.3d 971, 975 (9th Cir. 2009) ("The trial court's exclusion of the expert testimony to the extent that it constituted a legal opinion was well within its discretion.").

Considering the foregoing, the Court finds that Kallenberger may not offer opinion testimony on Plaintiff's motivations and intent in bringing this lawsuit. However, Kallenberger may offer opinions on his use of "psychographics" to conduct generalized anecdotal interviews of beer consumers from various segments of the beer market. To the extent that the Plaintiff takes issue with the remainder of Kallenberger's report, those issues can come out in the crucible of cross-examination. The motion is DENIED on this point.

**B. Testimony Regarding the Overlap Psychographics and Craft Markets**

The Plaintiff next argues that Kallenberger spends the remainder of his Motion proffering stale data to refute its claims. Specifically, "Kallenberger purports to offer

---

[3] "[A]n expert witness cannot give an opinion as to his *legal conclusion, i.e.,* an opinion on an ultimate issue of law." *Mukhtar*, 299 F.3d at 1065 n.10.

opinion about a pseudo-science of 'psychographics' involving his use of generalized anecdotal interviews from over a decade ago about overlap of beer consumers in various segments of the beer market" to demonstrate that the parties are not competing for the same drinkers, "demonstrating that there is almost no overlap between craft and economy drinkers in general, and Keystone and Stone Brewing drinkers in particular." (Doc. No. 196 at 11.)

Defendant contends that the Plaintiff's derision for Kallenberger's chosen method of collecting data further demonstrates its misunderstanding of how psychographics work. (Doc. No. 196 at 7.) Specifically, unlike demographic research, which relies on objective data such as age, gender, and income, or behavioral research, which looks at information such as actual purchase behavior, psychographics relies on qualitative study of consumers' personalities, values, opinions, attitudes, interests, and lifestyles often based on in-depth interviews with consumers. *See, e.g.*, Kallenberger Decl., Ex. 3, "The New Science of Focus Groups" (noting that qualitative researchers "predict that such creative and effective approaches may ultimately leave the traditional construct of focus groups far behind" and pointing out that some researchers find one-on-one interviews the most revelatory in obtaining fresh insights.[4] *Id.*

It is worth noting that "the participants in such qualitative interviews are not random strangers but are in fact pre-selected and recruited from the discussion, which takes place in a controlled setting with a defined framework."[5] *Id.* at 8. Furthermore, "Kallenberger relies on a number of different psychographic frameworks when

_____

[4]    "Kallenberger himself has published articles about the importance of this type of research in marketing generally, and in the beer industry in particular, explaining that the best way for a brand to understand what is working for its drinkers 'is to better understand the kind of people it's attracting, and the best way to do that is through in-depth, one-on-one conversations.'" (Doc. No. 196 at 7.)

[5]    "Typically, these interviews would be recorded, transcribed or summarized in comprehensive reports that were used to inform marketing strategy." (Doc. No. 196 at 8.)

1  interpreting the findings from qualitative interviews. The frameworks include: Maslow's

2  Needs Hierarchy; Mark and Pearson's Archetype Framework from *The Hero and the*

3  *Outlaw*; David Riesman's framework of inner-versus other-directed from *The Lonely*

4  *Crowd*; and the framework published by former Anheuser-Busch researchers Russell

5  Ackoff and James Emshoff." *Id.*

6        The Court concludes, based on the expert's statements and resume, that the

7  anticipated testimony by Kallenberger will be based on scientific knowledge he has

8  acquired over a period of more than 20 years of scientific research and study, and that

9  such testimony will assist the trier of fact. In other words, the Court concludes that the

10  Plaintiff has not made the showing required to preclude the proposed expert testimony by

11  Kallenberger regarding psychographics. This is not to say that Kallenberger's testimony

12  may not be barred or subject to a limiting order later when the character of the testimony

13  and the proof for which it is offered become clearer in the context of the evidence

14  admitted.

15        Therefore, consistent with the above analysis, the Plaintiff's Motion to preclude

16  testimony by Expert Kallenberger is **DENIED**.

17  **II.**    **PLAINTIFF'S MOTION TO PRECLUDE TESTIMONY BY EXPERT**
      **MARK J. HOSFIELD**

18

19        The Plaintiff moves pursuant to Rule 702 and *Daubert* to preclude the opinion and

20  profit calculations of Mark Hosfield ("Hosfield") (*Defendant's professional damages*

21  *expert*). Plaintiff asserts that Hosfield's opinions are flawed and his profit calculations

22  run afoul of settled Ninth Circuit and Supreme Court precedent, basic principles of

23  economics, and the disclosure requirements of Rule 26.

