UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STONE BREWING CO., LLC,<br><br>       Plaintiff / Counterclaim Defendant,<br><br>v.<br><br>MILLERCOORS LLC,<br><br>       Defendant / Counterclaim Plaintiff. | Case No.: 3:18-cv-00331-BEN-LL<br><br>**ORDER:**<br><br>**(1) GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT;**<br><br>**(2) DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; and**<br><br>**(3) DENYING AS MOOT PLAINTIFF'S MOTION TO STRIKE PORTIONS OF DEFENDANT'S SUMMARY JUDGMENT BRIEFS OR, IN THE ALTERNATIVE, FOR LEAVE TO FILE SUPPLEMENTAL BRIEF**<br><br>**[ECF Nos.: 175, 170, 271.]** |

Before the Court is Plaintiff Stone Brewing Co., LLC's ("Plaintiff") and Defendant MillerCoors LLC's ("Defendant") Motions for Summary Judgment, as well as Plaintiff's Motion to Strike portions of Defendant's Summary Judgment Briefs or, in the alternative,

for Leave to File Supplemental Brief. All three motions are fully briefed, and the Court has considered all the arguments presented, even those not discussed in this Order. To the extent that an argument is not acknowledged in this Order, it is rejected.

## BACKGROUND

For purposes of this decision, the Court assumes the parties are familiar with the procedural history and many disputed facts of the suit. The Court relies on the background facts provided in the Complaint and the parties' summary judgment motions to provide the following brief case background.

Plaintiff Stone is a San Diego-based craft brewer that has sold its artisanal Stone® beers nationwide for over two decades. (Doc. No. 1 ¶ 17.) From the beginning, Stone developed and maintained its trademark and brand. Stone's founders applied for the STONE® mark on July 29, 1997. *Id*. at 4. The mark was registered without objection on June 23, 1998, under U.S. Registration No. 2,168,093. *Id*. Roughly ten years later, on or about June 28, 2008, the Patent Trade Office ("PTO") recognized Stone's continuous use of the brand and granted Stone's Combined Declaration of Use and Incontestability application, making the STONE® mark incontestable. *Id*. Today, every Stone beer bears the registered incontestable trademark STONE®. *Id*. ¶ 20. Stone filed suit in this matter out of concern for its brand reputation.

Defendant Molson Coors is a multi-national beer conglomerate formed after a series of mergers involving Coors, Miller, and Canadian brewing giant Molson. In the United States, Molson Coors operates through its subsidiary, Defendant MillerCoors. Among the dozens of brands in its portfolio, MillerCoors has sold domestic lager brand Keystone since 1989. *Id*. at 33.

The Keystone line of beers consists of Keystone, Keystone Ice, and Keystone Light. (Doc. No. 44 at 1.) Since its inception, MillerCoors and its predecessors have sold "Keystone" sub-premium beer in cans with a primary KEYSTONE® mark and prominent imagery of the Colorado Rocky Mountains. (Doc. No. 1 at 34.) The name "Keystone" is the name of a popular ski resort town founded in the 1970s in Colorado.

2

The mountain range depicted on the can is styled after Wilson Peak located in the Rockies. *Id*.

From 1989 through today, Keystone cans have been updated from time to time but have always prominently featured the KEYSTONE® mark. For at least the past twenty-three years, Keystone packaging and advertising have also borne the nickname "STONES." (Doc. No. 44 at 1.)

MillerCoors undertook efforts to 'refresh' its KEYSTONE image by introducing an updated can and package design, in or around April 2017. *Id*. ¶ 38. MillerCoors also began acquiring various independent craft beer breweries like *Saint Archer Brewing*, through its craft beer holding entity, *Tenth and Blake Beer Company*, to expand its holdings and reduce competition. *Id*.

MillerCoors's 'refreshed' can design took "KEYSTONE" and separated "KEY" and "STONE" onto separate lines. (Doc. No. 30-1 at 10.) Its 'refreshed' packaging emphasized "STONE" rather than "KEYSTONE" *Id*. Similar advertising campaigns began to feature the redesigned Keystone can often accompanied by slogans or taglines such as the August 2017 campaign "Hunt the STONE." *Id*.

Since introducing the 'refreshed' can and package design, Keystone Light has gone from MillerCoors's worst, to its best-selling beer of the entire Keystone line. At this same time, Stone noticed a discernable drop in its sales as current and potential purchasers were allegedly confused by Keystone's new can and packaging. To further complicate matters, in many areas of the country, STONE® and KEYSTONE® use identical distribution and marketing channels. *Id*. ¶ 64.

## LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material if it could affect the outcome of the case under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is

genuine if the evidence, viewed in light most favorable to the non-moving party, "is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

The Party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party has the burden of proof at trial on an issue, the moving party must affirmatively show that no reasonable jury could find other than in the moving party's favor. *Id.* at 331 (Brennan, J., dissenting). Where the non-moving party has the burden of proof at trial, "the moving party may discharge its burden of production by either (1) negating an essential element of the opposing party's claim, or (2) showing that there is an absence of evidence to support the non-moving party's case." *Synoptek, LLC v. Synaptek Corp.*, No. 16-1838-CJC (JCGX), 2018 WL 3359017, at *4 (C.D. Cal. June 4, 2018) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-60 (1970) and *Celotex*, 477 U.S. at 325).

Once the moving party meets its initial burden, the non-moving party must go beyond the pleadings and show that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. It can do this by citing to specific parts of the materials in the record or by showing that the materials cited by the moving party do not compel a judgment in the moving party's favor. Fed. R. Civ. P. 56(c). The opposing party may also object to the movant's evidence. *Synoptek*, 2018 WL 3359017, at *4 (citing Fed. R. Civ. P. 56(c)(2)).

The Court will first address the parties Motion's for Summary Judgment, followed by Plaintiff's Motion to Strike.

## DISCUSSION

## I. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

### A. Plaintiff's Request for Judicial Notice

Plaintiff requests that the Court take judicial notice of several documents from United States Patent Trademark Office's ("USPTO") "File History" for U.S. Trademark

numbers: 77284884 for "STONES", 85002333 for "HOLD MY STONES', and 2168093 for "STONE".

A court may take judicial notice of a fact that is not subject to reasonable dispute because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Defendant did not object to the Court taking judicial notice of the documents. Courts may also take judicial notice of "'records and reports of administrative bodies,' file histories, and application materials." *Balance Studio, Inc. v. Cybernet Entm't, LLC*, No. 15-CV-04038-DMR, 2016 WL 1559745, at *1 (N.D. Cal. Apr. 18, 2016) (quoting *Mack v. South Bay Beer Distributors, Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986)); *see Oroamerica Inc. v. D & W Jewelry Co., Inc.*, 10 F. App'x 516, 517 n.4 (9th Cir. 2001).

Because the documents are not subject to reasonable dispute, are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned, and are a matter of public record, (*see Lee v. City of L.A.*, 250 F.3d 668, 689 (9th Cir. 2001)), the Court **GRANTS** Plaintiff's Request for Judicial Notice.

## B. Ownership of a Valid and Legally Protectable Mark

Under the Lanham Act, a mark may become incontestable if it is not challenged within five years of its registration. *See* 15 U.S.C. § 1065(3). To become incontestable, Section § 1065(3) requires that the registered mark be continuously used in commerce for "five consecutive years" subsequent to the date of registration and still be in use in commerce. *Id.* The registration of an incontestable mark is "conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark." 15 U.S.C. § 1115(b).

In this case, the first two elements of a claim for federal trademark infringement are met. First, Plaintiff holds a valid trademark in STONE® as it was registered *without objection* on July 23, 1998, under U.S. Reg. No. 2,168,093. (Doc. No. 175 at 4.) Second, in 2008 (*approximately ten years after registration*), the PTO accepted Plaintiff's

5

Combined Declaration of Use and Incontestability application, making STONE®

"incontestable" as a matter of law. *Id*. "If the mark at issue was federally registered and

had become 'incontestable', pursuant to 15 U.S.C. §§ 1058 and 1065, validity, legal

protectability, and ownership are proved." *Ford Motor Co. v. Summit Motor Products,*

*Inc.*, 930 F.2d 277, 291 (3d Cir. 1991) (citations omitted). Here, the "STONE®" mark is

federally registered and has obtained incontestable status. 15 U.S.C. § 1065. Thus,

Plaintiff has a valid and legally protectable mark.

### C. Likelihood of Confusion

Likelihood of confusion is a question of material fact. *Levi Strauss & Co. v. Blue*

*Bell, Inc.*, 778 F.2d 1352, 1356 n.5 (9th Cir. 1985) ("[T]he question of likelihood of

confusion is routinely submitted for jury determination as a question of fact."). "The

'likelihood of confusion' inquiry generally considers whether a reasonably prudent

consumer in the marketplace is likely to be confused as to the origin or source of the

goods or services bearing one of the marks or names at issue in the case." *Rearden LLC*

*v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1209 (9th Cir. 2011). "Eight factors,

sometimes referred to as the *Sleekcraft* factors, guide the inquiry into whether a

defendant's use of a mark is likely to confuse consumers…." *Fortune Dynamic, Inc. v.*

*Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1030 (9th Cir. 2010) (citing

*AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348-49 (9th Cir. 1979), *abrogated in part on*

*other grounds, Mattel, Inc. v. Walking Mountain Prod.*, 353 F.3d 792 (9th Cir. 2003)).

The eight factors are: (1) *strength of the mark*, (2) *proximity of the goods*, (3) *similarity of*

*the marks*, (4) *evidence of actual confusion*, (5) *marketing channels used*, (6) *type of*

*goods and the degree of care likely to be exercised by the purchaser*, (7) *defendant's*

*intent in selecting the mark*, and (8) *likelihood of expansion of the product lines*.

*Rearden*, 683 F.3d at 1209, (citing *Sleekcraft*, 599 F.2d at 348-49).

