J. Noah Hagey (SBN: 262331)
    hagey@braunhagey.com
Jeffrey M. Theodore (SBN: 324823)
    theodore@braunhagey.com
Forrest Arthur Hainline III (SBN: 64166)
    hainline@braunhagey.com
J. Tobias Rowe (SBN: 305596)
    rowe@braunhagey.com
BRAUNHAGEY & BORDEN LLP
351 California Street, 10th Floor
San Francisco, CA 94104
Telephone: (415) 599-0210
Facsimile: (415) 276-1808

Douglas S. Curran (*pro hac vice*)
    curran@braunhagey.com
BRAUNHAGEY & BORDEN LLP
7 Time Square, 27th Floor
New York, NY 10036
Telephone: (646) 829-9403
Facsimile: (646) 829-9403

Attorneys for Plaintiff
STONE BREWING CO., LLC

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STONE BREWING CO., LLC, | Case No: 18-cv-0331-BEN-LL |
|     Plaintiff / Counterclaim Defendant, | **PLAINTIFF'S PRETRIAL BRIEF** |
| v. | Complaint filed: February 12, 2018 |
| MILLERCOORS LLC, | Pretrial Conf.: November 3, 2021 |
|     Defendant / Counterclaim Plaintiff. | Trial Date: November 8, 2021 |
| | Judge: Hon. Roger Benitez |

# TABLE OF CONTENTS

I.      BACKGROUND ................................................................................1

II.     SIGNIFICANT DISPUTED ISSUES OF LAW .............................................7

        A.      MillerCoors's Prior-Use Defense Is Baseless .......................................8

        B.      MillerCoors Mischaracterizes the "Willfulness" Standard................11

        C.      MillerCoors's Belated Clawback Attempt Must Be Rejected ...........14

        D.      MillerCoors's "Agencies of Record" Are Its Legal Agents ..............15

        E.      217 Specific Documents Should Be Deemed Admitted....................16

        F.      Stone's Damages-Related Jury Instructions Are Proper....................23

        G.      MillerCoors's Defenses Regarding the Timeliness of Stone's
                Claims Must Be Rejected....................................................................25

        H.      MillerCoors's Late-Disclosed Witnesses Must Be Excluded............26

        I.      MillerCoors's Late-Disclosed Expert Opinions Must Be
                Excluded................................................................................................28

III.    CONCLUSION ................................................................................31

PLAINTIFF'S PRETRIAL BRIEF

# TABLE OF AUTHORITIES

**PAGE(S)**

<u>CASES</u>

*ABS Entertainment, Inc. v. CBS Corp.*,
   908 F.3d..................................................................................21

*Ada Liss Grp. (2003) Ltd. v. Sara Lee Corp.*,
   2013 WL 4735387 (M.D.N.C. Sept. 3, 2013)........................15

*Adray v. Adry-Mart, Inc.*,
   76 F. 3d 984 (9th Cir. 1995)..................................................25

*Am. Fed'n of Musicians v. Paramount Pictures*,
   903 F.3d 968 (9th Cir. 2018)..................................................20

*Amarel v. Connell*,
   102 F.3d 1494 (9th Cir. 1996)................................................19

*Autodesk, Inc. v. Flores*,
   2011 WL 337836 (N.D. Cal. Jan. 31, 2011) ..........................12

*Bauer Bros. v. Nike*,
   159 F. Supp. 3d 1202 (S.D. Cal. 2016)..................................24

*Brandon v. D.R. Horton, Inc.*,
   2008 WL 2096883 (S.D. Cal. May 16, 2008).........................15

*Brookfield Comm'ns v. W. Coast,
   Ent't*, 174 F. 3d 1036 (9th Cir. 1999)....................................11

*Casual Corner Assocs., Inc. v. Casual Stores of Nev., Inc.*,
   493 F.2d 709 (9th Cir. 1974).....................................................9

*Egbert v. Equifax Info. Servs., LLC*,
   2020 WL 1529568 (D. Nev. Mar. 31, 2020)..........................23

*Fifty-Six Hope Road Music v. Avela*,
   778 F. 3d 1059 (9th Cir. 2015)..........................................12, 13

*Groupion, LLC v. Groupon, Inc.*,
   826 F. Supp. 2d 1156 (N.D. Cal. 2011) .................................13

*Hana Financial, Inc. v. Hana Bank*,
   735 F. 3d 1158 (9th Cir. 2013)...............................................10

*Hokto Kinoko Co. v. Concord Farms*,
    738 F.3d 1085 (9th Cir. 2013)..................................................................12

*In re Homestore.com, Inc. Sec. Litig.*,
    347 F. Supp. 2d 769 (C.D. Cal. 2004)......................................................16

*Lindy Pen Co. v. Bic Pen Corp.*,
    982 F.2d 1400 (9th Cir. 1993)..................................................................25

*Luna Gaming-San Diego, LLC v. Dorsey & Whitney, LLP*,
    2010 WL 275083 (S.D. Cal. Jan. 13, 2010)............................................15

*Marketquest Grp. v. BIC Corp.*,
    316 F. Supp. 3d 1234 (S.D. Cal. 2018)....................................................24

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
    454 F. Supp. 2d 966 (C.D. Cal. 2006)......................................................16

*Navellier v. Sletten*,
    262 F.3d 923 (9th Cir. 2001)....................................................................23

*New West v. NYM Co. of Cal.*,
    595 F.2d 1194 (9th Cir. 1979)...............................................................9, 10

*One Industries, LLC v. Jim O'Neal Dist'g, Inc.*,
    578 F.3d 1154 (9th Cir. 2009)..................................................................11

*Oracle Corp. v. SAP AG*,
    765 F. 3d 1081 (9th Cir. 2014)................................................................24

*Philip Morris USA, Inc. v. Castworld Prods., Inc.*,
    219 F.R.D. 494 (C.D. Cal. 2003) .............................................................14

*Philip Morris USA, Inc. v. Liu*,
    489 F.Supp.2d 1119 (C.D. Cal. 2007).......................................................12

*Playboy Enterprises v. Baccarat Clothing Co., Inc.*,
    692 F. 2d 1272 (9th Cir. 1982)................................................................24

*Preferred Care Partners Holding Corp. v. Humana, Inc.*,
    258 F.R.D. 684 (S.D. Fla. 2009) .............................................................15

*Quevedo v. Trans-Pac. Shipping, Inc.*,
    143 F.3d 1255 (9th Cir. 1998)..................................................................30

iii

Case No. 18-cv-0331-BEN-LL

*Quiksilver, Inc. v. Kymsta Corp.*,
  466 F.3d 749 (9th Cir. 2006) ................................................................. 9, 10

*Rearden v. Rearden Commerce*,
  683 F.3d 1190 (9th Cir. 2012) ............................................................... 9, 10

*Romag Fasteners, Inc v. Fossil, Inc.*,
  140 S. Ct. 1492 (2020) ......................................................................... 12, 13

*Ruvalcaba v. City of Los Angeles*,
  64 F.3d 1323 (9th Cir. 1995) ...................................................................... 19

*SAS v. Sawabeh Info. Servs. Co.*,
  2015 WL 12763541 (C.D. Cal. June 22, 2015) .......................................... 12

*Sea-Land Serv. v. Lozen Int'l*,
  285 F.3d 808 (9th Cir. 2002) ................................................................. 20, 21

*Stone Creek v. Omnia Italian Design*,
  875 F.3d 426 (9th Cir. 2017) ................................................................. 12, 13

*Tacori Enterprises v. Beverlly Jewellery Co.*,
  253 F.R.D. 577 (C.D. Cal. 2008) ................................................................ 23

*Unicolors, Inc. v. Urban Outfitters, Inc.*,
  686 F. App'x 422 (9th Cir. 2017) ................................................................ 25

*United States v. Bonds*,
  608 F.3d 495 (9th Cir. 2010) ...................................................................... 16

*United States v. Castro*,
  887 F.2d 988 (9th Cir. 1989) ...................................................................... 21

*United States v. Evans*,
  728 F.3d 953 (9th Cir. 2013) ...................................................................... 20

*United States v. Lischewski*,
  2021 WL 2826474 (9th Cir. July 7, 2021) ................................................. 21

*Wall Data v. Los Angeles County Sheriff's Dept.*,
  447 F.3d 769 (9th Cir. 2006) ...................................................................... 24

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*,
  259 F.3d 1101 (9th Cir. 2001) ............................................... 27, 29, 30, 31