24        As a preliminary matter, the Court recognizes that Plaintiff does not challenge

25  Hosfield's qualifications to testify as an expert. The Court agrees.

26      **A.**    **Mr. Hosfield's Opinions regarding the Trademark and Lanham Act**

27        Plaintiff contends that the Trademark Act entitles it to all the Defendant's profits

28  "attributable to the infringing mark," whether they are based on "competition" or

9

1 | "diversion of customers." (Doc. No. 157 at 5.) Hosfield's calculations, however,

2 | compute the "amount of potential profit that MillerCoors got" as limited to "confused

3 | customers" who "might have bought the wrong beer." *Id.* As such, Plaintiff asserts that

4 | calculating profits according to Hosfield's approach excises key categories of the

5 | Defendant's profits from consideration and evades Defendant's obligation of

6 | demonstrating that the [profits] were not attributable to the use of the Stone mark.[6] *Id.*

7 | Defendant disputes the Plaintiff's contentions arguing that "Hosfield's expert

8 | opinion quantifies the maximum amount of profits that could be 'attributable to

9 | MillerCoors' alleged infringement." (Doc. No. 198 at 7.) "As the Ninth Circuit has

10 | recognized, an 'unjust enrichment' theory of damages is designed both to 'protect [] the

11 | trademark owner from . . . the most obvious form of damages - the diversion of sales,'

12 | and to 'provid[e] protection to the value of the goodwill built up in the trade-mark itself."

13 | *Id.* at 8.

14 | The Court disagrees with Plaintiff's assertion that Hosfield's testimony and

15 | calculations are unreliable. Hosfield's opinions and calculations regarding Defendant's

16 | allegedly earned profits arising from its alleged infringement of Plaintiff's mark pass

17 | muster under *Daubert* and Rule 702. All told, Plaintiff's challenge pertains more to

18 | underlying factual assumptions regarding Hosfield's disgorgement opinion and his

19 | credibility as an expert witness, which are determinations for the jury. Plaintiff's motion

20 | is DENIED on this point.

21 | **B.  Mr. Hosfield's Unjust Enrichment Analysis**

22 | Plaintiff contends that Hosfield's profits calculations are methodologically invalid

23 | because he utilizes a simplistic regression model that omits independent variables

---

26 | [6]    The Trademark Act permits a plaintiff, "subject to the principles of equity, to

27 | recover defendant's profits." 15 U.S.C. § 1117. "In assessing profits, the plaintiff shall

28 | be required to prove defendant's sales only; defendant must prove all elements of cost or
deduction claimed." 15 U.S.C. § 1117. (Doc. No. 157 at 6.)

corresponding to the Keystone rebrand (*a critical factor whose significance he purports to assess*). (Doc. No. 157 at 11.) Moreover, calculating incremental gross profits cannot accurately be determined utilizing the inaccurate regression numbers. *Id.* at 15.

Defendant disputes Plaintiff's contentions arguing that "[t]he plaintiff has only the burden of establishing the defendant's gross profits from the infringing activity with reasonable certainty .... The defendant thereafter bears the burden of showing which, if any, of its total sales are not attributable to the infringing activity ....").[7] (Doc. No. 198 at 18.)

The Court notes that Hosfield is a principal at Davis & Hosfield Consulting LLC. He is a former Controller and Vice President of Finance, and has financial management and operations experience as well. Hosfield has years of experience developing damage theories and performing analyses in areas such as lost profits, economic damages, incremental profits, fixed and variable costs, reasonable royalties, price erosion unjust enrichment, and business valuations, just to name a few. He has issued expert reports reflecting his professional opinions in these respective areas.

In the Court's estimation, Hosfield's unjust enrichment calculations are both relevant and reliable in that "the knowledge underlying it has a valid connection to the pertinent inquiry" and "a reliable basis in the knowledge and experience of the relevant discipline." *See Primiano*, 598 F.3d at 565. Though Plaintiff's experts will take a different approach in their analysis, this does not mean that Hosfield's calculations should be excluded wholesale. Thus, just as any technical defects of Plaintiff's expert's calculations go to weight, so too do any technical defects in Hosfield's calculations. The motion is DENIED on this point.

---

[7] To meet its burden, a trademark holder, must first "show that the defendant gained 'gross revenue from the infringement,'" before "the burden shifts to the defendant infringer" to prove the amount of any deductions. *Gianni Versace, S.p.A., v. Versace 19.69 Abbigliamento Sportivo SRL*, 328 F. Supp. 3d 1007, 1029 (N.D. Cal. 2018 (quoting *Fifty-Six Hope Rd.*, 778 F.3d at 1076.). (Doc. No. 198 at 18-19.)

## C. Disclosure of Mr. Hosfield's Unjust Enrichment Opinions

Plaintiff contends that Hosfield's "unjust enrichment calculations must be excluded because they were not disclosed until his rebuttal report, thereby depriving Plaintiff of the ability to respond." (Doc. No. 157 at 19.) Allowing Hosfield to proceed in this manner would be extremely prejudicial to Plaintiff.[8] *Id.* at 22. Additionally, the Court should also bar Hosfield from testifying as to the various supposed regressions and analyses that he described at his deposition but that he did not disclose in his expert report as well.[9] *Id.*

Defendant disputes Plaintiff's contention arguing that "[t]he Lanham Act establishes a burden shifting framework for disgorgement of a defendant's profits, under which "[t]he trademark holder has the burden to prove the defendant infringer's gross revenue from the infringement. Then the burden shifts to the defendant infringer to prove expenses that should be deducted from the gross revenue." *Fifty-Six Hope Rd.*, 778 F.3d at 1076.[10] In order to meet its burden, a trademark holder, must first "show that the defendant gained 'gross revenue from the infringement,'" before 'the burden shifts to the defendant infringer" to prove the amount of any deductions.