"The factors are non-exhaustive and applied flexibly; the *Sleekcraft* factors are not

intended to be a 'rote checklist.'" *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828

F.3d 1098, 1106 (9th Cir. 2016) (quoting *Rearden*, 683 F.3d at 1209).[1]  "Although some factors—such as the similarity of the marks and whether the two companies are direct competitors—will always be important, it is often possible to reach a conclusion with respect to likelihood of confusion after considering only a subset of the factors." *Brookfield Commc'ns, Inc. v. West Coast Entertainment Corp*, 174 F.3d 1036, 1054 (9th Cir. 1999) (citing *Dreamwerks Prod. Grp. v. SKG Studio*, 142 F.3d 1127, 1130-32 (9th Cir. 1998)); *see also Stone Creek*, 875 F.3d at 432 ("Two particularly probative factors are the similarity of the marks and the proximity of the goods.").  "A determination may rest on only those factors that are most pertinent to the particular case before the court, and other variables besides the enumerated factors should also be taken into account based on the particular circumstances." *Rearden*, 683 F.3d at 1209.  "Given the open-ended nature of this multi-prong inquiry, it is not surprising that summary judgment on 'likelihood of confusion' grounds is generally disfavored." *Id.* at 1210.  "However, in cases where the evidence is clear," the Ninth Circuit has "not hesitated to affirm summary judgment on this point." *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1075 (9th Cir. 2006).  The court addresses each *Sleekcraft* factor in turn.

a. <u>Strength of the Mark</u>

"The more likely a mark is to be remembered and associated in the public mind with the mark's owner, the greater protection the mark is accorded by trademark laws." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000) (citing *Kenner Parker Toys Inc. v. Rose Art Indus., Inc.*, 963 F.2d 350, 353 (Fed. Cir. 1992)), *overruled on other grounds, Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).  A mark's strength is evaluated based on two components: "the mark's inherent distinctiveness (i.e., its conceptual strength)" and "the mark's recognition in the market

---

[1]  "Not all factors are created equal, and their relative weight varies based on the context of a particular case."  *Stone Creek, Inc. v. Omnia Italian Design, Inc.,* 875 F.3d 426, 431 (9th Cir. 2017), *cert. denied*, —U.S.—, 138 S. Ct. 1984 (2018).

7

(i.e., its commercial strength)." *Stone Creek*, 875 F.3d at 432 *1352 (citing *Lahoti v. Vericheck, Inc.*, 636 F.3d 501, 508 (9th Cir. 2011)).

"A mark's conceptual strength 'depends largely on the obviousness of its connection to the good or service to which it refers.'" *JL Beverage Co.*, 828 F.3d at 1107 (quoting *Fortune Dynamic*, 618 F.3d at 1032-33).[2] "The more distinctive a mark, the greater its conceptual strength; in other words, a mark's conceptual strength is proportional to the mark's distinctiveness." *M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1080 (9th Cir. 2005). "Arbitrary and fanciful marks, which employ words and phrases with no commonly understood connection to the product, are the two strongest categories, and 'trigger the highest degree of trademark protection.'" *JL Beverage Co.*, 828 F.3d at 1107 (quoting *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 631 (9th Cir. 2005)). "An arbitrary mark consists of common words arranged in an arbitrary way that is non-descriptive of any quality of the goods or services," while fanciful marks consist of "coined phrase[s]," such as "Kodak" cameras, "invented solely to function as a trademark. *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1390 (9th Cir. 1993). Suggestive marks, which fall in the middle of the spectrum, "suggest a product's features and require consumers to exercise some imagination to associate the suggestive mark with the product." *JL Beverage Co.*, 828 F.3d at 1107 (citing *Fortune Dynamic*, 618 F.3d at 1033). Finally, descriptive and generic marks are the two weakest categories. *Id.* "Descriptive marks define a particular characteristic of the product in a way that does not require any imagination, while generic marks describe the product in its entirety and are not entitled to trademark protection." *Id.* (citing *Surfvivor Media*, 406 F.3d at 632).

---

[2]     "To determine a mark's conceptual strength, we classify a mark along a spectrum of five categories ranging from [most to least distinctive]: arbitrary, fanciful, suggestive, descriptive, and generic." *Id.* (citing *Network Automation Inc. v. Advanced Systems Concepts, Inc.*, 638 F.3d 1137, 1149 (9th Cir. 2011).

"After identifying whether a mark is generic, descriptive, suggestive, arbitrary, or fanciful, the court determines the mark's commercial strength." *Id.* (citing *Miss World (UK) Ltd. v. Mrs. Am. Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir. 1988), *abrogated in part on other grounds, Eclipse Assocs. Ltd. v. Data Gen. Corp.*, 894 F.2d 1114, 1116 n.1 (9th Cir. 1990). Commercial strength "is based on actual market place recognition." *Network Automation Inc. v. Advanced Systems Concepts, Inc.*, 638 F.3d 1137, 1149 (9th Cir. 2011) (internal quotations omitted). "Commercial strength may be demonstrated by commercial success, extensive advertising, length of exclusive use, and public recognition." *Adidas Am., Inc. v. Calmese*, 662 F. Supp. 2d 1294, 1303 (D. Or. 2009) (citing *M2 Software,* 421 F.3d at 1081). Further, "a suggestive or descriptive mark, which is conceptually weak, can have its overall strength as a mark bolstered by its commercial success" or by advertising expenditures that increase its market recognition. *M2 Software*, 421 F.3d at 1081 (citing cases).

Previously, while considering Plaintiff's motion for a preliminary injunction, this Court determined that Plaintiff's STONE® mark was conceptionally[3] and commercially[4] strong and recognizable based on the record before it *at that time*. (*See* Doc. No. 85 at 6-

---

[3]    In the Court's earlier Order, it said, "STONE® may be considered a suggestive or possibly arbitrary mark. However, currently, the Court is unconvinced that STONE® is an arbitrary mark because the can and packaging incorporate more than just the letters STONE. For example, even a glancing look at the "Selection of Stone's Iconic Brews" in the Complaint show a large gargoyle perched ominously over the STONE® mark, aptly described as Stone's mascot. Stone's packaging appears to reflect the same. Both taken together, serve to strengthen the Court's finding that its mark is suggestive, not arbitrary. However, the Court agrees, especially considering the marks incontestability, STONE® is entitled to the strong protection afforded to suggestive marks." (Doc. No. 85 at 7.)

[4]    In the Court's earlier Order, it said, "The Court finds Stone's mark to be commercially strong and recognizable. Moreover, while it is both nationally and internationally known, it need not reach the level of worldwide profitability and recognition of other market icons like Apple or Starbucks in order to be considered a 'strong' mark." (Doc. No. 85 at 6.)

9

7.)  As the evidentiary record has changed since the preliminary injunction stage, the Court will reevaluate the strength of the mark based on the current record.

Plaintiff argues its mark remains conceptually strong because it is arbitrary, fanciful, and because it does not inherently describe or even "suggest" anything at all about beer.[5]  (Doc. No. 175 at 5.)  It is also commercially strong since it is "both nationally and internationally known," and "is one of the ten largest craft breweries in the United States, with sales at thousands of stores, bars, and restaurants nationwide."  *Id*. at 6.  Moreover, "Stone is widely recognized as an industry leader by national and international publications including *The New York Times*, *The Wall Street Journal*, *The Economist*, *USA Today*, and *Time* magazine.  *Id*.

Defendant argues that Plaintiff's mark is conceptually weak because at least ten other craft breweries actively use the word "Stone" in their name.  (Doc. No. 202 at 6.)  Moreover, it is commercially weak as evidenced by the fact that even Plaintiff's own executives admit "that Stone Brewing is 'not a broadly known brand' and that 53% of beer drinkers" have "never even heard of Stone Brewing; even among craft beer drinkers, nearly a quarter of them had never heard of Stone Brewing."[6]  *Id*.

It is clear the parties dispute how broadly the relevant market should be characterized in evaluating whether the field is crowded with the word "STONE."  *See JL Bev. Co.*, 828 F.3d at 1108.  "In other words, there are genuine disputes of material fact as to what constitutes the relevant 'field,' whether the field is 'crowded,' and the effect of the foregoing on the likelihood of confusion analysis."  *Id*.  However, the impact of a crowded field "is not dispositive in determining a mark's conceptual strength; rather, it is but one factor a court considers in evaluating the strength of a mark."  *Id*.

_____

[5]     "STONE® is an inherently distinctive mark entitled to the highest degree of protection as a matter of law."  (Doc. No. 175 at 5-6.)
[6]     "This lack of recognition is unsurprising given that Stone Brewing is only 'one brand among over 10,500 other craft beer brands in the United States."  (Doc. No. 202 at 6.)

Viewing all the evidence in the light most favorable to Defendant, there remains a genuine issue of material fact as to whether the "STONE" mark is descriptive, suggestive, arbitrary, or even fanciful. Descriptive marks "define a particular characteristic of the product in a way that does not require any imagination.[7] *Id.* at 1107. While Defendant has provided some evidence that the word "STONE" has been used in craft brewery names, as well as it being an old-style beer brewing technique, the Court is unable to see a commonly understood connection between the mark and the product. Furthermore, Plaintiff also offers evidence that it has sold its products nationally. Nevertheless, viewing such evidence in the light most favorable to Defendant, a finder of fact could reasonably conclude that Plaintiff's marks are commercially weak. *See Fortune Dynamic, Inc.*, 618 F.3d at 1034-35; *JL Beverage Co., LLC*, 828 F.3d at 1109. Accordingly, the conceptual and commercial strength of Plaintiff's mark is a question for the jury.