## RULES

F.R.C.P. 30(b)(6) ............................................................................. 18, 21
Fed. R. Civ. P. 37(b)(2)(A)(i) ................................................................ 23
Federal Rule of Civil Procedure 37 ....................................................... 23
FRE 801(c)(2) & 803(3) ........................................................................ 20
FRE 801(d)(2)(D) .......................................................................... 16, 20
Rule 37(c)(1) ......................................................................................... 27

## OTHER AUTHORITIES

McCarthy on Trademarks and Unfair Competition § 3:4 (5th ed.) ............... 9
McCarthy on Trademarks and Unfair Competition § 16:1 (5th ed.) ............. 9
McCarthy on Trademarks and Unfair Competition § 30:62 (5th ed. 2019) .............. 13
Fed. R. Civ. P., 146 F.R.D. 401 .............................................................. 27

Plaintiff Stone Brewing Co., LLC ("Stone") submits this Pretrial Brief pursuant to Local Rule 16.1(f)(9)(a) to address significant legal disputes between the parties, which are presently ripe for determination.[1]  Each dispute should be resolved in Stone's favor for the reasons set forth below.[2]

# I.    BACKGROUND

Rarely is a case of trademark infringement so pronounced and obvious.  The lengths to which MillerCoors has gone to benefit itself and its brand at the direct and intentional expense of Stone are breathtaking.

Stone has long had the exclusive rights to use the name "Stone" throughout the beer industry in the U.S.  Stone was awarded those rights by the U.S. Patent and Trademark Office in 1998, through U.S. trademark Reg. No. 2,168,093 (for which it applied in 1996).  Stone used the name consistently and successfully as the foundation of its brand, as Stone grew its customer base and expanded throughout the San Diego area and nationwide.  After a few years of growing the business, Stone filed a so-called "Combined Declaration of Use and Incontestability" with the USPTO to further protect the name that it has spent so much effort and resources promoting and developing.  The USPTO accepted Stone's filing and declared the trademark "incontestable" in 2004, meaning that, under federal law, Stone—and Stone alone—has the ***exclusive*** and ***indisputable*** right to use the name "Stone" to sell

---

[1] By identifying these issues for purposes of this Rule 16.1(f)(9)(a) brief, Stone does not waive its rights regarding any other disputed issues.  Among other things, Stone has objected to MillerCoors's witness list, exhibits, expert testimony, proposed jury instructions, and other legal, factual, and procedural matters, including those objections set forth in the pretrial order, and it anticipates that evidentiary and procedural objections will arise during trial.  Stone also may raise certain objections in connection with the pretrial conference and/or through motions in limine. Stone expressly reserves all rights.  With this submission, Stone seeks to identify for the court significant disputes that have crystalized, and on which the Court's ruling would streamline the presentation of evidence to the jury and the resolution of the parties' dispute generally.

[2] Based on its reading of the Local Rules, Stone understands that the page limitations set forth in Local Rule 7.1(h), which governs "briefs or memoranda in support of or opposition to all motions noticed for the same motion day," do not govern this submission, which is separately required by Rule 16.1(f)(9)(a). If Stone is mistaken in that understanding, it respectfully seeks the Court's leave for six additional pages to address the matters set forth herein.

beer in the U.S.  And Stone used its name on a wide variety of products as the principal branding element:



Around the same time, MillerCoors's primary economy brand, Keystone Light, was beginning to suffer mightily.  Its year-over-year sales were falling off a cliff, and the company had concluded that if it lost out on the economy segment of the beer market, MillerCoors's business as a whole may be dragged into a death spiral.  Looking to breathe new life into the brand—and notwithstanding Stone's trademark—MillerCoors sought to lean into the name "Stones" as a supposed nickname for Keystone Light, and applied to trademark the name "Stones" in 2007. The USPTO rejected that application outright given Stone's existing trademark.  The USPTO found that "the respective marks"—i.e., "Stone" and "Stones"—"are essentially identical" such that "[c]onfusion as to source of origin or sponsorship is extremely likely if the applicant's proposed mark is allowed to register."  On that basis, the USPTO concluded, "Registration is therefore refused by the examining attorney."  MillerCoors abandoned its application.

Three years later, MillerCoors tried again, this time seeking to trademark the phrase "Hold My Stones" in connection with its sale of Keystone Light.  When Stone learned of this filing, it sent a cease-and-desist letter to MillerCoors, stating that its "use of STONE, STONES, and HOLD MY STONES for beer is likely to cause

1    confusion in the trade and among the purchasing public."  MillerCoors abandoned

2    that trademark application, too, acknowledging that Stone's incontestable and

3    exclusive ownership of the name "Stone" in the beer industry prevented MillerCoors

4    from legally using those close variants of the same name.

5         But, in 2017, MillerCoors elected to pursue by brute marketing force what it

6    could not do legally through the USPTO.  It launched a wide-ranging and carefully

7    orchestrated marketing campaign that did not simply use the term "Stones" or the

8    phrase "Hold My Stones" as part of its advertising of Keystone.  MillerCoors went

9    much further: it rebranded the product itself, deciding that Keystone Light's new

10   name in the marketplace would be "Stone."  MillerCoors called its marketing

11   campaign "Owning the Stone," and it set out to convince the consumer public to use

12   the name "Stone" for Keystone Light—even though it ***knew*** it was prohibited from

13   using that name under federal law.

14        The slogan was pasted on the cover of Keystone's "brand book," on hundreds

15   of presentations and emails, and used as the masthead of its 2017 distributor

16   conference summit where "Own the Stone" was presented to thousands of

17   MillerCoors retailers.  According to MillerCoors's new branding imperatives,

18   "[e]verything" in the campaign was "centered around owning the 'Stone," such that

19   "Stone always leads" and "Stone is never small or secondary."  With those

20   overriding objectives, Keystone cans, packaging, print advertisements, social media

21   posts, and billboards separated the "Key" from "Stone," and placed near-exclusive

22   focus on "Stone" as the new name of the brand.  All of this despite MillerCoors's

23   direct knowledge that it was prohibited from using the word "Stone" at all.

24

25

26

27

28

PLAINTIFF'S PRETRIAL BRIEF



The marketing campaign worked.  After years of stark decline, sales of Keystone surged and the beer became one of the industry's top growth products, generating over a billion dollars in revenue following the rebrand.  The below chart shows the moment when Keystone sales turned around—the launch of the rebranding campaign in 2017:

The jury will see that this infringement was no accident or oversight.  The evidence is indisputable that MillerCoors knew its attempt to "Own the Stone" was directly infringing on Stone's trademark, but it decided to do it anyway.  The campaign was executed and authorized by MillerCoors's Chief Executive Officer, Chief Marketing Officer, VP of Brand Marketing, Director of Economy Brands,

Director of Brand Marketing, and several other MillerCoors branding employees, and it also passed through the same legal counsel who had submitted the failed 2007 effort to trademark the word "Stones." Under their oversight—and in stunning disregard for Stone's incontestable trademark of the name "Stone"—MillerCoors actually *targeted* Stone with its infringing marketing campaign. Among other things, MillerCoors's VP of Brand Marketing described MillerCoors as being in a "civil war" with Stone and craft brewers generally, and MillerCoors strategized how to poach business from craft brewers like Stone as part of the Keystone rebranding.

MillerCoors decided that one front of that "civil war" would be in Stone's own backyard. As part of the "Own the Stone" campaign, MillerCoors's marketing agency designed a series of billboards to be erected directly next to Stone's Escondido headquarters, taunting Stone about the intentional misappropriation of its brand name. One of those proposed billboards read, "HI, STONE. WE'RE STONE TOO," and another read, "GREAT MINDS STONE ALIKE." (The jury and the Court will see MillerCoors's full mock-ups of both of these billboards at trial.) It is hard to imagine a clearer indication of intentional infringement than a company declaring "civil war" on the exclusive owner of an incontestable trademark—and then devising ways to taunt that owner about the infringement. By any measure, the rebranding worked for MillerCoors and saved its flailing economy beer, and MillerCoors was not about to abandon that turnaround, regardless of whether it violated Stone's exclusive rights.

But MillerCoors's campaign to steal away ownership of the name "Stone" did not just benefit MillerCoors's balance sheet—it directly and severely harmed Stone. The record evidence shows that MillerCoors's rebranding directly cannibalized sales of Stone's products and irreversibly damaged the hard-earned value of the "Stone" name by associating it with the low-quality, "economy" attributes for which Keystone Light is known. Customers wrongly associated the new "Stone"-branded Keystone beer with Stone Brewing. This mis-association and confusion torpedoed

1  Stone's brand equity, caused Stone to lose longstanding customers, and prevented it

2  from winning over new customers.  Stone's business abruptly reversed from

3  expansion to retraction, as it bled sales volume and revenue.