*Gianni Versace, S.p.A., v. Versace 19.69 Abbigliamento Sportivo SRL*, 328 F. Supp. 3d 1007, 1029 (N.D. Cal. 2018) (quoting *Fifty-Six Hope Rd.*, 778 F.3d at 1076).

The pertinent inquiry here is whether Hosfield timely disclosed his unjust enrichment opinions. Upon review, the Court notes that Hosfield's opening report

---

[8] It is "simply unfair" for "a party with the burden of proof on an issue" to disclose its opinions in rebuttal expert reports so that "their work would not be subject to a direct response from any opposing expert." *People v. Kinder Morgan Energy Partners*, 159 F. Supp. 3d 1182, 1192 (S.D. Cal. 2016.)

[9] In his reports, Hosfield disclosed four regressions: two for Keystone sales volumes and two for Stone sales volumes. (Doc. No. 157 at 22.)

[10] *See Lindy Pen*, 982 F.2d at 1408 ("The plaintiff has only the burden of establishing the defendant's gross profits from the infringing activity with reasonable certainty …. The defendant thereafter bears the burden of showing which, if any, of its total sales are not attributable to the infringing activity ….").

1 | included a detailed analysis of "whether any sales of Keystone beers in 2017 and 2018
2 | could be related to the refreshed packaging accused of trademark infringement." (Doc.
3 | No. 198 at 19.) In that report, Hosfield performed several quantitative analyses—that
4 | "[t]here was no discernable increase in the sales of the Keystone beers attributable to the
5 | packaging refresh introduced into the market in April 2017.[11] *Id.* at 19-20. The only
6 | thing Hosfield did not do was respond to Distler's calculation of purported revenue
7 | attributable to alleged infringement until after Distler submitted her opening report
8 | because the information about "incremental sales" claimed by Plaintiff was not available
9 | to him until after Distler served her opening report. Thereafter, Hosfield disclosed his
10 | regression analyses in his rebuttal report as he was permitted to do. Thus, the Court finds
11 | that Hosfield's opinions were timely and properly disclosed. Therefore, the motion is
12 | DENIED on this point.

At this juncture, the Court **DENIES** the Plaintiff's motion without prejudice.
Hosfield will be permitted to testify subject to cross-examination.

## III. DEFENDANT'S MOTION TO EXCLUDE EXPERT TESTIMONY BY CARRIE L. DISTLER

### A. Ms. Distler's Opinion regarding Reasonable Royalty

Defendant seeks to exclude Plaintiff's damages opinion concerning purported
reasonable royalty damages as speculative, unreliable, and falling far short of meeting the
*Daubert* standard. Trademark damages must be established with "reasonable certainty"
and have "a reasonable basis for computation." *McClaran v. Plastic Indus., Inc.*, 97 F.3d
347, 361 (9th Cir. 1996). Moreover, courts should deny monetary damages in trademark
infringement cases where damages are remote or speculative. *Id.*

---

[11] Hosfield also "calculate[d] any deductions from net revenue" in his opening report,
explaining that "in 2017 and 2018, [Keystone] gross margin and operating profit
declined," consistent with his ultimate conclusion that the increase in Keystone sales was
attributable to the refresh. (Doc. No. 198 at 20.)

1    Plaintiff disputes Defendant's contention arguing that it properly and timely

2    disclosed its expert damages opinion at the deadline for opening expert reports. (Doc.

3    No. 204 at 3.) Furthermore, Plaintiff argues that "[a] reasonable royalty is a well-

4    established and proper manner of assessing actual damages in trademark litigation,

5    including where there is no prior alleged licensing relationship or pre-existing intent to

6    license to the defendant." *Id.* at 1. The facts in this case are more than sufficient to

7    support a non-speculative reasonable royalty calculation in a trademark case, regardless

8    of the plaintiff's willingness to license. *Id.* at 10.

9        As to Distler's qualifications, the Court notes that she is an economist and

10   nationally-recognized expert in evaluating damages related to the misuse of intellectual

11   property.[12] (Doc. No. 204 at 1.) Moreover, she is a Senior Managing Director at FTI

12   Consulting and member of the Intellectual Property practice in the Forensic & Litigation

13   Consulting segment. With nearly 15 years of professional experience, she has provided

14   expert testimony related to damages on multiple occasions including reasonable royalty

15   assessments for complex financial and cost analyses to derive measures of value for

16   patented features, use of comparable licenses to determine royalty rates, and competitive

17   market evaluations to ascertain impacts of the patented features.

18       The requirement that expert testimony "assist the trier of fact" either "to

19   understand the evidence" or "to determine a fact in issue" goes primarily to relevance.