### b. Proximity/Relatedness of the Goods

"Related goods are generally more likely than unrelated goods to confuse the public as to the producers of the goods." *Brookfield Commc'ns, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1055 (9th Cir. 1999) (citing *Official Airline Guides*, 6 F.3d at 1392). "For related goods, the danger presented is that the public will mistakenly assume there is an association between the producers of the related goods, though no such association exists." *Sleekcraft*, 599 F.2d at 350 (citing *Stork Rest. v. Sahati*, 166 F.2d 348, 356 (9th Cir. 1948)). In addressing this factor, the court focuses on whether the consuming public is likely to somehow associate defendant's products with plaintiff. *Brookfield Commc'ns*, 174 F.3d at 1056; 4 J. Thomas McCarthy on Trademarks and Unfair Competition, § 24:24 (5th ed. 2017) ("Goods are 'related' if customers are likely to mistakenly think that the infringer's goods come from the same source as the

---

[7] An example of a descriptive mark, on the other hand, is "Honey Roasted" for nuts roasted with honey. *See Survivor Media*, 406 F.3d at 632.

senior user's goods or are sponsored by, affiliated with or connected with the senior user.").

Plaintiff contends that there is no reasonable dispute that Stone beers and MillerCoors Keystone Light beer are related and directly competing as "related goods (or services) … 'which would be reasonably thought by the buying public to come from the same source if sold under the same mark.'"[8] (Doc. No. 175 at 6.) Moreover, "when it comes to alcoholic beverages, courts have consistently held that wine, spirits, and beer are all related to one another, rejecting attempts to "slice and dice" the market into specialized sub-segments." *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 159-60 (9th Cir. 1963) ("beer and Scotch whisky" are related).

Defendant argues that Plaintiff's claims are erroneous because the parties are not true competitors as evidenced by the fact that Plaintiff produces "craft"[9] beer, while the Defendant produces an "economy"[10] beer. (Doc. No. 202 at 13.) In fact, in the beer market, the parties are at "polar extremes." *Id*. Moreover, Defendant asserts that it never considered Plaintiff's products (*or craft beers in general*), to be a segment of the market from which Keystone could take market share.[11] *Id*. at 14. Lastly, the cases offered by Plaintiff in support of this factor *pre-date* the existence of many craft breweries.

---

[8] "The USPTO came to the same conclusion in 2007 when it held that the parties sell in the same class of goods, namely, beer. And there is only one USPTO classification for beer: Class 32, which includes "beer" and no subclass thereunder." (Doc. No. 240 at 4.)

[9] "Craft beer, like Stone Brewing's products, is the 'high end' of the beer market notable for having some of the highest prices, typically smaller package sizes (such as 6-packs of bottles or cans), higher alcohol content, and unique, intense flavors." (Doc. No. 202 at 13.)

[10] "Economy beer, like Keystone, is the 'value end' of the beer market with the lowest prices, largest package sizes (typically 15-packs or more), lower alcohol content, and more consistent, light, refreshing flavor." (Doc. No. 202 at 13.)

[11] "Demographic data shows that craft beer and economy beer are largely purchased by different populations. Craft drinkers tend to be younger, higher-income individuals, while economy drinkers tend to be over the age of 55, less educated and lower income." (Doc. No. 202 at 14.)

Plaintiff's cases represent the early 1990's, not the drastically changed alcohol and beer market that exists today. *Id.* at 15.

The Court concludes that there remains a genuine issue of material fact as to whether the Defendant's Keystone Light and the Plaintiff's STONE® beer are related goods. The thrust of Defendant's argument is that the two brands do not directly compete for customers. But even if a jury concluded that the two brands do not directly compete, a jury could still reasonably find that the similarity of their products—specifically, beer— would likely result in consumer confusion between the brands and products. *See American Int'l Group, Inc. v. Am. Int'l Bank*, 926 F.2d 829, 832 (9th Cir. 1991) (concluding that although the parties were not direct competitors, customer confusion could result considering the similarities between the financial services offered by the parties). Thus, this factor weighs in Plaintiff's favor.

### c. *Similarity of the Marks*

"[T]he similarity of the marks…has always been considered a critical question in the likelihood-of-confusion analysis." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000); *Brookfield*, 174 F.3d at 1054 ("The similarity of the mark will always be an important factor.") "Three general principles help determine whether the marks are similar. First, [s]imilarity is best adjudged by appearance, sound, and meaning. Second, the marks must be considered in their entirety and as they appear in the marketplace. Third, similarities are weighed more heavily than differences." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1032 (9th Cir. 2010) (citations and internal quotations omitted). Moreover, even where the marks are identical, "their similarity must be considered in light of the way the marks are encountered in the marketplace and the circumstances surrounding the[ier] purchase." *Lindy Pen Co. v. Bic Pen Corp.*, 725 F.2d 1240, 1245 (9th Cir. 1984).

"Packaging is certainly a factor in the overall appearance of a mark in the marketplace." *PowerFood, Inc. v. Sports Science Inst.*, No. C-93-0259 MHP, 1993 WL 13681782, at *6 (N.D. Cal. Mar. 11, 1993). The Ninth Circuit has held that use of a

house mark or distinctive logo on packaging and advertising can reduce the likelihood of confusion. *Lindy Pen Co., Inc.*, 725 F.2d at 1245 n.4 (citing *Sleekcraft*, 500 F.2d at 351).

In *Lindy Pen Co*., after concluding that the marks themselves were identical if viewed in isolation, the Ninth Circuit looked at how the Lindy's "Auditor's" and Bic's "Auditor's fine point" appeared in the marketplace and held that the appearance of the pens, their packaging, and their display and promotional materials were dissimilar and readily distinguishable. *Lindy Pen Co.*, 725 F.2d at 1245. The court observed that the pens' dissimilar appearance, dominance of the company marks and logos on the pens themselves, and the dissimilar and distinctive packaging and promotional material overcame the similarity of the marks considered in isolation. *Id.*; *see also Charles Schwab & Co., Inc. v. Hibernia Bank*, 665 F. Supp. 800, 808 (N.D. Cal. 1987) (the house mark was downplayed in brochures and advertisements while the infringing mark was in bold and more conspicuous mark; therefore, marks were identical); *PowerFood, Inc.*, 2013 WL 13681782, at *7 *PowerFood, Inc.*, 2013 WL 13681782, at *7 ("packaging element which renders marks dissimilar is the appearance of conspicuous 'house marks', or producer names, on the labels.")

Plaintiff maintains that its STONE® mark and Defendant's KEYSTONE mark are identical and confusingly similar as displayed on the products themselves. Specifically, they both use the same letters, both are in capital letters, and both share a bold font. Moreover, "[w]hatever stylistic differences may exist between Stone and Keystone's materials, they both share the word "STONE" as the dominant visual element." (Doc. No. 175 at 9.) Furthermore, "the marks are also verbally identical, strongly favoring a finding of likelihood of confusion."[12] *Id.* Lastly, "it is self-evident that the marks' meanings are identical because they are the same English word – "STONE." *Id.* at 10. In

---

[12]     "As part of the rebrand, MillerCoors has attempted to create 'STONE' as a verbal nickname for Keystone by commissioning a radio campaign intended to 'establish our brand nickname ('STONE) in everyday vernacular." (Doc. No. 175 at 9.)

sum, Plaintiff argues that the marks are highly similar in sound, appearance, meaning and overall commercial impression.

Defendant responds that when one looks at how the parties' respective trademarks are presented to consumers, the similarities between the marks vanish. First and foremost, Defendant's actual wordmark – KEYSTONE® – is dissimilar from Plaintiff's STONE® mark. (Doc. No. 202 at 7.) Moreover, Defendant has not used "Own the Stone" in commerce. *Id.* Furthermore, in the marketplace, Defendant's Keystone product is found in different areas of the cooler or display shelf from Stone products. Thus, according to Defendant, when the marks are considered as they appear in the marketplace, they are not at all similar in appearance.

Next, while Plaintiff focuses on the identical words used in the marks and Defendant focuses on how the marks appear in the marketplace, the Court must consider both. *See Fortune Dynamic, Inc.*, 618 F.3d at 1032.

Here, the packaging of both products is dissimilar. The Court notes that the "STONE®" mark is used as a logo and label on Plaintiff's *single-serve* cans and/or bottles of beer.[13] (*See* Doc. No. 175 exhibits (*showing pictures of the trademarks alone and as used on cans and bottles*).) Defendant's *single-serve* cans have the "KEYSTONE" logo displayed vertically (*bottom to top*) with the letters "KEY" separated from and shown above the letters "STO" of "STONE." *Id.*

The salient differences are that the Plaintiff's cans/bottles are "generally labeled with the word 'Stone' along with the type or name of the specific beer—indeed, not a single year-round beer shown on Stone Brewing's website is labeled "Stone" alone, and each label is dominated by the name of the beer, not the word "Stone." (Doc. No. 202 at 9.) Defendant's "KEYSTONE® mark appears on bright blue packages that also include

---

[13] The single-serve cans produced by Plaintiff each contain the STONE mark printed onto the side of the can, while Plaintiff's individual glass bottles utilize a paper label mimicking the logo found on its associated flavor single-serve can.

the Coors Brewing Company name logo and Keystone's signature mountains," while Plaintiff's STONE® mark in contrast appears almost exclusively "alongside Stone Brewing's signature Gargoyle, with the word 'STONE' in smaller font than the descriptors 'IPA,' as in 'Tangerine Express IPA.'" *Id.* Lastly, the two products are not sold or promoted next to each other in grocery, liquor, or other retail establishments. Generally, Plaintiff's products are found in the refrigerated beer and wine section of the retail store, together with Plaintiff's other direct craft beer competitors. Defendant's products, on the other hand, are most generally found on the lower refrigerated shelfs of the cooler and/or aisle display unit with other economy class beers.

Therefore, even though the marks are dissimilar, there remains a genuine issue of material fact as to how the marks appear in the marketplace.