4       The below chart shows the upward trajectory of Stone's total sales and those

5  of Stone's flagship IPA in the years preceding the 2017 Keystone Rebranding.  The

6  black arrows indicate when the rebranding took place, after which sales for all of

7  Stone's products dropped precipitously:



**Stone & Stone IPA Annual Sales**

22 The effect could not be more obvious and pronounced, and Stone will show at trial,

23 through fact and expert witnesses, the myriad ways in which Stone's decline in sales

24 was caused directly by damage to its brand at the hands of MillerCoors.

25      Federal law entitles Stone to several categories of damages for MillerCoors's

26 intentional, wide-ranging, and sustained campaign of infringement against Stone's

27 incontestable trademark and the resulting irreversible harm to Stone's business.

28 Stone is entitled to recover at least (1) its substantial lost sales and revenue, (2) the

amount of irreversible damage inflicted on the Stone brand, (3) disgorgement of MillerCoors's sky-high profits as a result of the infringement, and (4) Stone's years of attorneys' fees and litigation costs.  Given the long-running nature of the infringement—the campaign is still in place after nearly five years—the evidence shows that these categories together total in the hundreds of millions of dollars.

## II.    SIGNIFICANT DISPUTED ISSUES OF LAW

In advance of presenting its case to the jury, and pursuant to Local Rule 16.1, Stone identifies the following matters as significant disputed issues of law, including procedural and evidentiary issues, on which the Court will be required to rule:

A.    <u>MillerCoors's Prior-Use Defense Fails</u>: MillerCoors's claimed use of the name "Stones" before Stone secured trademark protection in 1998 is insufficient to avoid liability for its obvious and ongoing infringement.

B.    <u>MillerCoors's Infringement Was Willful</u>: MillerCoors's argument that its infringement was not willful because it did not have a "specific intent" to infringe Stone's mark likewise fails.  Stone need only show that MillerCoors recklessly disregarded the likelihood of infringement on Stone's mark—even though the record shows that MillerCoors's conduct far exceeds that bar.

C.    <u>MillerCoors's Belated Clawback Attempt Must Be Rejected</u>: The Court must reject MillerCoors's eleventh-hour attempt to claw back documents that have been on Stone's exhibit list for two years and have been used extensively throughout the litigation.

D.    <u>MillerCoors's "Agencies of Record" Are Its Legal Agents</u>: MillerCoors relied on a handful of outside agencies and consultants—which it referred to as its "agencies of record"—for various marketing-related purposes in connection with the "Own the Stone" campaign.  These agencies were MillerCoors's legal agents, such that their words and actions should be attributed to it.

E.    <u>217 Specific Documents Should Be Deemed Admitted</u>: MillerCoors and its directly controlled agents produced admissible business communications and other documents that are highly probative of MillerCoors's infringement. Those documents should be deemed admitted because (i) they are facially admissible, and (ii) doing so remedies MillerCoors's discovery misconduct.

F.    <u>Stone's Damages-Related Jury Instructions Are Proper</u>: The parties' proposed jury instructions contain a variety of disputes regarding how to

accurately charge the jury under Ninth Circuit law.  Two of those disputes reflect fundamental disagreements regarding basic damages principles, each of which should be resolved in Stone's favor.

G.   <u>MillerCoors's Defenses Regarding the Timeliness of Stone's Claims Must Be Rejected</u>: MillerCoors raises timeliness defenses that must be rejected because they (i) are not proper matters for the jury, and (ii) are contrary to this Court's prior rulings.

H.   <u>MillerCoors's Late-Disclosed Witnesses Must Be Excluded</u>: At the last minute, MillerCoors included on its witness list certain individuals that it did not previously disclose.  Those witnesses must be excluded.

I.   <u>MillerCoors's Untimely Expert Opinions Must Be Excluded</u>: Weeks before trial and months after expert disclosures were due, MillerCoors served more than 600 pages of purported "second rebuttal expert reports" on Stone. Those reports are untimely and must be excluded.

For the reasons set forth below, the Court should rule in Stone's favor on each of these disputed issues.

## A.   MillerCoors's Prior-Use Defense Is Baseless

First, MillerCoors has indicated that one of its principal defenses at trial will be that it used a variation of the word "Stone" in connection with Keystone Light before Stone submitted its trademark application in 1996.  As a result, MillerCoors will conclude, its current use of the word "Stone" does not infringe on Stone's incontestable trademark.  This argument is factually baseless and contrary to established federal law, and must be rejected.

In order to establish a prior-use defense, an infringer must first prove that it used the term as an *identifying* name to designate the source or origin of the goods in a manner that creates an association in consumers' minds between the goods and the name.  This concept is well-established in federal trademark law. *E.g.*, 1 McCarthy on Trademarks and Unfair Competition § 3:4 (5th ed.) ("To create trademark or trade dress rights, a designation must perform the job of identification: to identify one source and distinguish it from other sources. If it does not do this, then it is not protectable as a trademark . . . ."); 2 McCarthy § 16:1 n.8 (5th ed.) ("To achieve

priority, the use must be as a trademark – to identify and distinguish source.”);
*Rearden v. Rearden Commerce*, 683 F.3d 1190, 1204 (9th Cir. 2012) (mark “not meritorious of trademark protection until it is used in public in a manner that creates an association among consumers between the mark and the mark’s owner”); *New West v. NYM Co. of Cal.*, 595 F.2d 1194, 1200 (9th Cir. 1979) (use must be of “such nature and extent as to create an association of the goods or services and the mark with the user thereof”).

Because federal law limits protectable uses to those that are for the purpose of *identifying* the goods in question as distinct from all others, mere casual, sporadic, or token use of the mark is not enough to establish trademark rights.  Instead, the use in question must have been “constant” and “continuous,” such that the mark was used as a means of identification “without interruption” for a meaningful period of time.  *See Casual Corner Assocs., Inc. v. Casual Stores of Nev., Inc.,* 493 F.2d 709, 712 (9th Cir. 1974) (holding there is a strict “continuous use” requirement to demonstrate common law priority; “To be a continuous use, the use must be maintained without interruption.”); *Quiksilver, Inc. v. Kymsta Corp.*, 466 F.3d 749, 757–58 (9th Cir. 2006) (“In determining whether a mark has independent trademark significance, we consider whether the mark owner has engaged in ‘a constant pattern or effort . . . to use . . . [the product mark] in a manner separate and distinct from [the house mark].’” (alterations in original)); *see also* Summary Judgment Decision, ECF 360 at 28-29, 31 (ruling use must be “continuous and not interrupted” and sufficient “to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the holder of the mark”).  As a result, and as this Court has already ruled in this case, “[A] party cannot rely on a few instances of use of the marks in the distant past that were casual or had little importance apparently attached to them.”  *Id.*  (ruling that “mere use of a word does not make it a trademark”; “where a claimant uses different designs, colors, fonts, font sizes, and the presentation of a word varies from item to item, the word is unlikely to be a trademark”).

1    Here, MillerCoors claims that its current infringement should be excused

2  because it occasionally used the word "Stones" in connection with Keystone Light

3  packaging in the past.  In particular, MillerCoors claims that Keystone Light's multi-

4  can packs sometimes used "Stones" to refer to the number of cans in the box.  For

5  instance, a 30-pack box may have stated "30 'Stones" on the outside of the

6  packaging to indicate that 30 cans were inside.  But it is settled law that such passing

7  use of "Stones" in a way that does not either identify the product or otherwise create

8  a connection in consumers' minds between the product and the word cannot give rise

9  to trademark protection.  *E.g.*, *Rearden*, 683 F.3d at 1204; *New West*, 595 F.2d at

10  1200.  And the record here shows that no such connection was established by that

11  occasional use: according to MillerCoors's own market research, prior to the 2017

12  rebrand "**no one**"—"even the loyalists"—"**referred to Keystones as 'stones**."

13  (PX 48 (emphasis added)).