20   *Daubert*, 509 U.S. at 591. "Expert opinion testimony is relevant if the knowledge

21   underlying it has a valid connection to the pertinent inquiry." *Primiano*, 598 F.3d at 565.

22   The pertinent inquiry here is the appropriate reasonable royalty rate for trademark

23   infringement. Distler's testimony, with a sufficient basis in experience and education,

24   speaks directly to this point. That is enough to assist the trier of fact. A court would

25   have to find that Distler is "qualified as an expert by knowledge, skill, experience,

26

27

---

28   [12]    Distler's ninety-two-page expert report explains that Defendant's conduct has
caused substantial economic injury to Plaintiff. (Doc. No. 204 at 1.)

1  training, or education" to render an opinion on reasonable royalty. The motion is
2  DENIED on this point.

3  **B.    Ms. Distler's Disclosed Opinions**

4  Defendant contends that Plaintiff's two measures of damages—reasonable royalty
5  and corrective advertising—to support a claim for damages of over $50 million should be
6  excluded because Plaintiff failed to comply with Rule 26(a) and (e) by failing to disclose
7  the "specific categories and computations of any damages" on which it now relies in
8  either its initial disclosures (or supplements thereto) or in response to Defendant's
9  Interrogatory No. 9. (Doc. No. 159 at 17.) As a result, Defendant was deprived of the
10  opportunity to develop the factual record as to purported reasonable royalty and
11  corrective advertising damagesa, and it is far too late to reopen discovery as to those
12  issues now. *Id.*

13  Plaintiff disputes Defendant's argument contending that Plaintiff told Defendant in
14  its discovery responses that it would lay out its damage theories and calculations in an
15  expert report—as in common and appropriate in complex intellectual property disputes.[13]
16  (Doc. No. 204 at 18.) In fact, it is normally not possible to disclose sophisticated
17  intellectual property damages calculations at the Rule 26(a) deadline.[14] Moreover,
18  Defendant's own cases confirm that it is entirely appropriate to use damages experts to
19  calculate damages in a sophisticated case and to inform the opposing party that one will
20  do so. *Id.* at 19. Furthermore, there is no failure of disclosure because Plaintiff clearly
21  and repeatedly advised Defendant that it would be seeking all its lost profits and actual

23
24  [13]    Defendant never objected to this approach, which has been endorsed in many
cases, including the two on which Defendant primarily relies. (Doc. No. 204 at 18.)
25  [14]    It is usually not possible to disclose sophisticated intellectual property damages
calculations at the Rule 26(a) deadline—something recognized by the Advisory
26  Committee Notes to Rule 26, which provides that "a party would not be expected to
27  provide a calculation of damages" in cases where that "depends on information in the
possession of another party or person." *Corning Optical Commc'ns Wireless Ltd. V.*
28  *Solid*, 306 F.R.D. 276, 277 (N.D. Cal. 2015).

damages, the "nature" and "measure" of which were to be explained in an expert report. *Id.* at 20. As to the HFF License Agreement, Plaintiff contends it was disclosed within a reasonable time for Defendant to make use of it, including for depositions of damages 30(b)(6) witnesses. *Id.* Lastly, Plaintiff is unaware of any prejudice suffered by Defendant arising from when the HFF License was disclosed to Defendant.

The Court finds the arguments raised here to be like those raised in the prior Hosfield Motion. Having considered the arguments presented by each side, the Court finds that Distler's opinions were timely and properly disclosed. The motion is DENIED on this point.

Therefore, consistent with the above analysis, the Defendant's Motion to exclude testimony by Expert Carrie L. Distler is **DENIED**.

## IV. PLAINTIFF'S MOTION TO PRECLUDE TESTIMONY BY HEIDI HARRIS

### A. Ms. Harris's Expert Opinions

Defendant has listed Heidi Harris[15] ("Harris") to testify at trial regarding the volume of historical Keystone packaging and other materials collected from the Coors Archives that use "STONE" or "STONES," and the dates when those items were put into

---

[15] Harris holds a B.A. in Anthropology from Colorado State University and an M.S. in Museum and Field Studies from the University of Colorado Boulder, with an emphasis in Archives. She devoted her master's thesis to "an environmental study of the University of Colorado's] nitrate film and nitrate negative collection" during which she "provided a preservation assessment and analysis of what their best methods are to preserve that specific collection for long-term use. Prior to her current position as the Coors Archivist, Harris worked with many of Colorado's most highly recognized archives and museums, including the Golden History Museum; the Lafayette Miners Museum; the Norlin Library at the University of Colorado Boulder; the University of Colorado Natural History Museum; and the Denver Museum of Nature and Science, among other institutions. She is also a member of the Society of American Archivists and has attended its annual meeting, where she presented the findings of her business archivist working group in 2018. (*See* Doc. No. 194 at 3-4.)