### d. Evidence of Actual Confusion

"[E]vidence of actual confusion, at least on the part of an appreciable portion of the actual consuming public, constitutes strong support for a 'likelihood of confusion, finding." *Rearden*, 683 F.3d at 1210. Moreover, "[e]vidence that use of the two marks has already led to confusion is persuasive proof that future confusion is likely."[14] *Sleekcraft*, 599 F.2d at 352 (citing *Plough, Inc. v. Kreis Labs.*, 314 F.2d 635, 639 (9th Cir. 1963)). Nevertheless, "[b]ecause of the difficulty in garnering such evidence, the failure to prove instances of actual confusion is not dispositive. Consequently, this factor is weighed heavily only when there is evidence of past confusion…." *Id.* at 353 (internal citation omitted).

Plaintiff offers evidence of actual consumer confusion "[s]ince the launch of the 2017 Keystone Rebrand" by identifying instances where individual consumers reported

---

[14] "In the Ninth Circuit, district courts often rely on three types of evidence to demonstrate actual confusion: (1) evidence of actual instances of confusion; (2) survey evidence; and (3) inferences arising from judicial comparison of the conflicting marks and the context of their use in the marketplace." *HM Elecs. v. R.F. Techs.*, No. 12-CV-2884-MMA (WMC), 2013 WL 120074966, at *5 (S.D. Cal. Oct. 3, 2013).

'being confused between the rebranded Keystone and STONE® beers' on online forums and social media platforms." (Doc. No. 175 at 11.) For example, "[i]n December 2017, as MillerCoors was ramping up its social media campaign for the Keystone rebrand, a customer contacted Stone to ask whether it was making a 'Stone Lite.'" *Id*. Moreover, Plaintiff's marketing expert, Professor David W. Stewart, Ph.D., conducted four consumer surveys using different methods to assess consumer confusion related to the 2017 Keystone Rebrand, each showing clear evidence of confusion.

Defendant disputes Plaintiff's claims arguing that no actual evidence of consumer confusion has been submitted. (Doc. No. 202 at 10.) First, the three declarations cited by Plaintiff, came from its own employees who were never disclosed during discovery. As a result, Defendant lacks discovery from these individuals regarding the purported "actual confusion" which Plaintiff's Motion relies on. *Id*. Next, Plaintiff's reliance on Dr. Stewart's survey results is severely misplaced because each of the surveys suffers from fatal flaws rendering them wholly unreliable and invalid. *Id*. at 11. Specifically, "[u]nmentioned in Plaintiff's motion is that Dr. Stewart performed a previously undisclosed fifth survey, in which he used accurate images of Keystone products—and tabulated note confusion "in the vicinity of four or five," which "Dr. Stewart agreed that such low numbers are 'not considered sufficient evidence of likelihood of confusion."[15] *Id*.

The court notes that it is not permitted to weigh the evidence on summary judgment. In this case, a jury could reasonably find that Plaintiff's evidence was *de minimus*, or reasonably credit Plaintiff's evidence of actual confusion over Defendant's.

---

[15] "This evidence, which Plaintiff's counsel and expert withheld in clear violation of the Federal Rules, is alone sufficient to create a disputed issue of fact as to whether there is a likelihood of confusion. 6 *McCarthy on Trademarks and Unfair Competition* § 32:189 (5th ed.) ('When the percentage results of a confusion survey dip below 10%, they can become evidence which will indicate that confusion is not likely.')." *Id* at 11-12.

*See Americana Trading Inc. v. Russ Berrie & Co.*, 966 F.2d 1284, 1289 (9th Cir. 1992) (finding that one letter from a confused consumer plus evidence of retailer confusion was enough evidence for a trier of fact to find actual confusion). Therefore, this factor merits little weight in the likelihood of confusion analysis.

e. Marketing Channels Used

"Convergent marketing channels increase the likelihood of confusion." *Nutri/Sys., Inc. v. Con-Stan Indus., Inc.*, 809 F.2d 601, 606 (9th Cir. 1987). "In assessing marketing channel convergence, courts consider whether the parties' customer bases overlap and how the parties advertise and market their products." *Pom Wonderful LLC*, 775 F.3d at 1130 (citing *Nutri/Sys., Inc.*, 809 F.2d at 606). "The greater the degree of overlap, the more likely there is to be confusion." *Fiji Water Co., LLC v. Fiji Mineral Water USA, LLC*, 741 F. Supp. 2d 1165, 1180 (C.D. Cal. 2010) (citing *Sleekcraft*, 599 F.2d at 353).

Here, the evidence before the Court demonstrates genuine issues of material fact as to marketing channel convergence. First, Plaintiff provides evidence that the parties "share overwhelmingly identical marketing channels, including retail, distribution, and advertising."[16] (Doc. No. 175 at 14.) Specifically, "Stone is sold at 80% of Keystone's top 150 retailers nationwide." *Id.* Second, there is also overlap at the distributor level, and at over fifty of Defendant's own regional brand "houses" as demonstrated by the fact that Plaintiff's beer has been distributed alongside Keystone. *Id.* Finally, the parties share similar advertising channels as evidenced by the fact that both make extensive use of social media and in-store promotional displays to advertise their beers. *Id.* at 15.

In response, Defendant provides evidence that there is little overlap between Keystone and Stone Brewing drinkers because the products are overwhelmingly not sold

---

[16]  Additionally, this Court has already found, "[b]oth Stone and Miller sell through thousands of the same stores, restaurants, pubs and liquor stores." (Doc. No. 175 at 14.)

in the same outlets.[17]  (Doc. No. 202 at 15.)  Defendant's expert Mark Hosfield even found that "Keystone and Stone Brewing offerings were sold at the same national retail chain in the same zip code within the same month at most only 38% of the time." *Id*. at 16.  Lastly, even if the products were to be found in the same stores, Keystone would be located separately from Stone Brewing's products, since Keystone does not carry the same retail shelf segment and price tier as Plaintiff's products.  *Id*.

In sum, it is a jury question as to whether the parties' current marketing channels "overlap significantly." *See Entrepreneur Media, Inc.*, 279 F.3d at 1151.  Therefore, the Court finds that this factor merits little weight in the likelihood of confusion analysis.

### f. Type of Goods and Degree of Care Likely Exercised by Purchaser

"In analyzing the degree of care that a consumer might exercise in purchasing the parties' goods, the question is whether a 'reasonably prudent consumer' would take the time to distinguish between the two product lines." *Surfvivor Media*, 406 F.3d at 634 (citing *Brookfield Commc'ns*, 174 F.3d at 1060).  Courts look both to the "relative sophistication of the relevant consumer," *Fortune Dynamic*, 618 F.3d at 1038, and the cost of the item, *Brookfield Commc'ns*, 174 F.3d at 1060, in determining the degree of care likely to be exercised by the purchaser.  The "reasonably prudent consumer" is expected "to be more discerning—and less easily confused—when he is purchasing expensive items." *Id*.  "On the other hand, when dealing with inexpensive products, customers are likely to exercise less care, thus making confusion more likely." *Id*.

Here, the parties present conflicting evidence as to the degree of care consumers of their products are likely to exercise.  Plaintiff's marketing expert Brandon Hernandez confirms that the "tendency for the public to generalize beer, coupled with the beverage's relative low cost, renders it a consumable for which shoppers exercise less care when

---

[17]  "Approximately 28.4% of Stone Brewing sales are on premise, meaning in a restaurant or bar.  By contrast, only 2.8% of on-premise accounts sell Keystone." (Doc. No. 202 at 15.)

purchasing." (Doc. No. 175 at 16.)  Defendant, however, offers evidence that economy beer drinkers are highly price sensitive, and often make their purchase decisions based on price and the availability of promotions that afford them more value.[18]  (Doc. No. 202 at 17.)  As a result, beer drinkers focused on value and accustomed to Keystone Light pricing would certainly stop and take notice if they suddenly noticed they were paying more than three times as much as they used to for the same good.  *Id*.

The Court finds that triable issues of fact remain regarding the degree of care exercised by the parties considering the evidence regarding costs and purchaser sophistication.  A reasonable factfinder might or might not find this factor weighs in favor of Plaintiff.

### g. Defendant's Intent in Selecting Mark

While "not required for a finding of trademark infringement," *Brookfield Commc'ns*, 174 F.3d at 1059, "[w]hen an alleged infringer knowingly adopts a mark similar to another's, courts will presume an intent to deceive the public."  *Official Airline Guides*, 6 F.3d at 1394 (citing *E. & J. Gallo Winery v. Gallo Cattle Co*, 967 F.2d 1280, 1293 (9th Cir. 1992)).  This factor is of "minimal importance."  *GoTo.com, Inc.*, at 1208 (declining to attempt to divine the defendant's intent).  Plaintiff establishes that Defendant was aware of the Plaintiff's brand, product, and trademark at the time the Defendant adapted its Keystone mark to visually separate KEY from STONE, which weighs in favor of infringement.  (See Doc. No. 175 at 16-20); *Surfvivor Media*, 406 F.3d at 634.  For its part, Defendant argues that Plaintiff's contentions that Defendant was aware of Stone Brewing prior to the refresh, and second, that Defendant attempted to register "Stones" with the USPTO, are of questionable significance considering the

---

[18]    Demographic data shows that economy drinkers generally have blue collar jobs or are not currently in the workforce and have household incomes of $50,000 per year or less and these demographics are mirrored in Keystone Light drinkers.  (Doc. No. 202 at 17.)

evidence that Defendant is a senior user of the STONE and STONES marks. (Doc. No. 202 at 18.) Furthermore, this Court already noted: "Both points are true, and neither is evidence of bad intent" on the part of Defendant. *Id.* This minimal evidence does little to aid a jury's determination of intent. Because this factor is "minimally important," the Court concludes that this factor is neutral for the purposes of summary judgment. *See GoTo.com, Inc.*, 202 F.3d at 1208.

### h. Likelihood of Expansion of Product Lines

"[A] 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." *Sleekcraft*, 599 F.2d at 354. When, however, the parties "already compete to a significant extent," as they do here, this factor is "relatively unimportant" to the likelihood of confusion analysis. *Brookfield Commc'ns*, 174 F.3d at 1060.