14    Moreover, because "Stones" (the term MillerCoors claims to have used in the

15  past) and "Stone" (the term it uses now) are not literally identical, MillerCoors's

16  supposed prior-use defense can succeed only if it can satisfy the so-called "tacking"

17  requirement of federal copyright law.  Under this difficult standard, a party must

18  show that the current mark and the prior mark are "legal equivalent[s]" of or

19  "indistinguishable" from one another, such that they "create the same, continuing

20  commercial impression" and "consumers consider both as the same mark."  *Hana*

21  *Financial, Inc. v. Hana Bank*, 735 F. 3d 1158, 1163 (9th Cir. 2013) (determining

22  whether prior and current marks "convey[] the same commercial impression such

23  that they possess the same connotation in context").  As the Ninth Circuit has held,

24  "The standard for tacking . . . is exceedingly strict: The marks must create the *same,*

25  *continuing commercial impression,* and the later mark should not materially differ

26  from or alter the character of the mark attempted to be tacked." *Brookfield Comm'ns*

27  *v. W. Coast Ent't*, 174 F. 3d 1036, 1048 (9th Cir. 1999) (emphasis in original); *One*

28  *Industries, LLC v. Jim O'Neal Dist'g, Inc.*, 578 F.3d 1154, 1160 (9th Cir. 2009).

There is no question that MillerCoors fails to meet these standards. It cannot possibly show as a matter of law or fact that the rebranded Keystone cans, packaging, and other materials—which seek to "Own the Stone" and ensure that the term "Stone is never small or secondary" by effectively renaming the product "Stone"—are the "legal equivalent" of or are "indistinguishable" from prior Keystone products. Indeed, the entire purpose of the 2017 rebrand was to breathe new life into a flailing brand by *changing* the "commercial impression" of the brand in consumers' minds, not by keeping it consistent.

The bottom line is that MillerCoors's alleged sporadic use of the word "Stones" on Keystone packaging in the distant past is categorically different from MillerCoors's intentional renaming of "Keystone Light" to "Stone" in 2017. The Court should rule that the prior-use justification is legally and factually baseless.

### B.   MillerCoors Mischaracterizes the "Willfulness" Standard

Next, the parties dispute the standard that the Court must apply to determine whether MillerCoors's infringement was willful, with MillerCoors seeking to artificially raise the bar to heights the law does not require. This dispute has crystalized in connection with the parties' competing Jury Instructions 51 and 52.

Under established federal law, MillerCoors acted willfully in infringing Stone's trademark if it either (i) <u>knowingly</u> adopted a mark identical or similar to Stone's mark, or (ii) acted with <u>indifference</u> to or <u>reckless disregard</u> for Stone's trademark rights. *Hokto Kinoko Co. v. Concord Farms*, 738 F.3d 1085, 1096 (9th Cir. 2013) ("When an alleged infringer knowingly adopts a mark identical or similar to another's mark, courts will presume an intent to deceive the public."); *Stone Creek v. Omnia Italian Design*, 875 F.3d 426, 434 (9th Cir. 2017) ("[C]hoosing a designation with knowledge that it is another's trademark permits a presumption of intent to deceive."); *Fifty-Six Hope Road Music v. Avela*, 778 F. 3d 1059, 1074 (9th Cir. 2015) (finding willfulness based on defendant's "awareness of its competitors and its actions at those competitors' expense"; noting that "Use of an infringing

1  mark, in the face of warnings about potential infringement, is strong evidence of

2  willful infringement."); *Romag Fasteners, Inc v. Fossil, Inc.*, 140 S. Ct. 1492, 1498

3  (2020) (Sotomayor, J., concurring) ("Courts . . . [have] defined 'willfulness' to

4  encompass a range of culpable mental states—including the equivalent of

5  recklessness, but excluding 'good faith' or negligence"); *Id.* Oral Arg. Tr. at 38:18-

6  25, 44:8-18 (questioning by Kavanaugh, J.) (same).[3]

7      Notwithstanding this plain authority, MillerCoors asks the Court to rule that

8  willfulness requires much more.  It maintains that a defendant acts willfully only

9  when it "knowingly and purposefully capitalizes on and appropriates the goodwill of

10 a plaintiff," such that it "must have had a deliberate intent to deceive," because

11 "[m]ere knowledge is insufficient."  (MillerCoors's Proposed Jury Instruction 52).

12 This is a misstatement of the law.  First, contrary to MillerCoors's position and as

13 explained above, knowledge is sufficient to establish willfulness as a matter of law.

14 *See Hokto Kinoko Co.*, 738 F.3d at 1096 (9th Cir. 2013) ("When an alleged infringer

15 knowingly adopts a mark identical or similar to another's mark, courts will presume

16 an intent to deceive the public."); *Stone Creek*, 875 F.3d at 434; *Fifty-Six Hope Road*

17 *Music*, 778 F. 3d at 1074.  Indeed, one of MillerCoors's own cases, *Groupion, LLC*

18 *v. Groupon, Inc.*, explains that adoption of a trademark with *knowledge* of another's

19 similar mark is sufficient to presume intent.  826 F. Supp. 2d 1156, 1165 (N.D. Cal.

20 2011) ("When an alleged infringer *knowingly* adopts a mark similar to another's,

21 *courts will presume an intent to deceive the public*.").  MillerCoors's assertion that

22 "defendant must have had a deliberate intent to deceive" and that "knowledge is

23 insufficient" to show this are stark misstatements of governing law.  Indeed, under its

24 proposed construction, willfulness would be nearly impossible to show.

25 _____

26 [3] District Courts in the Ninth Circuit routinely apply this same standard.  *E.g.*, *SAS v. Sawabeh Info. Servs. Co.*, 2015 WL 12763541, at *7 (C.D. Cal. June 22, 2015); *Philip Morris USA, Inc. v. Liu*, 489 F.Supp.2d 1119, 1123 (C.D. Cal. 2007); *Autodesk, Inc. v. Flores*, 2011 WL 337836, at *8

27 (N.D. Cal. Jan. 31, 2011) ("Under the Copyright and Lanham Acts, willfulness may be found where the defendant's infringing actions are undertaken either with knowledge that the conduct

28 constitutes infringement or with reckless disregard for the copyright or trademark owner's rights.").

Second, MillerCoors fails to acknowledge that willfulness encompasses a broader range of culpable conduct and is not limited to "*deliberate* intent to deceive." While the Supreme Court in *Romag* did not decide what constitutes willfulness, several Justices observed that "Courts . . . [have] defined 'willfulness' to encompass a range of culpable mental states—including the equivalent of recklessness, but excluding 'good faith' or negligence.  *Romag*, 140 S. Ct. at 1498 (2020) (Sotomayor, J., concurring); *id.* Oral Argument Tr. at 38:18-25, 44:8-18 (U.S. 2020) (questioning by Ginsburg, J., and Kavanaugh, J.) (same).

As a leading treatise explains, "willfulness . . . range[s] from fraudulent and knowing to reckless and indifferent" behavior.  5 McCarthy on Trademarks and Unfair Competition § 30:62 (5th ed. 2019).  Thus, District Courts in the Ninth Circuit routinely hold that willful trademark violations can be found based on reckless disregard and willful blindness.  *See supra* n.1.  Moreover, although the Ninth Circuit does not provide a model willfulness instruction specific to trademarks, it does for copyrights.  That instruction, No. 17.37, states that "[a]n infringement is considered willful when the plaintiff has proved [that] . . . the defendant knew that those acts infringed the copyright, *or the defendant acted with reckless disregard for, or willful blindness to, the copyright holder's rights*." (emphasis added).  Courts regularly borrow from copyright authorities when assessing willfulness in trademark cases. *See Philip Morris USA, Inc. v. Castworld Prods., Inc.*, 219 F.R.D. 494, 500 (C.D. Cal. 2003) (holding that "courts faced with determining statutory damages under the Trademark Act [may] analogize[ ] to the body of case law interpreting a similar provision in the Copyright Act").

The Court should not credit MillerCoors's misstatement of the Ninth Circuit's willfulness standard, and should instead rule that "willfulness" is established through showing either MillerCoors's (i) <u>knowing</u> adoption of a mark identical or similar to Stone's mark, or (ii) <u>indifference</u> to or <u>reckless disregard</u> for Stone's trademark rights.

### C.    MillerCoors's Belated Clawback Attempt Must Be Rejected

Third, the parties dispute whether MillerCoors can claw back, purportedly on privilege grounds, a number of damaging documents that were produced years ago and have been on Stone's exhibit list since November 2019.  There is no basis to assert any such clawback claim, and even if there had been at some point, such a claim has long since been abandoned and waived.