the market by Coors Brewing Company. (Doc. No. 194 at 1.) Plaintiff contends that Harris lacks the necessary qualifications to render certain expert opinions. (Doc. No. 162 at 1.) First, Plaintiff challenges Harris's qualifications to offer three specific opinions because she is not an expert and the professed opinions do not require any genuine expertise.[16] *Id.* at 3. Defendant responds that Harris is an expert witness archivist whose testimony will provide the volume of historical Keystone packaging and other materials collected from the Coors Archives that use "STONE" or "STONES," and the dates when those items were put into the market by Coors Brewing Company. (Doc. No. 194 at 1.) This testimony will "help the trier of fact to understand the evidence" and to determine facts at the core of this case, including Defendant's counterclaim that it has the right to use STONE and STONES in connection with Keystone beer based on its longstanding historical use. *Id.* at 1-2. Plaintiff replies that Harris should not be permitted to testify because her proposed testimony is unrelated to any expertise she may have and because her opinions do not cover any topics jurors are incapable of understanding. (Doc. No. 232 at 1.)

"The Ninth Circuit has found opinions based on an expert's experience in the industry to be proper: 'When evaluating specialized or technical expert opinion testimony, the relevant reliability concerns may focus upon person knowledge or experience.'" *GSI Tech., Inc. v. Cypress Semiconductor Corp.*, No. 11-cv-03613-EJD, 2015 WL 364796, at *2 (N.D. Cal. Jan. 27, 2015) (quoting *United States v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006)). "Subjective beliefs and opinions are proper expert testimony." *Id.* Here, Harris has extensive experience working as an Archivist in Defendant's Golden, Colorado archives, where she has been responsible for

---

[16]    Harris purports to offer three expert opinions in this litigation: (1) that Defendant consistently used the word "Stones" on 30-packs of Keystone, (2) that Defendant consistently used "Stone" on Keystone materials generally, and (3) to provide the dates associated with historical Keystone marketing materials. (*See* Doc. No. 162 at 3.)

maintaining a collection comprised of hundreds of thousands of historical items reflecting the 146-year-old history of Coors Brewing Company and the products it has offered since its founding in 1873. (Doc. No. 194 at 1.) Her experience as an archivist in the beer industry qualifies her to testify about her impressions about the historical Keystone packaging and other materials collected from the Coors Archives that use "STONE" or "STONES," and the dates when those items were put into the market by Coors Brewing Company. *See United States v. Brooks*, 610 F.3d 1186, 1195-96 (9th Cir. 2010) ("The fact that Detective Hein lacked an advanced degree, supervisory experience, previous experience as an expert witness, or relevant publications did not render her unfit to provide expert testimony.").

The Court finds that Harris's opinions will be helpful to the jury and they are sufficiently reliable to be admissible. The weight to be accorded her testimony, since she does not purport to have a sophisticated understanding of trademark law, did not consult other experts, and did not conduct any type of market study in forming her opinions, is a question for the jury. *See Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969-70 (9th Cir. 2013) (Basically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable. The district court is not tasked with deciding whether an expert is right or wrong, just whether her testimony has substance such that it would be helpful to a jury."). The motion is DENIED on this point.

## B.    Ms. Harris's Inability to Articulate Her Purported Opinions

Plaintiff contends that Harris was unable to articulate her responses to questioning at her deposition and was unable to provide responses to questions "[w]ithout looking at every single piece of Keystone item [sic]." (Doc. No. 162 at 6.) Moreover, Harris admitted that she has "not been able to sit down at any specific point in time with the clear end goal of examining the collection that has been provided" to evaluate the historical sweep of the use of "STONE" and "STONES" for Keystone. *Id.* In response, Defendant argues that Harris, when asked, specifically described—in accordance with her

18

1  expert disclosure—that she is "planning on testifying that Keystone has been a consistent
2  brand through the years with its usage of 'STONES' on 30-packs" and that Keystone
3  "has been a consistent brand in its usage of 'STONE' for other materials for
4  advertisements, point-of-sale items or anything that includes any kind of packaging," and
5  that "she would also provide any dates" for such materials. (Doc. No. 194 at 9.)

6       The Court concludes that Harris's opinions will be helpful to the jury and that they
7  are sufficiently reliable to be admissible. The motion is DENIED on this point.

8       **C.    Ms. Harris's Qualifications Regarding Market Circulation Materials**

9       Plaintiff contends that Harris will testify, in addition to the existence of prototypes,
10  testimony regarding whether historical materials made their way into commerce. (Doc.
11  No. 162 at 8.) Harris will base her opinions on this issue on "two conversations she had,
12  one with Mr. Wexelbaum (MillerCoors's Economy Brands Marketing Director), and the
13  other with Ray Toms (another MillerCoors employee), in which they said that because
14  Keystone is a relatively small brand by MillerCoors's standards, the Company would
15  likely have released anything that they made into the market. *Id.* Defendant contends
16  that Plaintiff simply ignored Harris's deposition testimony to the contrary—twice in
17  order to assert this argument. (Doc. No. 194 at 11.) Specifically, Harris testified both in
18  her capacity as a 30(b)(6) witness and as a non-retained expert witness, and she can
19  form—and indeed has formed—opinions on historical Keystone materials having entered
20  U.S. commerce. *Id.* In fact, Harris can opine that Keystone's historical materials were
21  put into U.S. commerce based on various information that is of the sort that archivists
22  consider in attempting to understand the historical context for the information they are
23  responsible for maintaining and preserving. *Id.* at 12.