Plaintiff contends that the Eighth *Sleekcraft* factor, "likelihood of expansion," is not relevant to this analysis because the products already compete in the same market. (Doc. No. 240 at 8.) Defendant, on the other hand, argues Plaintiff had no intentions of expanding into "light beer" as evidenced by the fact that Stone Brewing's cofounder Steve Wagner, stated under oath that he "hate[s] light beer," and that "we [Plaintiff] don't have any plans to produce a light beer … it's definitely something we never plan on doing….". *Id.* Because the parties' goods are already related, the Court finds the factor to be neutral and affords it little weight.

### i. *Evaluation of the Factors*

Evaluating all the factors and the evidence provided by the parties, the Court cannot find Plaintiff has, as a matter of law, demonstrated a likelihood of consumer confusion, although it is a close call. While some of the eight factors favor Plaintiff, in determining whether a likelihood of confusion of the parties' marks exists, the court does not "merely count beans or tally points." *Stone Creek*, 875 F.3d at 431; *see also Thane Int'l, Inc.*, 305 F.3d at 901 ("The list of [*Sleekcraft*] factors is not a score-card-whether a party' wins' a majority of the factors is not the point."). "Not all factors are created

equal, and their relative weight varies based on the context of a particular case." *Stone Creek*, 875 F.3d at 431.

Here, a triable issue remains on the "critical question" of the degree of similarity of the marks. *GoTo.com, Inc.*, 202 F.3d at 1205; *see SunEarth, Inc. v. Sun Earth Solar Power Co.*, No. C 11-4991 CW, 2013 WL 3428539, at *13 (N.D. Cal. Aug. 23, 2013) ("[T]he classic type of source confusion, 'forward confusion,' [is] where customers 'want to buy the senior user's product and because of the similarity of marks, mistakenly buy the junior user's product instead' ...." (quoting *McCarthy, supra,* § 23:10), *amended in part*, No. C 11-4991 CW, 2013 WL 6157208 (N.D. Cal. Nov. 22, 2013), *and aff'd*, 650 F. App'x 473 (9th Cir. 2016), *on reh'g en banc*, 839 F.3d 1179 (9th Cir. 2016). Thus, the question of likelihood of consumer confusion "should be answered as a matter of fact by a jury, not as a matter of law by a court." *Fortune Dynamic*, 618 F.3d at 1031.

Therefore, the Court **DENIES** Plaintiff's Motion for Summary Judgment on its trademark infringement claim.

### D.    Defendant's First[19], Third[20], and Fourth[21] Counterclaims

In addition to moving for summary judgment on its own trademark infringement claim, Plaintiff also seeks summary judgment on Defendant's counterclaims for declaratory judgment that: (1) it has a right to use STONE and STONES to advertise Keystone Beer, (2) it has not infringed based on its right to the STONE mark, and (3) it has an "exclusive common law right to use STONE in connection with the sale of beer in the United States. (*See* Doc. No. 19 at 24:17-25:20, 26:18-28:20). Plaintiff argues that Defendant cannot state a claim for declaratory judgment as to these counterclaims

---

[19]    First Counterclaim – Declaratory Judgment of MillerCoors' Right to use STONE and STONES to advertise Keystone Beer. (Doc. No. 109 at 24-25.)

[20]    Third Counterclaim – Declaratory Judgment of MillerCoors' Non-Infringement Based on its Right to the STONE® Mark. *Id.* at 26-27.

[21]    Fourth Counterclaim – Declaratory Judgment of MillerCoors' Exclusive Right to Use the Stone Mark in the United States. *Id.* at 27-28.

because the Defendant has not sought to enforce any right against Plaintiff through them. (Doc. No. 240 at 8.)  Essentially, by seeking the court to grant the counterclaims, Defendant is asking the Court to render advisory opinions about all potential uses of "STONE" or "STONES" divorced from any specific context or dispute with Plaintiff.[22] *Id.*  As a result, the counterclaims are not justiciable, and the Court lacks jurisdiction. *Medimmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007).

Article III of the United States Constitution authorizes federal courts to adjudicate only "Cases" or "Controversies."  U.S. Const. Art. III, § 2, cl. 1; *see MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 120 (2007).  "Throughout the litigation, the party seeking relief must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *United States v. Juvenile Male*, 131 S. Ct. 2860, 2864 (2011) (internal quotation marks omitted).  If at any point the party seeking relief lacks a personal interest in the outcome of the litigation, the action is moot and must be dismissed. *Genesis Healthcare Corp. v. Symczyk*, 133 S. Ct. 1523, 1528 (2013).

The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction … any court of the United States … may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  The phrase "case of actual controversy" in the Act refers to the type of "Cases" and "Controversies" that are justiciable under Article III. *MedImmune*, 549 U.S. at 127.  As applied to the Declaratory Judgment Act, Article III requires that a dispute be "definite and concrete, touching the legal relations of parties having adverse legal interests." *Id.*  (internal quotation marks omitted).  A court may not enter an advisory opinion on a hypothetical set of facts. *Id.*

---

[22]    No case or controversy existed because plaintiff's claims "would have the Court declare a safe harbor as equally applicable against Defendant as to any other copyright holder." *See Veoh*, 522 F. Supp. 2d at 1270.

However, a declaratory judgment claimant need not actually expose himself to liability before bringing suit. *Id*. at 129-30. "[T]he question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id*. at 127.

At first blush, the existence of an actual controversy regarding Counterclaims One and Three seems obvious. In this case, Plaintiff has sued Defendant for its use of names allegedly infringing on Plaintiff's trademark rights. Plaintiff's allegations are sweeping and implicate the names "STONE," "STONES," and other iterations utilized in Defendant's advertising and sales of Keystone Light. (*See* Doc. No. 175 at 22-24.) Additionally, Plaintiff contends that Defendant never used STONES as a trademark until filing its counterclaim in this litigation.[23]

Defendant's Counterclaims One and Three assert a right to use, and lack of infringement based off a prior right, to use the objectionable words "STONE," and "STONES," respectively, in advertising. On these allegations, the Court finds an actual controversy between the parties, such that the Court may exercise Article III jurisdiction over Defendant's declaratory judgment Counterclaims One and Three. *See Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 727 (2013) (finding that a party had standing to assert an invalid trademark counterclaim where the party was sued for violating the trademark.) In this case, since the pleadings show an actual controversy over whether Defendant may use the words "STONE," and "STONES," and since Plaintiff has not voluntarily withdrawn his objections to Defendant's use of the words, the Court finds that it has Article III jurisdiction to consider Counterclaims One and Three.

---

[23] Plaintiff contends that Defendant admitted that it never considered its use of "STONES" as an enforceable property right and never claimed such as an asset or as goodwill. (Doc. No. 175 at 23.)

As to Counterclaim Four, Defendant seeks a declaration that it has an exclusive common law right to freely use the word "STONE" in connection with its sale of beer in the United States.[24] (Doc. No. 175 at 22.) Plaintiff argues that Defendants "past sporadic use of 'STONES' on boxes and promotional materials is not sufficient to rise to the level of use of the word as a trademark."[25] *Id.* at 23. Moreover, it is beyond any dispute that neither Defendant nor its customers considered "Stone" to be a trademark of Keystone beer. *Id.*

In response, Defendant contends that its "use of STONE and STONES has undoubtedly been "sufficiently public" such that consumers would associate the words with Keystone beer.[26] (Doc. No. 202 at 22.) For instance, throughout Defendant's examples of Keystone packaging and marketing materials, "STONE" and/or "STONES" was prominently displayed utilizing larger print, capital letters, and different color schemes than other text. *Id.* Furthermore, there is no requirement that Defendant use a

---

[24] To succeed on its claims for trademark infringement under California common law, Plaintiff must make the same showing it must make to succeed on its Lanham Act claim for trademark infringement. *See American Petrofina v. Petrofina of California, Inc.*, 596 F.2d 896, 897 (9th Cir. 1979) (under California common law, "whoever first adopts and uses a trade name, either within or without the state, is its original owner"); *see also Toho Co. v. Sears, Roebuck & Co.*, 645 F.2d 788, 791 (9th Cir. 1981) ("[w]ithout likelihood of confusion there is no infringement under the California common law of trademarks").

[25] "MillerCoors never affixed the common law trademark symbol, 'TM,' to the words 'Stone' or 'Stones' on any merchandise or materials (*see Edsal* 2012 WL 5558849 at *7 (lack of use of 'TM' suggested that word on packaging was not used as a trademark)), and never put the word 'Stone' or 'Stones' on Keystone's *primary* packaging (e.g., the actual cans themselves). (Doc. No. 175 at 23.)

[26] The examples that Defendant has produced include point of sale advertising materials to be displayed in stores and promotional items for Keystone to be distributed to consumers, packages of Keystone Light distributed nationally beginning in 1995, and dozens of additional examples of advertising, all of which clearly were intended to be distributed to consumers and all of which associate the terms "STONE" and/or "STONES" with Keystone beer. (Doc. No. 202 at 22.)

"TM" symbol on its cans, packaging and merchandising materials to evidence its continuous use of "STONE" and/or "STONES" as a trademark back as early as 1991. *See Id*. at 21-23. Thus, considering the parties competing claims as to whether Defendant had a common law right to use the word STONE(S), the Court finds that it has Article III jurisdiction to consider Defendant's Counterclaim Four. *See MedImmune*, 549 U.S. at 127.