For the first time on October 1, 2021, five weeks before trial, Stone received a demand from Defendant's former lead counsel purporting to claw back as privileged nine of Stone's trial exhibits—PX0115, PX0173, PX0292, PX0897, PX1093, PX1094, PX1100, PX2289, and PX2386—which have been identified and used in the case for more than two years.  Stone has made use of these documents throughout the litigation, and it has been relying on them in its preparations for trial. Each of these exhibits have appeared on Stone's exhibit list since at least November 2019, and MillerCoors even served evidentiary objections to them without issuing any clawback demand.  In addition, at least three of the exhibits were used at fact depositions in Spring 2019, and at least five appeared on Stone's Court-ordered December 2020 exhibit disclosure.  (*See* ECF 440 at 7).  At least six appeared on Stone's list of exhibits submitted pursuant to the Court's instructions at the July 7, 2021 status conference, as set forth in ECF 480.  And at least three were used at the deposition of MillerCoors's corporate representative.  On none of these occasions did MillerCoors attempt to claw back the documents or prevent Stone from using them.

MillerCoors has waived any claims of privilege by failing to issue a claw back demand for **two years** after Stone made obvious use of the documents at depositions, added the documents to exhibit lists and other court-ordered disclosures, and otherwise relied on them throughout the litigation. *See Luna Gaming-San Diego, LLC v. Dorsey & Whitney, LLP*, 2010 WL 275083, at *5 (S.D. Cal. Jan. 13, 2010); *Brandon v. D.R. Horton, Inc.*, 2008 WL 2096883, at *3 (S.D. Cal. May 16, 2008), as amended (May 21, 2008); *Preferred Care Partners Holding Corp. v. Humana, Inc.*,

258 F.R.D. 684, 700 (S.D. Fla. 2009) (finding waiver where party failed to issue clawback demand for three weeks after the opposing party cited the allegedly privileged document in support of a motion); *Ada Liss Grp. (2003) Ltd. v. Sara Lee Corp.*, 2013 WL 4735387, at *4 (M.D.N.C. Sept. 3, 2013), adopted, 2014 WL 4370660 (M.D.N.C. Aug. 28, 2014) ("Defendants have waited approximately two and a half years to challenge Plaintiff's use of it in their motion").[4]

Moreover, MillerCoors has provided *zero* support for the merits of its privilege claims. Given that they are emails within the marketing team rather than between lawyers, there appears to be no basis for any such claim. The Court should overrule the claim of privilege as to PX0115, PX0173, PX0292, PX0897, PX1093, PX1094, PX1100, PX2289, and PX2386.

### D.   MillerCoors's "Agencies of Record" Are Its Legal Agents

MillerCoors relied on a handful of outside agencies and consultants—which it referred to as its "agencies of record"—for various marketing-related purposes. These agencies included, among others, Mekanism, which was responsible for the overall "Own the Stone" campaign, Soulsight, which designed the revamped Keystone packaging and branding, Positive and PRS In Vivo, which conducted branding-related focus group studies, and Epic Signal, which generated social media content in connection with the rebranding. These agencies were MillerCoors's legal agents, and the Court should rule that their words and acts can be attributed to it.

These agencies "act[ed] on [MillerCoors's] behalf" and were "subject to [its] control." *See United States v. Bonds*, 608 F.3d 495, 506 (9th Cir. 2010). MillerCoors has stated under oath that these "agencies of record" were functionally employees of MillerCoors who "functioned as the design arm of [Defendant's] Keystone brand team." (Decl. of Grace Needleman, ECF 184 ¶ 6). Under this arrangement, agency personnel were "***directed and supervised*** by the [in-house]

---

[4] Nor is MillerCoors helped by the parties' agreement in the ESI protocol that inadvertent production does not constitute waiver. (ECF 74 ¶ 35). Waiver here is the result of an inexcusable failure for two years to object; it is not the result of inadvertent production.

Keystone brand team" and "***worked hand-in-hand with the brand team*** on the communications strategy for Keystone, communicating on an almost daily basis by phone, e-mail, or in person." (*Id.* ¶ 8 (emphasis added)). The agencies were even allegedly privy to Defendant's internal attorney-client communications and received legal advice from Defendant's lawyers. (*Id.* ¶ 10). Defendant's 30(b)(6) witness did not dispute any of this testimony. (J. Stauffer Dep. Tr. at 63:15-65:6).

This Court should therefore rule that these agencies were the legal agents of MillerCoors, such that all documents and communications produced by, all statements made by, and all actions taken by these agents within the scope of their agency relationship are properly attributable to, and are therefore admissible against, MillerCoors. *E.g.*, *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 454 F. Supp. 2d 966, 972–73 (C.D. Cal. 2006) (documents produced by defendant's public relations agency in response to subpoena were presumptively authentic and were admissible against defendant); *In re Homestore.com, Inc. Sec. Litig.*, 347 F. Supp. 2d 769, 780–83 (C.D. Cal. 2004) (documents produced by defendant's auditor were presumptively authentic and were admissible against defendant); FRE 801(d)(2)(D) (statements "made by the party's agent . . . on a matter within the scope of that relationship and while it existed" are admissible).

**E.    217 Specific Documents Should Be Deemed Admitted**

Fourth, the parties dispute the admissibility of approximately 200 documents (detailed in Exhibit 1, attached hereto), all of which are authentic business records of MillerCoors's "Own the Stone" campaign. The Court addressed these documents at the July 7, 2021 Pretrial Conference and in the ensuing Order, ECF 480 (the "Admission Order"). Even though these documents were produced by MillerCoors and its directly controlled agents, MillerCoors nevertheless objects to their admissibility on the grounds that, among other things, some of the employees in question are no longer employed by MillerCoors. The Court ordered MillerCoors to produce a 30(b)(6) witness to address MillerCoors's foundation issues in advance of

trial, but MillerCoors failed to abide by that order, instead producing a witness who disclaimed knowledge of the vast majority of the documents.  In light of the obvious relevance and authenticity—these are routine, run-of-the-mill business emails—and MillerCoors's disregard for the Court's order, the documents should be deemed admitted.  Their admission will streamline trial and avoid unnecessary and repeated evidentiary objections at trial. Alternatively, if Stone is forced to jump through evidentiary hoops for each document, the Court should charge to MillerCoors the time required to lay foundation for and introduce into evidence any of these documents to which it has objected.

For the past year, the Court has ordered the parties to work together to address the admission of exhibits and to resolve any objections in advance of trial so as to ensure the efficient presentation of evidence.  (*See e.g.*, ECF 410; ECF 440 at 17 (citing Oct. 21, 2020 Status Conf. Tr., ECF 415 at 23:22-25:5); ECF 480).  At the July 7, 2021 hearing, the Court ordered: "I don't want to have a trial [cluttered] up in a whole bunch of unnecessary objections and delays" and that "it sure seems like it would make sense" to "focus our time in front of the jury on actually litigating the merits rather than having fights over evidentiary disputes and fights over admissibility." (Jul. 7, 2021 Tr. at 12:20-25, 17:9-11).  The Court established a procedure to admit documents and rejected Defendant's arguments to prevent, delay, or limit their use at trial, stating that "if the documents are admissible, they're admissible." (*Id*. at 18:23-24).

Following the hearing, the Court entered the Admission Order, directing that: (1) Stone first identify a list of documents "it will seek to admit through defendant's witnesses at trial"; (2) "Defendant will inform Plaintiff to which of those exhibits it agrees there is no objection and is admissible into evidence"; and (3) "Defendant will make available for deposition its F.R.C.P. 30(b)(6) witness with knowledge to answer foundational questions about the exhibits on Plaintiff's list to which Defendant does not agree to withdraw its objections." (ECF 480 at 2).

Stone timely disclosed its list of exhibits, which consisted of Defendant's communications and corporate records.  But MillerCoors continued to stonewall, failing to comply with the Court's order in two ways: ***First***, although Defendant purported to "stipulat[e] as to admissibility" for certain of the exhibits, it "expressly reserve[d] the right to object to the[ir] introduction" and refused to agree that Stone could enter them into evidence or use them in accordance with the Court's instructions and the Admission Order.  (Defendant's Response to Stone's ECF 480 Disclosure at 2 ("'Yes' . . . does not constitute an agreement . . . .")).  Defendant asserted that it would agree to the exhibits' use only with certain witnesses and, even then, did not waive many objections to their admission or use at all.  (*Id*. at 2-3).  That violates the Court's instructions at the July 7 hearing and defeats the Court's Admission Order – and would delay trial by days while Stone is forced to waste time entering unobjectionable exhibits in rote fashion.  Defendant has not responded to Stone's requests that it agree Stone may enter those exhibits into evidence.