24       The Court concludes that Harris's opinions will be helpful to the jury and that they
25  are sufficiently reliable to be admissible. The motion is DENIED on this point.

26       **D.    Ms. Harris's Testimony regarding Keystone Nicknames**

27       Plaintiff contends that "the skills of an archivist have no relation to the issue of
28  what nickname people allegedly used for Keystone beer. (Doc. No. 162 at 9.) As such,

3:18-cv-00331-BEN-LL

whatever expertise Harris has as an archival scientist is irrelevant to the nicknames customers allegedly used for Keystone beer. *Id.* Defendant asserts that Plaintiff's questioning on this issue is irrelevant since, "at no point in her expert disclosure or in her deposition was there any assertion that Harris holds any expert opinion on Keystone nicknames. (Doc. No. 194 at 13.)

The Court concludes this to be a moot issue and irrelevant assuming Harris is not questioned on this topic at trial. In the unlikely event she is questioned about Keystone Nicknames, she shall not respond as those questions would be outside Harris's area of specialty. However, as it currently stands, the motion is DENIED on this point.

Therefore, consistent with the above analysis, the Plaintiff's Motion to preclude testimony by Expert Heidi Harris is **DENIED**.

## V. **DEFENDANT'S MOTION TO EXCLUDE TESTIMONY BY EXPERT DAVID W. STEWART**

Defendant moves under *Daubert* to exclude Stewart's expert testimony regarding four surveys he conducted on *confusion* caused by Defendant's "Own the Stone" campaign.[17] (Doc. No. 164 at 1.) Furthermore, Defendant alleges Stewart and Plaintiff concealed a fifth unfavorable survey from Defendant, refusing to turn over evidence, information, or Stewart's opinions from it. *Id.* Plaintiff disputes Defendant's claims asserting Stewart is an internationally-recognized authority on marketing and consumer perception studies, whose surveys and testimony is regularly accepted and approved by courts throughout the United States on Trademark litigation. (Doc. No. 209 at 1.) Plaintiff argues that Stewart prepared a meticulous analysis of confusion by conducting three surveys (*using principles and methods routinely accepted by trial and appellate courts throughout the United States and this Circuit*), as well as designing an in-person

---

[17] The survey evidence is: (1) unreliable; (2) does not demonstrate confusion; (3) based on novel and unproven methodology; and (4) untimely disclosed. (Doc. No. 164 at 1.)

1    qualitative study to assess how consumers interact with the pre-and post-Rebrand

2    Keystone products on store shelfs. *Id.*

3    **A.    Mr. Stewart's Concealing of Unfavorable Survey Evidence**

4          Defendant contends Stewart deliberately concealed non-privileged survey results

5    relevant to the critical *confusion* issue in this case. Defendant argues that testifying

6    experts must provide a report containing "a complete statement of all opinions the

7    witness will express and the basis and reasons for them" along with "the facts or data

8    considered by the witness in forming" their opinions. Fed. R. Civ. P. 26(a) (2)(b)(i)-(ii).

9    As a result, he should be excluded from testifying entirely in this case.[18] (Doc. No. 164 at

10    5.)

11          Plaintiff disputes Defendant's claim Stewart "somehow 'concealed' preliminary

12    results from a follow-up study, when those results were not 'concealed' at all and, in any

13    event, were not relied upon by Dr. Stewart." (Doc. No. 209 at 2.) Furthermore, if

14    Defendant believes Stewart should have produced the results of the missing survey, "it

15    should file an appropriate motion, not seek the extreme remedy of excluding Dr. Stewart

16    altogether—in its *Daubert* motion. *Id.* at 25.

17          The Court finds that the appropriate sanction in this case is not exclusion, but to

18    allow Stewart to testify concerning the undisclosed fifth survey, but also to allow cross-

19    examination concerning the unfavorable survey evidence. The jury will be free to

20    determine what effect, if any, that has on the reliability of Stewart's conclusions. The

21    motion is DENIED on this point.

22    **B.    Mr. Stewart's Surveys I - III**

23          Defendant contends that *Surveys I-III* should be excluded because all three used

24    improper test images, primarily of the accused Keystone Light can. (Doc. No. 164 at 9)

25    Specifically, Defendant argues all three should be excluded for violating the accepted

26

27    _____

28    [18]    Stewart secretly re-ran his Survey I, this time using "the same Keystone [images] that Mr. Poret had used." *Id.*

principle that, "[t]o be probative of actual confusion, a survey must use stimuli that approximate what a potential customer would encounter in making purchasing decisions." *Kargo Glob., Inc. v. Advance Magazine Publishers, Inc.*, No. 06 CIV 550 JFK, 2007 WL 2258688, 10-12 (S.D.N.Y. Aug. 6, 2007). *Id.* at 9-10. The photographs utilized by Stewart in Survey's I – III did not meet this burden.