## *Laches*

Next, Defendant asserts that Plaintiff's claims are barred by laches. "'Laches is an equitable limitation on a party's right to bring suit.'" *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (2002) (quoting *Boone v. Mech. Specialties Co.*, 609 F.2d 956, 958 (9th Cir. 1979)). It is a defense to both Lanham Act claims and related state law claims. *Id*. at 835. The principle behind laches is that "'one who seeks the help of a court of equity must not sleep on his rights.'" *Id*. (quoting *Piper Aircraft, Corp. v. Wag-Aero, Inc.*, 741 F.2d 925, 939 (7th Cir. 1984) (Posner, J., concurring)). To prevail on a laches defense, a defendant must prove (1) the plaintiff unreasonably delayed in bringing suit, and (2) because of the delay, the defendant suffered prejudice. *Internet Specialties W., Inc. v. Milon-DiGiorgio Enters., Inc.*, 559 F.3d 985, 989 (9th Cir. 2009) (citing *GoTo.Com, Inc*., 202 F.3d at 1209). Defendant contends Plaintiff has unreasonably delayed in filing its lawsuit. (Doc. Nos. 175 at 24-25; 202 at 24-25.)

In assessing the reasonableness of a delay, the court "must first decide whether [a plaintiff] filed suit within the applicable" statute of limitations period. *Internet Specialties W., Inc.*, 559 F.3d at 990. When a plaintiff filed suit within the limitations period, "the strong presumption is that laches is inapplicable." *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002). The Lanham Act contains no statute of limitations, so federal courts borrow the statute of limitations from analogous state law. *See id*. at 836. In this case, the court finds California's four-year statute of limitations for trademark infringement actions governs as the most analogous limitations period. *See Pinkette Clothing, Inc. v. Cosmetic Warriors Ltd.*, 894 F.3d 1015, 1025 (9th

Cir. 2018) (finding California's four-year statute of limitations for trademark infringement actions most analogous); *Internet Specialties W., Inc.*, 559 F.3d at 990 & n.2 (applying four-year limitations period from California trademark infringement law). Additionally, the court measures delay from the time plaintiff knew or should have known of the allegedly infringing conduct. *Eat Right Foods, Ltd. v. Whole Foods Market, Inc.*, 697 F.3d 1221, 1226 (9th Cir. 2012)).

Here, Plaintiff timely filed suit within the four-year statutory period. Although Defendant asserts in its response that it has been using "STONE" and "STONES" in association with Keystone as early as 1991, (Doc. No. 202 at 21), Plaintiff's claims stem from Defendant's use of its mark in connection with its Keystone Light refresh in 2017, not any prior use of the mark. Plaintiff filed its complaint on February 12, 2018, less than four years after its potential claims accrued. (*See* Doc. No. 1.) Accordingly, a strong presumption against the application of laches arises. *Jarrow Formulas, Inc.*, 304 F.3d at 835. Accordingly, Plaintiff's motion for summary judgment on Defendant's affirmative defense of laches is GRANTED.

Therefore, consistent with the above analysis, the Plaintiff's entire Motion for Summary Judgment is **GRANTED IN PART and DENIED IN PART**. Notwithstanding that outcome, considering the procedural setting of this action, the merits of the Defendant's Motion are next addressed.

## II.     DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### A.     Defendant's Priority Right to Use "STONE" and STONES"

Defendant asserts that it is entitled to claim priority of use because it has utilized the word "STONE" and/or "STONES" in commerce as early as 1991, provided evidence that each and every 30-pack of Keystone Light sold since 1995 included the word "STONES" on its packaging/packaging artwork evidencing continuous, nationwide use of the "STONE" and "STONES" mark beginning in 1991, through 2017. (Doc. Nos. 170

at 13-15; 238 at 1-7.)  In support of this assertion, Defendant cites to Casamassima's Declaration and the corresponding exhibits.  *Id.*

Plaintiff disputes Defendant's claim of priority.  Specifically, Plaintiff argues that Defendant's assertion of priority is based off "unverified, supposedly historical documents contained in an "archive" that MillerCoors has refused to allow Stone to inspect." (Doc. No. 206 at 2-3.)  Moreover, not a single MillerCoors executive "has any personal knowledge of Keystone ever using the alleged terms before 1996," and its only witness to support its claim "is a librarian who has given contradictory testimony and who admittedly has no personal knowledge of whether any of the items (many of which are plainly 'drafts') entered the market." *Id.* at 3.

"It is axiomatic in trademark law that the standard test of ownership is priority of use.  To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services." *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1202-03 (9th Cir. 2012).  The term "use in commerce" is defined by statute to mean "the bona fide use of a mark in the ordinary course of trade …. [A] mark shall be deemed to be in use in commerce … on goods when … (A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto … and (B) the goods are sold or transported in commerce …." 15 U.S.C. § 1127.

"In determining whether the two prongs of the 'use in commerce' test have been satisfied, [the Ninth Circuit has] … generally followed a 'totality of the circumstances' approach.  This approach turns on 'evidence showing, first, adoption, and, second, use in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind.'" *Rearden*, 683 F.3d at 1205 (some internal quotation marks omitted) (quoting *New W. Corp. v. NYM Co. of Cal.*, 595 F.2d 1194, 1200 (9th Cir. 1979)).  That use must be "continuous and not interrupted." *Dep't of Parks & Recreation for State of Cal. v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1125-26 (9th Cir. 2006)

(citing *Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1157 (9th Cir. 2001); *Casual Corner Assocs., Inc. v. Casual Stores of Nev., Inc.*, 493 F.2d 709, 711-12 (9th Cir. 1974)). "While the first use need not be extensive, the use must be bona fide and commercial in character"; a party "cannot rely on a few instances of use of the marks in the distant past that were casual or had little importance apparently attached to them." *Id*. at 1126 (alternation and internal quotation marks omitted) (quoting *Menendez v. Holt*, 128 U.S. 514, 521 (1888)). "[E]vidence of actual sales, or lack thereof, is not dispositive in determining whether a party has established 'use in commerce' within the meaning of the Lanham Act." *Rearden*, 683 F.3d at 1205. When applying the "totality of the circumstances" approach, "district courts should be guided in their consideration of non-sales activities by factors … such as the genuineness and commercial character of the activity, the determination of whether the mark was sufficiently public to identify or distinguish the marked [good] in an appropriate segment of the public mind as those of the holder of the mark, the scope of the non-sales activity relative to what would be a commercially reasonable attempt to market the [good], the degree of ongoing activity of the holder to conduct the business using the mark, [and] the amount of business transacted." *Id*. (quoting *Chance*, 242 F.3d at 1159).

A federal trademark registration is "prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to sue the registered mark in commerce …." 15 U.S.C. § 1115(a); *see id.* § 1057(b). Additionally, after a mark is registered, "the filing of the application to register such mark shall constitute constructive use of the mark, conferring a right of priority, nationwide in effect, on or in connection with the goods or services specified in the registration against any other person except for a person whose mark has not been abandoned and who, prior to such filing … has used the mark …." *Id*. § 1057(c)(1). Thus, "the registrant is granted a presumption of ownership, dating to the filing date of the application for federal registration, and the challenger must overcome this presumption by a preponderance of the evidence." *Sengoku Works*, 96

F.3d at 1219-20 (citing *Vuitton et Fils S.A. v. J. Young Enters.*, 644 F.2d 769, 775-76 (9th Cir. 1981); *Rolley, Inc. v. Younghusband*, 204 F.2d 209 (9th Cir. 1953)). However, "[u]nder 15 U.S.C. § 1057(c)(1), a registered mark cannot be asserted against a person who used the otherwise infringing mark in commerce before the priority date of the registered mark. Prior use, including both sales and non-sales activities, may be sufficient to vest trademark rights in a prior user, based on the court's evaluation of the totality of the circumstances." *New Enchantment, LLC v. Journey Spa & Wellness Ctr., Inc.*, No. SACV 12-1382 JGB (RNBx), 2014 WL 12558845, at *6 (C.D. Cal. Jan. 2, 2014) (citation and footnote omitted) (citing *ConsumerInfo.com, Inc. v. Money Mgmt. Int'l, Inc.*, 374 F. App'x 696, 697 (9th Cir. 2010); and then *Rearden*, 683 F.3d at 1206).

Here, Plaintiff's actual intent to use the STONE® mark is clear from the record. Accordingly, the question before this Court is whether Defendant provides sufficient evidence from which a reasonable juror could conclude Defendant used the mark prior to 1996. Thus, priority of use is a genuine issue of material fact.

Plaintiff's application for registration for STONE with the USPTO claims first use in 1996, and first use in commerce in 1997. (*See* Doc. No. 1.) Defendant's Motion asserts that Plaintiff has failed to provide sufficient evidence to support its claim of prior use of the STONE® mark. (*See* Doc. No. 170.) In support of this assertion, Defendant argues it has provided declarations and documentation of its use of "STONE" and "STONES" on packaging material, in advertising, and other marketing merchandise such as frisbees to demonstrate its prior continuous use, beginning in 1991 and continuing

through 2017.[27]  Furthermore, its use was sufficiently public to establish priority.[28]  (Doc. No. 238 at 2.)  Defendant claims that the Ninth Circuit has specifically instructed that use in commerce need not be extensive but need merely show a "bona fide intention to use the mark in commerce." *Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1157 (9th Cir. 2001).  Defendant further declares that Defendant has clearly demonstrated that it used 'STONE' and 'STONES' in commerce prior to 1996.  *Id*. at 4.  In support, Defendant presented evidence that Keystone achieved nationwide distribution by 1991, and "every Keystone 30-pack sold since 1995 … included '30 STONES.'"  (Doc. No. 238 at 4.)  Finally, Defendant declares that "[i]t is undisputed that MillerCoors has used the 'Stone' and 'Stones' marks continuously since at least 1991."  (Doc. No. 170 at 16.)  Thus, it is argued that Defendant's continuous use occurred through nationwide distribution, which was sufficient market penetration to illustrate five years of prior use by Defendant entitling it to be deemed the senior user.  *See Davis v. ESS Worldwide Corp.*, 2010 U.S. Dist. LEXIS 152290, at *14 (S.D. Cal. Jan. 5, 2010).