***Second***, Defendant did not comply with the Court's order to produce a competent corporate representative with "knowledge to answer foundational questions" about the remaining exhibits, as this Court ordered and Defendant agreed.  Presented with Defendant's own corporate records and communications that Defendant itself produced in discovery, Defendant's corporate representative could not answer "to what degree these documents were saved or where they were saved, or if they were saved at all" on Defendant's systems for "any of the documents" she was shown during the deposition.  (J. Stauffer Dep. Tr. at 335:24-336:9).  When asked about the source of the documents, she repeatedly stated variations of "I don't know where this document came from," (*id*. at 295:10-297:11), and "I don't know any more information other than what I can see in front of me," (*id*. at 286:9-287:10).  And the witness did not know whether documents were "kept in the regular course of Molson Coors's business."  (*Id*. at 334:19-336:19).  This obstructionist testimony prevented Stone from obtaining answers to many of its foundational questions—but

1    it also showed that MillerCoors's own corporate representative was unable to call

2    into doubt the admissibility of any of these documents.

3         As a result, the documents should be deemed admitted because (a) they are

4    facially authentic and admissible; and (b) admission is a well-tailored remedy for

5    MillerCoors's discovery misconduct.

6         **a.    The Documents Should be Admitted on their Face**

7         The Court should admit the documents on Stone's list under its broad

8    discretion to make evidentiary rulings and to admit evidence "conducive to the

9    conduct of a fair and orderly trial." *Amarel v. Connell*, 102 F.3d 1494, 1515 (9th Cir.

10   1996), *as amended* (Jan. 15, 1997); *Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323,

11   1328 (9th Cir. 1995).  All of the documents that Stone seeks to introduce are classic

12   business records and party communications of the sort that rarely are subject to a

13   dispute with respect to admission at trial.  Stone has complied with the Court's

14   Admission Order and Court-ordered procedure; the documents are authentic and, on

15   their face, satisfy the low evidentiary standard for admission to the jury; and

16   Defendant is precluded from challenging the evidentiary facts supporting admission

17   by proffering a corporate representative who lacked knowledge to dispute them.

18        "The trial court must admit evidence that is (1) relevant, and (2) not

19   inadmissible under, *inter alia*, some other rule." *United States v. Evans*, 728 F.3d

20   953, 961 (9th Cir. 2013).  Accordingly, courts routinely admit into evidence

21   documents that are relevant and admissible on their face without the need for a

22   sponsoring witness. *See e.g., Am. Fed'n of Musicians*, 903 F.3d at 976 (reversing

23   exclusion of email sent by party's employee based on information on the face of the

24   exhibit); *Sea-Land Serv. v. Lozen Int'l*, 285 F.3d 808, 821 (9th Cir. 2002) (same).

25        The documents at issue all satisfy this standard.  They consist of:

26   (1) Defendant's own communications and records regarding its campaign to have

27   Keystone "Own the Stone," including emails, presentations, speeches, strategy

28   memos, analyses and other documents created by Defendant's own personnel and

produced by Defendant in this case; (2) presentations, analyses, and market research that Defendant commissioned from its marketing agencies and consultants, who worked under the supervision of and at the direction of Defendant's internal Keystone brand team; (3) Defendant's own public filings with the PTO and SEC; (4) Defendant's own advertising and marketing materials for Keystone; and (5) Defendant's instructions to and communications with its distributors of Keystone beer. The documents are listed by category on Exhibit 1, with the basis for admissibility identified for each.

The documents should be admitted because Defendant does not dispute their authenticity and they contain admissions that are standard fare for trial. They are not hearsay because: (i) they were made by Defendant's agents and employees on matters within the scope of their responsibilities, FRE 801(d)(2)(D) ("statements "made by the party's agent or employee on a matter within the scope of that relationship and while it existed" are not hearsay); *see Am. Fed'n of Musicians*, 903 F.3d at 976; *Sea-Land*, 285 F.3d at 819-20; (ii) they are also admissible not for the truth of the matter asserted but because they reveal state of mind, prove notice, and show the Keystone brand team's thinking, knowledge, and intentions, *see* FRE 801(c)(2) & 803(3); *United States v. Castro*, 887 F.2d 988, 1000 (9th Cir. 1989) (reports received by defendant were not hearsay when offered to prove "what information was available to [defendant] at the time" of relevant acts); and (iii) they are business records, *Sea-Land,* 285 F.3d at 819–20; *United States v. Lischewski*, 2021 WL 2826474, at *3 (9th Cir. July 7, 2021); *ABS Ent.*, 908 F.3d at 425–26 (reports that "[Defendant] itself relied on […] in the ordinary course of business" admissible as business records). Defendant, according to the testimony of its Rule 30(b)(6) witness, does not have facts to dispute any of these points.

The Court should admit all of these materials now to avoid wasted time in front of the jury at trial based on spurious objections to admissibility and unnecessary extension of the time for trial. As shown on the chart attached as Exhibit 1, many of

the documents have had foundation established at deposition, and for all of them foundation is apparent on their face.

### b.   The Documents Should Be Admitted to Remedy Defendant's Discovery Misconduct

Further, admission of the documents is necessary to prevent Stone from being unfairly deprived of the ability to use and rely on the documents as a result of Defendant's control of witnesses.  MillerCoors has refused to make available for trial the two officers most closely involved in the development of the Keystone rebrand.  And its conduct at the Rule 30(b)(6) deposition reveals what would have happened had the Court accepted Defendant's proposal to supply a Rule 30(b)(6) witness at trial—hours wasted in front of the jury with a corporate representative witness trained to avoid supplying foundational information.  Admission is also necessary to prevent the Court's Admission Order—intended to facilitate movement of Defendant's documents into evidence—from being twisted into a vehicle whereby Defendant can preferentially move materials into evidence but Stone cannot.

In addition to taking the position that documents can be admitted only with certain witnesses (who are under Defendant's control), Defendant has selectively "agreed" to the admission of documents based on whether it believes the document in question would be useful to itself at trial.  For example, Stone sought agreement that multiple Keystone advertising images taken from the same MillerCoors database could be moved into evidence.  These images were produced by Defendant with adjacent bates numbers:

| PX2444 | PX2445 |
|--------|--------|
|  |  |

Defendant agreed that the second exhibit, PX2445, was admissible, but it refused to make the same stipulation for PX2444 (and many others like it).  When asked, Defendant's corporate representative could not identify a single foundational difference between PX2444 and PX2445, nor could she articulate a single reason why one would be reliable or admissible but the other would not be.  Ex. 4 at 284:21-287:13.  The only difference between the documents is that PX2445 emphasizes the Keystone 15 pack, which Defendant has advanced as an alternative explanation for Keystone's massive sales turnaround, whereas PX2444 does not support that (inaccurate) alternative explanation.  Similarly, Defendant has refused to stipulate to the admission of certified copies of many of its filings with the USPTO despite previously stipulating to the admission of an *uncertified* printout of the USPTO file for the KEYSTONE® trademark.

Defendant's decision to agree to the admission of materials that it finds helpful but not to equivalent materials that it finds harmful demonstrates why pre-admission of these documents is necessary: Defendant should not be permitted to take advantage of a process designed to ensure smooth admission of trial exhibits by creating a selective record in which only its favored documents can be introduced.

Defendant's violation of the Court's Admissibility Order and undermining of the Court's procedure for establishing foundation for relevant documents itself justifies admission of the documents.  Federal Rule of Civil Procedure 37 permits a court to declare that "matters embraced in the order or other designated facts" are "taken as established for purposes of the action" if a party or 30(b)(6) witness "fails to obey an order to provide or permit discovery."  Fed. R. Civ. P. 37(b)(2)(A)(i).  Courts routinely apply Rule 37 to preclude parties in violation of discovery orders from contesting matters described in a Rule 30(b)(6) deposition notice when they fail to produce a knowledgeable witness at the deposition.  *See e.g., Tacori Enterprises v. Beverlly Jewellery Co.*, 253 F.R.D. 577, 584 (C.D. Cal. 2008) (party who obstructed Rule 30(b)(6) deposition and refused to appear for continued

questioning was precluded from contesting subjects described in the notice); *Egbert v. Equifax Info. Servs., LLC*, 2020 WL 1529568, at *2–3 (D. Nev. Mar. 31, 2020) (party who failed to produce knowledgeable Rule 30(b)(6) witness was precluded from contesting issues described in notice).