Plaintiff disputes Defendant's claim arguing that it was not in error to use a Defendant produced image of the Keystone can in Stewart's *confusion* survey (*Survey I*), nor was it improper to use an actual photograph of a Keystone can on a store shelf in his name recognition and product association surveys (*Surveys II and III*). (Doc. No. 209 at 2.)

Here, the Court finds in the case of *Survey I*, Defendant's criticism of the product images is meritless because the images portray the rebranded can and packaging materials as they are found in the marketplace.[19] *Id.* at 7. As to *Surveys II and III*, Defendant's assertions regarding Stewart's choice of survey images is a classic example of a question that goes to the weight of the survey, not its admissibility, as courts in this Circuit have repeatedly held. *See Morton & Bassett, LLC v. Organic Spices, Inc.*, No. 15-CV-01849-HSG, 2017 WL 3838097 (N.D. Cal. Sept. 1, 2017) (denying *Daubert* motion on grounds that selection of survey images goes to weight, not admissibility). The motion is DENIED on this point.

## C.   Mr. Stewart's Surveys II and III

Defendant contends that Stewart's *Survey II* (*Product Association Survey*) and *Survey III* (*Name Recognition Survey*) do not reflect either of the two likelihood of confusion survey formats, "*Eveready*" or "*Squirt*" commonly utilized to demonstrate

---

[19]   The way marks appear in the marketplace is not limited to photographs of the products but includes the way they are advertised and promoted. *See, e.g., Marketquest Grp. Inc. v. BIC Corp.*, No. 11-CV-618-BAS (JLB), 2018 WL 1756116, at *2 (S.D. Cal. Apr. 12, 2018) (admitting survey that used pages from catalogs as stimuli).

1  trademark infringement.[20] (Doc. No. 164 at 16.) Moreover, Defendant argues neither *II*

2  or *III* is based on well-accepted, reliable methodologies, nor tests for likelihood of

3  confusion. *Id.* As a result, both *Surveys* are irredeemably flawed and should be excluded

4  as unreliable.

5      Plaintiff disputes Defendant's contention the surveys are invalid arguing that

6  *Survey II* is probative evidence of likelihood of confusion because it shows a clear

7  association between the rebranded Keystone packaging and the STONE® mark, while

8  *Survey III* is evidence related to the likelihood of consumer confusion in various market

9  situations in which the name "STONE" is used as a product identifier. (Doc. No. 209 at

10  13, 18.)

11      After thoughtful consideration, the Court finds that Stewart's *Survey II* and *III*

12  were conducted according to accepted principles. *Clicks Billiards, Inc. v. Sixshooters,*

13  *Inc.*, 251 F.3d 1252, 1263 (9th Cir. 2001). Moreover, the Court finds that Defendant's

14  contentions regarding Stewart's surveys go to the weight of the evidence, not its

15  admissibility. *Prudential Ins. Co. v. Gibraltar Fin. Corp.*, 694 F.2d 1150, 1156 (9th Cir.

16  1982), cert. denied, 463 U.S. 1208 (1983). ("Technical unreliability goes to the weight

17  accorded a survey, not its admissibility."). As in *Fortune Dynamic, Inc.* v. Victoria's

18  Secret Stores Brand Mgmt., 618 F.3d 1025, 1037-38 (9th Cir. 2010), the defects raised by

19  Defendant have been determined by the Ninth Circuit not to impact the admissibility of

20  the survey. The motion is DENIED on this point.

21  **D.    Mr. Stewart's Survey IV**

22      Defendant contends that Stewart's *Survey IV* should be excluded because it is not a

23  proper rebuttal survey, and it is based on the argument that it is a qualitative, not a

24  quantitative survey. (Doc. No. 236 at 19.) Defendant contends *Survey IV* suffers from

25

26

27  [20]    At his deposition, Stewart admitted that he is unaware of any court accepting either
28  a so-called "Product Association" survey or a "Name Recognition" survey as evidence of
   a likelihood of confusion in a trademark matter. (Doc. No. 164 at 16.)

numerous fatal flaws and is not a scientifically valid survey probative of the issues at the core of this dispute. *Id.*

Plaintiff disputes Defendant's contention that it is not a valid survey simply because it did not follow the same format as Jeffrey Stec's survey. Stec performed an in-person, non-videotaped survey where consumers were presented with Stone in one room and then five beers placed on separate pedestals in another, with respondents encouraged to carefully inspect and evaluate the different packages. Stewart's rebuttal report was designed to "contradict or rebut evidence on the same subject matter identified by another party," in this case Stec. *Id.* As with § C *supra*, the Court finds Stewart's *Survey IV* admissible. The motion is DENIED on this point.

Therefore, consistent with the above analysis, the Defendant's Motion to exclude testimony by expert David W. Stewart is **DENIED**.