In response, Plaintiff points out that "[m]ere use of a word does not make it a trademark."[29]  (Doc. No. 206 at 3.)  In this case, because Defendant's use of "STONE" and "STONES" varied, it was not clear and/or recognizable without extended analysis

---

[27]  "…MillerCoors has provided overwhelming, incontrovertible evidence that it used 'STONE' and 'STONES' to advertise Keystone beer starting in at least 1991, five years before Stone Brewing filed its trademark application, and that it began placing 'STONES' on the packaging for its 30-packs beginning in at least 1995, a year before Stone Brewing's trademark application was filed."  (Doc. No. 170 at 14.)

[28]  "Correctly examining the totality of MillerCoors' use of STONE and STONES (on both packaging and marketing materials) undoubtedly shows that use has been 'sufficiently public' such that consumers would associate that use with Keystone.") (Doc. No. 238 at 2-3.)

[29]  Ninth Circuit courts have cited *Tovey* for the proposition that, where a claimant uses different designs, colors, fonts, font sizes, and the presentation of a word varies from item to item, the word is unlikely to be a trademark.  *See Macy's v. Strategic Marks*, No. 11-CV-06198-EMC, 2016 WL 374147, at *4 (N.D. Cal. Feb. 1, 2016).

that it was intended to identify the item as a Keystone Light beer product.  Moreover, Plaintiff's evidence shows that MillerCoors never used "STONE" or "STONES" on the Keystone packaging or as a source identifier prior to 2017.  *Id*. at 5.  It is notable that "MillerCoors's own internal marketing surveys and analyses establish that consumers (*even its brand loyalists*) never recognized 'Stone' and 'Stones' as names for Keystone Light beer.  *Id*. at 8.  Furthermore, Defendant's evidence fails to demonstrate that its proffered marketing materials were ever used in commerce, much less prior to 1996.[30]  *Id*. at 9.  Additionally, Plaintiff's evidence shows there was a fourteen-year gap in MillerCoors use of the word "STONE," proving its use was not continuous.  *Id*. at 12.  This fact was most clearly illustrated by Ms. Harris, the Defendant's archivist who "admitted that, other than 30-packs there was not 'any Keystone marketing or other materials between 1996 and 2010 that used 'STONE' or 'STONES.'"  *Id*.  Lastly, Defendant's use of "STONE" in its promotional materials is insufficient to establish trademark rights in the mark.  *Id*. at 13.

Although it is a close call, considering *all* the evidence submitted by the parties, there remains a genuine issue of material fact as to whether MillerCoors has demonstrated a priority right to use the "STONE" and/or "STONES" mark.  Ultimately, the Defendant may prevail on this issue at trial when the issues are fully fleshed out on direct and cross.  However, as the record currently stands, such a determination would be improper on summary judgment.  Therefore, the Court DENIES Defendant's motion for summary judgment as to priority right to use.

## B.  Lack of Evidence of Willfulness

Plaintiff "must show intentional or willful infringement before disgorgement of [Defendant's] profits could be awarded."  *Stone Creek, Inc. v. Omnia Italian Design, Inc.*,

---

[30]  "MillerCoors offers no introducing witness or person with actual knowledge of the brand or its use prior to 1996 legally capable of presenting the material."  (Doc. No. 206 at 9.)

875 F.3d 426, 442 (9th Cir. 2017), *cert. denied*, No. 17-731, 2018 WL 21862227 (May 14, 2018). "Willful infringement carries a connotation of deliberate intent to deceive. Courts generally apply forceful labels such as 'deliberate,' 'false,' 'misleading,' or 'fraudulent' to conduct that meets this standard." *Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1405-06 (9th Cir. 1993), *abrogated on other grounds by SunEarth, Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179 (9th Cir. 2016) (denying an accounting of profits because the defendant's "infringement was innocent and accomplished without intent to capitalize on [the plaintiff's] trade name"). "*Lindy Pen* requires at least a showing of trading on the mark holder's established name as part of the willfulness required to justify disgorgement." *Spin Master, Ltd. v. Zobmondo Entm't, LLC*, 944 F. Supp. 2d 830, 847 (C.D. Cal. 2012); *see Lindy Pen*, 982 F.2d at 1405 ("Where trademark infringement is deliberate and willful, this court has found that a remedy no greater than an injunction' slight' [to] the public … only in those cases where the infringement is 'willfully calculated to exploit the advantage of an established mark.'").

Here, Plaintiff presents evidence that Defendant was admittedly aware of Plaintiff's federally owned and registered STONE® trademark. (Doc. No. 206 at 16.) Moreover, Defendant intended to trade off the STONE® trademark without a license as evidenced by its conduct in developing advertising materials utilizing the Keystone rebrand theme, "OWN THE STONE." *Id.* at 18. Lastly, Plaintiff contends the Defendant was deliberately indifferent to Plaintiff's rights when it launched "its 'OWN THE STONE' campaign in the face of repeated warnings" that such use would infringe the STONE® mark. *Id.* at 19. Defendant on the other hand argues there is no evidence to disprove its claim that MillerCoors used "STONE" and "STONES" prior to Plaintiff's registration and publication of its STONE® mark,[31] (Doc. No. 170 at 14) or that

---

[31]    MillerCoors claims it has provided overwhelming, incontrovertible evidence "that it used 'STONE' and 'STONES' to advertise Keystone beer starting in at least 1991, five years before Stone Brewing filed its trademark application, and that it began placing

Defendant has used the "STONE" and "STONES" marks continuously since at least 1991.[32]  *Id.*  These are all appropriate and valid arguments the Court expects the parties to make to the jury.

In this case, a jury could find from these facts that the Defendant was willfully using Plaintiff's mark to suggest a connection between Keystone Light and the Stone Brewery product line.  Moreover, a jury could find that such actions have created confusion in the promotion of Keystone Light and Stone products throughout the marketplace.  Of course, a jury could find quite the opposite as well.  Thus, genuine issues of fact appear such that it is not appropriate for the Court to make such a determination of willfulness at the summary judgment stage.  Therefore, Defendant's Motion is DENIED on this point.

## C. Plaintiff's Trademark Dilution Claims

"Dilution is a cause of action invented and reserved for a select class of marks—those marks with such powerful consumer associations that even non-competing uses can impinge on their value."  *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 875 (9th Cir. 1999).  It "refers to the 'whittling away of the value of a trademark' when it's used to identify different products."  *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 903 (9th Cir. 2002) (quoting *McCarthy, supra*, § 24:67).  "For example, *Tylenol* snowboards, Netscape sex shops and Harry Potter dry cleaners would all weaken the 'commercial magnetism' of these marks and diminish their ability to evoke their original associations."  *Id.*  (citing Ralph S. Brown, Jr., *Advertising and the Public Interest: Legal Protection of Trade Symbols*, 57 Yale L.J. 1165, 1187 (1948), *reprinted in* 108 Yale L.J.

---

'STONES' on the packaging for its 30-packs beginning in at least 1995, a year before Stone Brewing's trademark application was filed."  (Doc. No. 170 at 14.)

[32]    At trial, Defendant must bear the burden of showing that its use of "STONE" and "STONES" since 1991 was in a sufficiently public way "to identify or distinguish the marked goods in an appropriate segment of the public mind" to justify its claim as senior user of the mark.

1619 (1999)). "These uses dilute the selling power of these trademarks by blurring their uniqueness and singularity, [or] by tarnishing them with negative associations." *Id*. (internal citation omitted).

To prove a claim for dilution under 15 U.S.C. § 1125(c), "a plaintiff must show that (1) the mark is famous and distinctive; (2) the defendant is making use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark is likely to cause dilution by blurring or dilution by tarnishment." *Jada Tory, Inc. v. Mattel, Inc.*, 518 F.3d 628, 634 (9th Cir. 2008). The analysis is the same for a trademark dilution claim whether under federal or California law. *See Id*. "Whether a defendant's mark creates a likelihood of dilution is a factual question generally not appropriate for decision on summary judgment." *Visa Int'l Serv. Ass'n v. JSL Corp.*, 610 F.3d 1088, 1090 (9th Cir. 2010) (citing *Jada Toys, Inc.*, 518 F.3d at 632). That is the case here.

Defendant contends that Plaintiff has not adequately alleged that the STONE® mark is famous, or MillerCoors's use started after the STONE® mark became famous. (Doc. No. 170 at 21.) A mark qualifies as famous for the purposes of a dilution claim "if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2). The mark must have acquired the requisite level of fame by the time "the defendant first began to use the mark in commerce." *Pinterest, Inc. v. Pintrips, Inc.*, 140 F. Supp. 3d 997, 1031, 2015 WL 6167967, at *21 (N.D. Cal. 2015)' *see also Clearly Food & Beverage Co. v. Top Shelf Beverages, Inc.*, 102 F. Supp. 3d 1154, 1175-77 (W.D. Wash. 2015); *Parts.com, LLC. v. Yahoo! Inc.*, 996 F. Supp. 2d 933, 940 (S.D. Cal. 2013). "In determining whether a mark possesses the requisite degree of recognition, the court may consider all relevant factors, including the following: (i) the duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties. (ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark. (iii) The extent of actual

3:18-cv-00331-BEN-LL

recognition of the mark. (iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1906, or on the principal register." 15 U.S.C. § 1125(c)(2)(A)(i)-(iv).

Applying these provisions, the Ninth Circuit has concluded that trademark dilution "is a cause of action reserved for a select class of marks—those marks with such powerful consumer associations that even noncompeting uses can impinge on their value." *Nissan Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002, 1011 (9th Cir. 2004) (internal quotation marks omitted). "[D]ilution protection [extends] only to those whose mark is a household name." *Id.* (internal quotation marks omitted). Courts have described dilution fame as difficult and demanding requirement," *United Tactical Sys., LLC v. Real Action Paintball, Inc.*, No. 14-cv-04050-MEJ, 2014 WL 6788310, at *20 (N.D. Cal. Dec. 2, 2014) (internal quotation marks omitted), and "difficult to prove," *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1373 (Fed. Cir. 2012).