In light of its ongoing failure to comply with the Court's Order, the Court should preclude Defendant from disputing the admission of the materials that were subject to the Admission Order and the Rule 30(b)(6) deposition. *See Navellier v. Sletten*, 262 F.3d 923, 947–48 (9th Cir. 2001). This remedy is narrowly tailored to both address the discovery misconduct on the part of MillerCoors and to remedy the prejudice that MillerCoors's misconduct has caused to Stone. Moreover, Defendant is not unduly burdened or prejudiced by such a remedy because the documents are admissible on the merits and because Defendant has foreclosed its ability to contest foundation by proffering a 30(b)(6) witness with no such information.

The Federal Rules favor the resolution of disputes on the merits rather than by procedural maneuvering. Admitting these documents will permit the jury to render its verdict on a full record, will put an end to Defendant's effort to avoid a fair result, and will ensure the efficient conduct of trial without any unnecessary delays.

## F.     Stone's Damages-Related Jury Instructions Are Proper

The next dispute relates to the parties' proposed jury instructions, which contain a variety of conflicts regarding how to accurately charge the jury. Stone's comprehensive arguments and authorities are set forth in its jury-instructions submissions, and it stands on each of those objections. But it raises two of those disputes, both of which reflect disagreements regarding basic damages principles, under Local Rule 16.1 for the Court's benefit.

1. Stone is entitled to reasonable royalty damages (Jury Instruction ("J.I.") 58): Stone is entitled to recover damages measured by the value of a reasonable royalty rate, had such a royalty been negotiated between the parties at the time of infringement. *Playboy Enterprises v. Baccarat Clothing Co., Inc.*, 692 F. 2d 1272,

1274 (9th Cir. 1982) (affirming reasonable royalty damages in trademark case); *Marketquest Grp. v. BIC Corp.*, 316 F. Supp. 3d 1234, 1300 (S.D. Cal. 2018) ("Reasonable royalties are a calculation of the hypothetical licensing royalties that an infringer would have paid to the senior owner of a mark and can be recovered as a measure of damages in trademark infringement cases."); *Bauer Bros. v. Nike*, 159 F. Supp. 3d 1202, 1213-14 (S.D. Cal. 2016) (courts "have awarded reasonable royalty damages absent prior licensing agreements if the evidence provides a sufficiently reliable basis from which to calculate them.").  These authorities show that, contrary to MillerCoors's contentions, such damages are proper even though this is a trademark case, not a copyright or patent case.

Moreover, Stone is not required to affirmatively prove that it actually would have granted such a license to MillerCoors at the time. *See Oracle Corp. v. SAP AG*, 765 F. 3d 1081, 1087-88 (9th Cir. 2014) (holding that "hypothetical-license damages also constitute an acceptable form of 'actual damages' recoverable under" the analogous "actual damages" provision of the Copyright Act even where the plaintiff "never would have granted a license"; "Hypothetical-license damages assume rather than require the existence of a willing seller and buyer."); *Wall Data v. Los Angeles County Sheriff's Dept.*, 447 F.3d 769, 786 (9th Cir. 2006).  MillerCoors's contentions to the contrary misstate federal law and should be disregarded.

<u>2. Stone is entitled to lost profits damages (J.I. 56 & 61)</u>: Stone is likewise entitled to recover damages measured by the profits it lost because of MillerCoors's infringement.  These damages constitute actual damages that Stone will establish with "reasonable certainty," as required in the Ninth Circuit.  *See Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993), *abrogated on other grounds by SunEarth, Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179 (9th Cir. 2016) ("As a general rule, damages which result from a tort must be established with reasonable certainty. The Supreme Court has held that '[d]amages are not rendered uncertain because they cannot be calculated with absolute exactness,' yet, a

reasonable basis for computation must exist.") (citations omitted; alteration in original)); *Adray v. Adry-Mart, Inc.*, 76 F. 3d 984, 989 (9th Cir. 1995) ("The burden of any uncertainty in the amount of damages should be borne by the wrongdoer."). This is all federal law requires; MillerCoors's attempt to cleave off lost profits as a separate category from Stone's other actual damages is without merit and should be rejected by the Court.

### G.   MillerCoors's Defenses Regarding the Timeliness of Stone's Claims Must Be Rejected

Next, in its proposed jury instructions, MillerCoors asks the Court to instruct the jury regarding four distinct defenses that all center on the notion that Stone's claims are untimely.  Each of these defenses is contrary to the Court's prior decisions in this case and should be rejected.

First, MillerCoors seeks an advisory verdict on various of its purported defenses that it admits are equitable in nature: wavier (J.I. 70), estoppel (J.I. 71), and acquiescence (J.I. 72).  But, as equitable defenses, each of these are properly considered by the Court, not the jury.  *E.g.*, *Unicolors, Inc. v. Urban Outfitters, Inc.*, 686 F. App'x 422, 425 (9th Cir. 2017) ("The district court also did not abuse its discretion in refusing to issue a jury instruction on Urban's estoppel defense. Estoppel is an equitable defense that the court, not the jury, must decide.")

Moreover, each of these defenses also pertain to the timeliness of Stone's claims, as MillerCoors suggests that, for one reason or another, Stone should be barred from bringing its claims because it did not act quickly enough to challenge MillerCoors's infringement.  This is an obvious effort to sidestep the Court's ruling in Stone's favor on MillerCoors's related laches defense.  In its summary judgment decision, the Court rejected the laches defense and ruled that Stone "timely filed suit" because Stone's "claims stem from Defendant's use of its mark in connection with its Keystone Light refresh in 2017, not any prior use of the mark."  (Summary Judgment Order, ECF 360 at 27).  This finding forecloses each of these equitable

defenses, as they all depend on the contrary assertion that Stone somehow consented to MillerCoors's pre-2017 conduct.

Relatedly, MillerCoors also asks the Court to instruct the jury on a statute of limitations defense (J.I. 73), despite the fact that the Court has already found that Stone's claims are timely.  Indeed, in its summary judgment order, the Court went beyond rejecting MillerCoors's laches defense, and expressly found that "Plaintiff timely filed suit within the four-year statutory period."  (ECF 360 at 27).

Stone is suing MillerCoors for its infringement relating to the 2017 rebranding.  By filing suit in 2018—within one year of that marketing campaign—Stone is plainly within any equitable or legal limitations periods.  MillerCoors's contentions to the contrary must be rejected.

### H.    MillerCoors's Late-Disclosed Witnesses Must Be Excluded

Further, MillerCoors should not be permitted to call late-disclosed witnesses for whom it produced no documents and did not make available for deposition.

1. Scott Whitley.  On October 20, 2021, less than three weeks before trial, Defendant served amendments to its witness list purporting to add previously undisclosed MillerCoors employee Scott Whitley.  Whitley is a longtime MillerCoors employee who worked for MillerCoors during the time period of discovery in this action, and recently retired (according to Defendant).  However, he was not listed in Defendant's Rule 26 disclosures during discovery, MillerCoors did not search or produce his documents during discovery, and MillerCoors has never disclosed him as a potential witness in any of its previous trial witness lists.  Defendant's last-minute addition of this undisclosed witness violates the Rules and is prejudicial to Stone.  The Court should preclude him from testifying.

Under Rule 26(a)(1)(A), each party must disclose "(i) the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses[.]"  Where a party fails to disclose such

1   witnesses, it cannot rely on them at trial. "Rule 37(c)(1) gives teeth to these

2   requirements by forbidding the use at trial of any information required to be

3   disclosed by Rule 26(a) that is not properly disclosed." *Yeti by Molly, Ltd. v.*

4   *Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001). Exclusion under Rule

5   37(c)(1) is "automatic" in that it follows as a matter of course for witnesses that are

6   not properly disclosed in discovery, without the need for a sanctions motion. See

7   Advisory Committee Notes, 1993 Amendments to Fed. R. Civ. P., 146 F.R.D. 401,

8   691 (exclusion is "a self-executing sanction for failure to make a disclosure required

9   by Rule 26(a)").

10      Whitley was not timely disclosed pursuant to Rule 26(a) despite being

11  employed by MillerCoors throughout this litigation. Whitley has served since 2014

12  until recently as the President and CEO of MillerCoors's craft beer division. If

13  MillerCoors believed that Whitley had relevant information regarding this case, it

14  was obligated to disclose him in its Rule 26 disclosures and to search for relevant

15  documents in their possession. But MillerCoors did neither, failing to disclose

16  Whitley identities until more than three years after the case was filed and less than

17  three weeks before trial. Whitley was never deposed, and Stone does not have access

18  to his documents, which Defendant did not search or produce.