## VI. PLAINTIFF'S MOTION TO PRECLUDE TESTIMONY BY EITHER HAL PORET OR JEFFERY A. STEC

The Plaintiff moves pursuant to Fed. R. Evid. 403 to preclude the parallel, duplicative expert opinions of Hal Poret ("Poret") and Jeffery Stec ("Stec") critiquing Professor Dave Stewart, Ph. D ("Stewart"). (Doc. No. 168-1 at 1.) Plaintiff asserts that Poret and Stec's opinions are cumulative and will unduly waste judicial and party resources.[21] Expert testimony is properly excluded where, "if allowed, [it] would be cumulative to and much weaker than that of" another expert proffered by the same party. *United States ex rel. Jordan v. Northrop Grumman Corp.* No. CV 95-2985 ABC (EX), 2003 WL 27366247, at *4 (C.D. Cal. Feb. 24, 2003). Defendant disputes Plaintiff's claim and argues it should not be forced to choose which of its survey experts it may call to testify at trial on the critical issue of 'likelihood of confusion.' (Doc. No. 192 at 1.)

///

---

[21]    Federal Rule of Evidence 403 contemplates precisely this issue and precludes parties from "loading the box" with experts.

**A.      Identical Critiques of Professor Stewart**

Plaintiff moves to preclude either Poret or Stec's critique of Stewart because "*[b]oth* experts reviewed and critiqued Stewart's survey and report." (Doc. No. 168-1 at 2.) Defendant asserts that its experts' critiques are intended to address the central issue in this case, demonstrating that when respondents are shown accurate images of Keystone beer, there was no likelihood of confusion between the parties' cans and packaging materials. (Doc. No. 192 at 5.)

As an initial matter, the Court notes that Plaintiff does not challenge the relevance or reliability of either Poret or Stec's testimony. Accordingly, there is no basis under *Daubert* to exclude the testimony of either expert. Next, Rule 403 requires the court to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403. Here, without a doubt, the surveys evidence produced by Poret and Stec are prejudicial to the position of Plaintiff, but the Court finds that this is so *only* because it has high probative value. Because the Court finds that the probative value is not outweighed by its prejudicial effect, the Court does not find that Rule 403 requires exclusion of this evidence at this time. Instead, the jury will have to decide what weight, if any, to afford the survey after considering Defendant's evidence. The motion is DENIED on this point.

**B.      Similar Surveys re Likelihood of Confusion**

Plaintiff contends that Poret's and Stec's surveys were essentially identical.[22] (*See* Doc. No. 168-1 at 3.) Thus, the result is that neither study adds anything unique, and the experts will provide testimony that is duplicative.[23] *Id.* at 4. Defendant argues that while

---

[22]      "Stec said in his report that he conducted a survey 'that followed a similar design as Dr. Stewart's survey, but correct the flaws in that survey", while Poret 're-ran the Stewart Survey adopting Dr. Stewart's methodology' while correcting the 'critical flaw' in that survey." (Doc. No. 168-1 at 3.)

[23]      "...the Court has wide discretion to exclude, or partially exclude the testimony of Poret or Stec as duplicative to prevent undue prejudice[;]" (Doc. No. 225 at 2.)

Stec[24] and Poret[25] might have considered each other's criticisms of Stewart consistent with the best survey practices, they did not repeat all of the criticisms that the other had made in their respective expert reports.

The Court finds that even if there are minor points of overlap between Poret and Stec's survey's, each was independently formed and is distinct from the other. Moreover, each offers a relevant and reliable counter analysis of Stewart's likelihood of confusion survey analysis, which is a critical issue in this case. Thus, the motion is DENIED on this point.

Therefore, consistent with the above analysis, the Plaintiff's Motion to preclude testimony by either Poret or Stec is **DENIED**.

## CONCLUSION

The Court orders as follows:

(1) The Plaintiff's Motion to preclude testimony by Expert Michael Kallenberger is **DENIED;**

(2) The Plaintiff's Motion to preclude testimony by Expert Mark J. Hosfield is **DENIED;**

(3) The Defendant's Motion to preclude testimony by Expert Carrie L. Distler is **DENIED;**

(4) The Plaintiff's Motion to preclude testimony by Expert Heidi Harris is **DENIED;**

---

[24] Stec performed a detailed analysis of how Stewart's improper sampling in Survey III contravened best survey practices and, as a result, may have introduced bias toward "early responders." (Doc. No. 192 at 7.)

[25] Poret, on the other hand, scrutinized respondents' open-ended responses in Survey II—and extrapolated that many had "commented on the misleading nature of the [Keystone] image," to the point that a number of respondents "even volunteered" that something was wrong with the Keystone Image. (Doc. No. 192 at 7.)

3:18-cv-00331-BEN-LL

(5) The Defendant's Motion to exclude testimony by Expert David W. Stewart is **DENIED**;

(6) The Plaintiff's Motion to preclude testimony of Experts Hal Poret or Jeffery A. Stec is **DENIED**;

**IT IS SO ORDERED.**

DATED: February 2⁄ , 2020

Hon. Roger T. Benitez
United States District Court