In defending its allegations of dilution fame, Plaintiff points to Stone's extensive nationwide sales and media coverage. (Doc. No. 206 at 20.) There, Plaintiff states that "Stone has been extensively covered by national and local media outlets since at least the mid-2000s." *Id.* Moreover, "Stone has been regularly featured in stories by national news media outlets including virtually every major news outlet in the United States." *Id.* Furthermore, "Stone also has received extensive coverage in widely recognized general-interest magazines with national subscriber bases."[33] *Id.* It states that it has done so, not by relying on traditional advertising, "but the simplest advertising technique of all: producing remarkably great beer that journalists and consumers across the country want to talk and write about." *Id.* at 21. Plaintiff also states that it "prioritizes grassroots

_____

[33] "The fact that Stone has been widely discussed in dozens of national publications reaching virtually every consumer of media in the United States is strong evidence that Stone is 'widely recognized by the general consuming public of the United States. 15 U.S.C. § 1125(c)(2)." (Doc. No. 206 at 20, FN*5.)

marketing efforts like social media and in-store promotions." This allows it to maintain an "industry-leading social media presence with hundreds of thousands of followers and/or viewers across multiple platforms," together with strategic product placement[34]. The combined effect of Stone's traditional media exposure equals at least $39 million in advertising spending for 2018, $39 million for 2018, and $94.6 million for 2017. *Id.* Lastly, it is also important to note, as discussed *supra*, Plaintiff's mark is both registered and deemed uncontestable by the PTO. As a result, Plaintiff asserts that the evidence of actual recognition in the record is sufficient to support a finding of fame without the need for a *per se* survey to support Plaintiff's claim of fame.[35]

However, the undisputed evidence in the record is not sufficient to show that the STONE® mark is famous within the meaning of 15 U.S.C. § 1125(c)(2). While the fourth of the 15 U.S.C. § 1125(c)(2)(A) factors (regarding registration of the mark) favors Plaintiff, the rest weigh heavily in favor of Defendant. *See Parts.com*, 996 F. Supp. 2d at 940-41 (dismissing federal trademark dilution claim where the plaintiff's mark was registered but the plaintiff's "allegations regarding th[e] [other] three factors are conclusory and do not provide sufficient specific facts to be plausible").

First, with respect to the "duration, extent, and geographic reach of advertising and publicity of the mark," 15 U.S.C. (c)(2)(A)(i), Plaintiff began using the STONE® mark in 1998, which it displays on the product containers of all the craft beers in the STONE product line. Defendant offers some evidence that it first began using the "STONE" or

---

[34] "Stone also engages in product placement, with its products appearing in nationally-syndicated TV shows like *The Big Bang Theory*." (Doc. No. 206 at 21.)

[35] "Given these admissions and the other extensive evidence of actual recognition, a survey is not necessary. *See adidas-Am., Inc. v. Payless Shoesource, Inc.*, 546 F. Supp. 2d 1029, 1063 (D. Or. 2008) ("Given the extensive evidence adidas submitted as to each of the statutory 'fame' factors, it failure to conduct a fame survey is not dispositive." (Doc. No. 206 at 22.)

"STONES" mark in commerce to sell Keystone Light beer as early as 1991.[36]  (Doc. No. 170 at 24.)  "Since at least 1995, every 30-pack of Keystone Light sold has prominently featured the 'STONES' reference."  *Id*.  Thus, to prevail on its dilution claims, Plaintiff must show that the STONE® mark acquired fame by the early to mid-1990s.  *See Pinterest*, 140 F. Supp. 3d at 1032 (N.D. Cal. 2015) (finding that "[Defendant] first used its marks by no later than October of 2011.  To prevail on its dilution claim, [Plaintiff] must demonstrate that its marks were famous by that date.")  Here, "Stone Brewing was not even formed until 1996, and did not claim to begin using the STONE® mark until 1998."  (Doc. No. 170 at 24.)

Second, with respect to the amount, volume, and geographic extent of media coverage, Plaintiff relies on its submission of a declaration with attached press articles mentioning Stone Brewing.  However, it is improper because it was not produced in discovery and falls short of providing sufficient market context to justify its assertion that Plaintiff's mark is famous.[37]  Specifically, "press accounts are only evidence of fame when they describe 'the popularity of the brand.'"  *Thank Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 912 (9th Cir. 2002).  (Doc. No. 238 at 9.)  Plaintiff's evidence does suggest its STONE® mark has attained a level of national recognition among craft beer consumers[38], but a showing of specialized or niche market fame does not satisfy the rigorous fame standard of trademark dilution.  *See, e.g., MGA Entm't, Inc. v. Dynacraft BSC, Inc.*, No. 2:17-CV-08222-ODW-KS, 2018 WL 2448123, at *6 (C.D. Cal. May 30,

---

[36]     "Stone Brewing admits that MillerCoors has demonstrated at least some use of STONES in the early 1990s, (ECF No. 206 at 1), which is sufficient to establish prior use…")  (Doc. No. 238 at 10.)

[37]     A mark is not famous simply because it is mentioned in media outlets.  *Thane Int'l, Inc. v. Trek Bicycle Corp.* 305 F.3d 894, 912 (9th Cir. 2002).

[38]     "The fact that Stone has been widely discussed in dozens of national publications reaching virtually every consumer of media in the United States is strong evidence that Stone is 'widely recognized by the general consuming public of the United States.'"  (Doc. No. 206 at fn.*4.)

2018) ("[T]he Trademark Dilution Revision Act of 2006 restricted the statute from protecting marks that are famous only in 'niche' markets."); *Planet Coffee Roasters, Inc. v. Dam*, No. SACV 09-00571-MLG, 2009 WL 2486457, at *3 (C.D. Cal. Aug. 12, 2009) (same); *Century 21 Real Estate LLC v. Century Ins. Grp.*, No. 03-0053-PHX-SMM, 2007 WL 484555, at *14 (D. Ariz. Feb. 8, 2007) (same), *aff'd sub nom.*, *Century 21 Real Estate LLC v. Century Sur. Co.*, 300 F. App'x 527 (9th Cir. 2008). While the evidence here shows more than a decade of extensive fan following and sales (*of Stones craft beers bearing the STONE® mark*) since it was first introduced, it does not show the STONE® mark attained the requisite level of nationwide fame among the general population as opposed to a niche following among craft beer fans. *See* 15 U.S.C. § 1125(c)(2)(A) (fame requires mark be "widely recognized by the general consuming public of the United States").

Finally, with respect to the "extent of actual recognition of the mark," 15 U.S.C. § (c)(2)(A)(iii), Plaintiff offers only nonconclusory allegations about the extent to which consumers recognize the STONE® mark. Plaintiff simply alleges that its extensive nationwide sales and media coverage (*since at least the mid-2000's*) has enabled it to achieve 'Big Beer' status alongside conglomerates like MillerCoors and Anheuser-Busch. (Doc. No. 206 at 22.) Thus, given its success, Plaintiff simply argues its STONE® mark was famous before Defendant began its infringing use in 2017.[39] *Id.* In any event, Plaintiff has not submitted undisputed proof that its STONE® mark is a "household name," or that it is famous throughout the population at large. The "extraordinarily high level of public awareness" required to show fame has been recommended to be at least 75%." *Pinterest, Inc. v. Pintrips, Inc.*, 140 F. Supp. 3d 997, 1035 (N.D. Cal. 2015) (citing McCarthy on Trademarks § 24:106). Here, Defendant notes that "[a] survey

---

[39] Plaintiff contends Defendants infringing use of the STONE® mark began in 2017, as opposed to Defendants assertion that it began using STONE and STONES back in 1991.

39

Stone Brewing commissioned in the ordinary course of its business in mid-2018 demonstrated that the Plaintiff was not known **even by a majority** of the general public," which is well short of the 75% suggested to show fame. *See Id.* Moreover, in a May 9, 2018 email to Stone Brewing's CEO, Plaintiff's data analyst best summarized the results of the survey as "'We're not a broadly known brand … We need to advertise and get our name out there ….'" (Emphasis added). *Id.*

Given the high burden that a plaintiff faces in establishing that its mark is sufficiently famous to support a dilution claim, Plaintiff must establish more than conclusory assertions of fame. While this Court cannot, as a matter of law, find that Plaintiff's STONE® mark is sufficiently famous, it does not find that Plaintiff's claims lack all merit to justify granting summary judgment on counterclaims three and four. As the evidentiary record currently stands, such a determination would be improper on summary judgment. Therefore, the Court DENIES Defendant's motion for summary judgment as to Counts three and four for trademark dilution.

### D. Defendant's Laches Defense

The Court has already granted Plaintiff's motion as to Defendant's laches affirmative defense. (*See* § C *supra* at 26.) Accordingly, Defendant's motion for summary judgment is DENIED as Moot.

Therefore, consistent with the above analysis, the Defendant's Motion for Summary Judgment is **DENIED**.

## III. PLAINTIFF'S MOTION TO STRIKE

Plaintiff submitted a motion to strike portions of Defendant's summary judgment briefs or, in the alternative, for leave to file supplemental brief. The Court having reviewed the fully briefed motion declines to rule on the motion as it finds the evidence sought to be stricken, or alternatively, to supplement the record, will not change the outcome of the Court's analysis with respect to Defendant's motion for summary judgment.

Accordingly, Plaintiff's motion to strike is **DENIED as moot**.

**CONCLUSION**

The Court **ORDERS** as follows:

(1) The Plaintiff's Motion for Summary Judgment is **GRANTED IN PART and DENIED IN PART**;

(2) The Defendant's Motion for Summary Judgment is **DENIED.**

(3) The Plaintiff's Motion to Strike Portions of Defendant's Summary Judgment Brief is **DENIED as moot**.

**IT IS SO ORDERED.**

DATED: March 27, 2020

**Hon. Roger T. Benitez**
United States District Court

3:18-cv-00331-BEN-LL