19      2. Sabrina Stavish & Neil Nydegger.  In its October 20, 2021 disclosure,

20  MillerCoors also sought to add Stone's former trademark counsel Neil Nydegger to

21  its witness list as the mirror image to MillerCoors's own former trademark counsel,

22  Sabrina Stavish. Inclusion of both of these witnesses is similarly improper. Neither

23  Stavish nor Nydegger was listed on any version of Defendant's Rule 26 disclosures,

24  and neither was deposed during discovery. Moreover, Defendant has strenuously

25  resisted producing communications and documents involving Stavish, who appears

26  more than a dozen times in Defendant's privilege log. Defendant cannot invoke

27  privilege as both a sword and shield, steadfastly resisting discovery of information

28  from Stavish and at the same time seeking to present her as an affirmative witness.

Defendant should likewise be precluded from presenting these late-disclosed witnesses at trial.

Under these circumstances, exclusion of each of these three witnesses—none of whom appear on MillerCoors's Rule 26 disclosures—follows automatically pursuant to Rule 37(c)(1).  MillerCoors should not be permitted to gain an unfair advantage by springing witnesses on Stone three weeks before trial.

## I.    MillerCoors's Late-Disclosed Expert Opinions Must Be Excluded

Finally, the Court should reject the more than 600 pages of purported "second rebuttal expert reports" served by MillerCoors on October 1, 2021, just weeks before trial and more than seven months after the period for disclosures had lapsed.

On October 1, 2021, just weeks before trial, Defendant served more than 600 pages of purported "Second Rebuttal Expert Reports" of its expert witnesses Mark Hosfield (damages) and Michael Kallenberger (marketing).  The reports rely on never-before-produced—and, in several instances, still unproduced—data and documents that reach back to before the filing of this lawsuit, including selective excerpts from the advertising database that was responsive to Stone's document requests and that Defendant withheld throughout this litigation in the face of Stone's repeated motions to compel.  The reports are untimely by more than seven months, rely on data that still has not been produced, and go far beyond the limited supplements timely served by Stone in February 2021 and to which Defendant now purports to rebut.  At no point did Defendant disclose its intention to serve purported rebuttal reports or seek to work out a schedule with Stone that would permit a fair opportunity for Stone to respond.  Under Rule 26 and controlling law, the Court must bar Defendant from introducing the opinions or underlying data at trial.

***First***, the rebuttal reports should be excluded because they are untimely.  Rule 26(a)(2)(B) requires disclosure of expert rebuttal reports "within 30 days after the disclosure of the evidence that the expert is assigned to rebut."  *Yeti by Molly, Ltd. v.*

1  *Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001).  "Rule 37(c)(1) gives

2  teeth to these requirements by forbidding the use at trial of any information required

3  to be disclosed by Rule 26(a) that is not properly disclosed." *Id.*

4       Hosfield and Kallenberger's so-called "second rebuttal" reports purport to

5  respond to supplemental reports by Stone's experts that were served on February 12,

6  2021, as required under Rule 26(a)(2)(E) & (e)(2).[5]  Defendant's deadline to serve

7  rebuttal reports, if any, would have been March 15, 2021, under Rule

8  26(a)(2)(B).  But Defendant withheld its reports for another six-and-a-half months—

9  never mentioning that it intended to serve rebuttals or proposing an agreed schedule

10  that would protect both parties—before serving them on the eve of trial.

11       Because Defendant failed to timely disclose these "second rebuttal" reports,

12  exclusion of the reports is "self-executing" and "automatic."  *Yeti*, 259 F.3d at 1106;

13  *see also Quevedo v. Trans-Pac. Shipping, Inc.*, 143 F.3d 1255, 1258 (9th Cir. 1998)

14  (affirming exclusion of expert report that was served a month and a half after

15  deadline).  The Ninth Circuit grappled with virtually identical facts in *Yeti*, where it

16  affirmed the trial court's exclusion of a purported rebuttal report served "just 28 days

17  prior to trial."  *Id*. at 1105.  The same result is required here.  Defendant's decision to

18  lie in wait for eight months, ignore Rule 26, eschew any discussion of cooperative

19  exchange, and unilaterally submit 600 pages of rebuttal reports on the eve of trial is

20  highly prejudicial and requires exclusion.

21       ***Second***, the new reports are prejudicial because they go beyond the scope of

22  rebuttal of new facts and data and purport to modify the opinions expressed by the

23  same experts at their depositions and in earlier reports about matters that long predate

24  Defendant's original expert reports.  For example, damages expert Hosfield purports

25

26  _____

[5] Stone apprised Defendant of that deadline and proposed a mutual exchange of
27  supplemental reports to account for developments post-dating the reports served in
   mid-2019.  Yet, Defendant chose not to respond or to supplement its reports by
28  February 12.

to re-calculate Keystone's historical downward trend between the years **2011 and 2017**, a time period before this litigation was even filed and for which data has long been available.  Nor was Keystone's pre-rebrand historical downward trend the subject of any update in Stone's February 2021 supplemental reports.  Defendant appears to be using its "Second Rebuttal Expert Reports" to re-do its original expert reports after the time for deposition and response has past, not to make updates to account for data and developments post-dating the parties' original reports.

*Third*, Defendant's new reports rely on data that was never previously produced or disclosed in this case, even though it was responsive to Stone's document requests.  As the Court knows, Stone has moved repeatedly to remedy the prejudice caused by Defendant's wholesale withholding of documents and data.  One example is Defendant's advertising database, which contains granular records of Defendant's Keystone advertising and expenditures responsive to Stone's RFP No. 8 for "All Documents and Communications regarding Your advertising of the Keystone brand since January 2017."  Defendant did not produce this material.  In a brief filed on April 26, 2021, MillerCoors told the Court that "this information is not probative of any issue in this case" and that it could not produce it because "the database . . . is owned and maintained by a third party."  ECF 461 at 17.

Yet, on April 21, 2021, two weeks before it served that brief, Defendant gave its damages expert a 9,861 row, 33-column export of *selected portions* of that database, including materials dating back before the parties' original reports were filed.  Hosfield used that withheld, selective excerpt of the advertising database as the basis for these substantial new opinions that have now been revealed many months later in this "Second Rebuttal Report."  And even then, Defendant did not produce the data to Stone with the report, instead waiting another three weeks until Stone was able to suss out what Hosfield was relying on and requested it specifically.

Likewise, Defendant withheld the underlying data, models, and statistical outputs for alleged regressions contained in Kallenberger's "Second Rebuttal

Report," and still has not produced significant portions of these materials to Stone, including the p-values, coefficients, R-squared, Adjusted R-Squared and other standard elements of regression output.

Defendant's decision to withhold from Stone the basic materials on which its experts are relying only compounds the prejudice created by its decision to serve 600 pages of "rebuttal" expert reports and analyses—many times the size of the reports they are supposedly rebutting—just weeks before trial.  Under controlling Ninth Circuit precedent, Defendant's late disclosures are improper and these opinions must be excluded at trial.  *Yeti*, 259 F.3d at 1106.

## III.   CONCLUSION

For the reasons set forth above, each of these disputes should be resolved in Stone's favor in order to secure complete presentation of the evidence to the jury and a fair resolution to the lawsuit.

Dated:  November 1, 2021   Respectfully Submitted,

          BRAUNHAGEY & BORDEN LLP

          By:  *s/ J. Noah Hagey*
             J. Noah Hagey

          J. Noah Hagey (SBN: 262331)
           hagey@braunhagey.com
          Jeffrey M. Theodore (SBN: 324823)
           theodore@braunhagey.com
          Forrest Arthur Hainline III (SBN: 64166)
           hainline@braunhagey.com
          J. Tobias Rowe (SBN: 305596)
           rowe@braunhagey.com
          BRAUNHAGEY & BORDEN LLP
          351 California Street, 10th Floor
          San Francisco, CA 94104
          Telephone: (415) 599-0210
          Facsimile: (415) 276-1808

          Douglas S. Curran (*pro hac vice*)
           curran@braunhagey.com
          BRAUNHAGEY & BORDEN LLP
          7 Time Square, Twenty-Seventh Floor
          New York, NY 10036
          Telephone: (646) 829-9403
          Facsimile: (646) 829-9403

          *Attorneys for Plaintiff*
          *Stone Brewing Co., LLC*