1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

SOUTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11  STONE BREWING CO., LLC, | Case No.:  3:18-cv-00331-BEN-MDD |
| 12                          Plaintiff, | **\*CORRECTED\* ORDER:** |
| 13     vs. | **(1) DENYING DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR IN THE ALTERNATIVE, NEW TRIAL; and** |
| 14 | |
| 15  MILLERCOORS LLC, | |
| 16                          Defendant. | |
| 17 | **(2) DENYING PLAINTIFF'S MOTION FOR PARTIAL NEW TRIAL** |
| 18 | |
| 19 | |
| 20 | **[ECF Nos. 742, 743]** |

**I.     Background[1]**

Following a three-week trial, a jury awarded Stone Brewing Co. LLC ("Plaintiff or "Stone") $56 million in compensatory damages after finding Defendant MillerCoors LLC ("Defendant" or "MillerCoors") infringed on Plaintiff's STONE trademark. Verdict, ECF No. 625.  However, the jury did not find that MillerCoors' infringement

---

[1] The facts and complete procedural history are referred to in this Court's prior orders and are not necessary to duplicate here.  The Court references procedural history and facts relevant to the parties identified issues in the discussion thereof.

1

was willful.  *Id.*  Now before the Court is Plaintiff's Motion for Partial New Trial, and Defendant's Motion for Judgment as a Matter of Law or in the Alternative, New Trial. ECF Nos. 742, 743.   The Court held a hearing on September 6, 2023 to hear argument from the parties.  ECF No. 774.  For the reasons set forth below, the Court **DENIES** both motions.

## II.   LEGAL STANDARDS

### A.   Judgment as a Matter of Law

"Under Rule 50, a court should render judgment as a matter of law when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'"  *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 149 (2000) (quoting Fed. R. Civ. P. 50(a)).  "[T]he standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'"  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51 (1986)).   As such, the court must review all of the evidence in the record, *cf., e.g.*, *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), drawing all reasonable inferences in favor of the nonmoving party, but making no credibility determinations or weighing any evidence, *see e.g.*, *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554–55 (1990).   The latter functions, along with the drawing of legitimate inferences from the facts, are for the jury, not the court.  *Anderson*, 477 U.S. at 255 (1986).  "A jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion."  *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1218 (9th Cir. 2010) (quoting *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002)).

### B.   New Trial

Unlike Rule 50, when considering a motion for new trial under Rule 59, the Court "is not required to view the trial evidence in the light most favorable to the verdict" and "can weigh the evidence and asses the credibility of the witnesses."  *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*, 762 F.3d 829, 842 (9th Cir. 2014).  Under Rule 59, a

2

Court may order a new trial if "the verdict is against the weight of the evidence," "the damages are excessive" or, "for other reasons, the trial was not fair to the moving party." *Claiborne v. Blauser*, 934 F.3d 885, 894 (9th Cir. 2019) (cleaned up). *Cf. Passantino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493, 510 n.15 (9th Cir. 2000). However, a new trial may not be granted "merely because [the court] might have come to a different result from that reached by the jury." *Roy v. Volkswagen of Am., Inc.*, 896 F.2d 1175, 1176 (9th Cir. 1990). When a motion for new trial is based on insufficiency of the evidence, a "stringent standard applies" and the motion should only be granted if the verdict is "against the great weight of the evidence, or it is quite clear the jury has reached a seriously erroneous result." *E.E.O.C. v. Pape Lift, Inc.*, 115 F.3d 676, 680 (9th Cir. 1997) (citing *Venegas v. Wagner*, 831 F.2d 1514, 1519 (9th Cir. 1987)).

Further, district courts have broad discretion in admitting or excluding evidence. *Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995) (citation omitted). "A new trial is only warranted when an erroneous evidentiary ruling 'substantially prejudiced' a party." *Id.* at 1328 (citing *U.S. v. 99.66 Acres of Land*, 970 F.2d 651, 658 (9th Cir. 1992)); *see also Obrey v. Johnson*, 400 F.3d 691, 699 (9th Cir. 2005).

## III.    ANALYSIS—PLAINTIFF'S MOTION FOR PARTIAL NEW TRIAL

As a preliminary matter, Stone's request is made under two subsections of Rule 59, which by their plain language only apply to non-jury trials. *See* Fed. R. Civ. P. 59(a)(1)(B) & (a)(2). Stone argues nonetheless this Court can proceed with a partial new bench trial on certain equitable issues. However, Stone's authorities purportedly supporting relief under these subsections are unavailing.

Stone cites to *Harbor Breeze Corp. v. Newport Landing Sportfishing, Inc.*, arguing that submitting an equitable issue to the jury in the first instance does not preclude the Court from retrying the issue in a bench trial. 28 F.4th 35, 40 (9th Cir. 2022). However, *Harbor Breeze* is distinguishable on two key points. First, the Ninth Circuit noted the parties had failed to specify whether the jury's verdict on disgorgement was advisory or binding. *Id.* at 40. Second, the Ninth Circuit found the jury's verdict on disgorgement

3

was "entirely defective" due to erroneous jury instructions. *Id*. These points place *Harbor Breeze* at odds with Plaintiff's arguments.[2] First, Stone does not even attempt to argue the jury's finding on willfulness was merely advisory. Second, Stone does not contend the jury's verdict was "entirely defective"—in fact, it argued the opposite at the motions hearing, representing to the Court that the "jury did a very good job," and Stone was "not seeking to bring the case back to the jury . . . ." ECF No. 775, 9/6/23 Hearing Tr. at 5:7-8, 5:14-15.[3]

Notwithstanding serious questions regarding the propriety of Stone's request, the Court will address the merits of Stone's argument. Stone argues MillerCoors was allowed to use attorney-client privilege as both a sword and a shield at trial to Stone's prejudice, and this consequently unfairly affected *part of* the jury's verdict and the Court's post-trial equitable rulings regarding MillerCoors' willfulness. *See* ECF No. 742 ("Stone Mot.").

Stone points to three sources in the record as the primary basis of its sword and shield argument. Stone first points to comments made in MillerCoors' opening statement.[4] Next, Stone points to a statement made during the testimony of MillerCoors

---

[2] Stone's citation to *Tobinick v. Scripps* also fails. 81 F.App'x 677 (9th Cir. 2003). In *Tobinick*, the Ninth Circuit found no error when a district court rejected a proposed jury instruction on willfulness, where willfulness was only relevant to an equitable issue which was not submitted to the jury. *Id*. at 679. Neither *Harbor Breeze* nor *Tobinick* support the proposition that a bench trial can supersede a jury's explicit, non-advisory finding merely because an issue is equitable in nature.

[3] Stone essentially represented that its motion was "defensive" in nature to "preserve issues[,]" and thus did not offer oral argument to the Court in support of its motion. ECF No. 775, 9/6/23 Hearing Tr. at 5:1-17. Accordingly, the hearing focused on MillerCoors' Motion for Judgment as a Matter of Law or in Alternative, New Trial.

[4] *See* ECF No. 558, 3/8 AM Tr. at 42:24-43:7, "Now, wholly apart from likelihood of confusion is this issue of prior use . . . . Because the way this works in the trademark law—you heard the Judge's instruction yesterday—is that if you were first to use a word or words like 'Stones,' you can continue to use the word or words like 'Stones,' even if

CEO Gavin Hattersley, where he stated, "It's not the way I understand it.  My understanding is that's a legal issue.  We've had—we've used 'Stone' and 'Stones' for decades.  I believe that gives you right of usage."  ECF No. 559, 3/9/22 AM Tr. at 35:3-5.  Finally, and perhaps most important, Stone points to the testimony of Mr. Joshua Wexelbaum, MillerCoors' Senior Marketing Director for Creative Services.  During friendly cross examination, the following exchange occurred:

> Q: And your answer was: As I stated earlier, I don't believe that the team felt that they needed approval.  They had common law rights.
>
> …
>
> Q: When you gave that answer in deposition, what did you understand, what did you mean by "common law rights"?
>
> [Objection omitted]
>
> A: I'm not a lawyer, but what I had always been counseled on is that any asset that you use consistently over time could be considered a trademark and that you, therefore, have common law rights to it, especially when your activity is consistent and predates anyone with a registered mark.
>
> Q: And you refer to Ms. Stavish's 2010 letter to Stone brewing.  Ms. Stavish being MillerCoors' lawyer.
>
> A: That's correct.

ECF No. 569, 3/11/22 PM Tr. at 40:19-41:19.  Stone notes despite Wexelbaum's use of the word "counseled", the Court sustained an objection when Stone sought to inquire into specific attorney-client communications during re-direct.  *Id.* at 101:10-102:2.  Stone then filed a brief during trial, identifying this exchange as impermissible reference to attorney

---

somebody else gets a mark.  You're grandfathered in."  Notably absent from this statement is reference to any "good faith belief" or argument regarding willfulness.

advice, and sought a corrective instruction that the jury either disregard Mr. Wexelbaum's statement or be instructed that MillerCoors had "intentionally concealed evidence" regarding its common law rights. *See* ECF No. 576.

The Court addressed and rejected Stone's argument outside the presence of the jury, finding there was nothing in Wexelbaum's testimony that indicated he reached his opinions or conclusions based on the advice of counsel. *See* ECF No. 589, 3/17/22 AM Tr. at 115:16-117:17. The Court noted there were reasonable, alternative explanations for the origin of Mr. Wexelbaum's belief, such as the 2010 correspondence between MillerCoors' attorney Stavish and Stone. *Id.* at 116:14-117:14. The Court expressly noted the direct parallel between the contents of the 2010 letter and Mr. Wexelbaum's testimony. *Id.* at 117:10-14 ("And in that letter, that's precisely what it said. And so anyone who saw that letter and that exchange of communication would, of course, form the opinion that in fact that's the law; whether it is or it isn't.").

"The privilege which protects attorney-client communications may not be used both as a sword and a shield." *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992) (citing *U.S. v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991)). "Where a party raises a claim which in fairness requires disclosure of the protected communication, the privilege may be implicitly waived." *Chevron*, 974 F.2d at 1162. In the Ninth Circuit, a party "need not invoke the magic words 'advice of counsel' when it is otherwise relying on privileged information to trigger waiver." *Spin Master Ltd. v. Zobomondo Entm't, LLC*, Nos. CV 06-3459-ABC-PLA and CV 07-0571-ABC-PLA, 2012 WL 8134011 at *2 (C.D. Cal. Mar. 9, 2012) (citation omitted, cleaned up).

Examination of Stone's legal authority reveals the somewhat tenuous nature of this argument. Stone cites to *Bilzerian, Chevron*, *Spin Master* and *Arista*.[5] However, these cases distinguishable, all on the same point: the parties in those cases did not point to an

---

[5] *Arista Records LLC v. Lime Group LLC*, No. 06-cv-5936-KMW, 2011 WL 1642434 at *2 (S.D.N.Y. Apr. 20, 2011).

independent source for their good faith belief. *See Bilzerian*, 926 F.2d at 1292-93 (defendant discussed the allegedly fraudulent transactions with his attorney); *Chevron*, 974 F.2d at 1162-63 (appellee "claim[ed] that its tax position [was] reasonable because it was based on advice of counsel[,]" and directly referenced advice of counsel in supporting declarations); *Spin Master*, 2012 WL 8134011 at *3 (noting proof defendant relied on advice of counsel, "Horn's email from 2002 also conclusively demonstrates that he relied in some part on his counsel's advice…"); *Arista*, 2011 WL 1642434 at *2 (noting the absence of independent source, "Defendants seem to be suggesting that Gorton's belief in the lawfulness of his own conduct come [sic] from some innate knowledge of copyright law, and not from advice of counsel.").

This is especially apparent in *Spin Master*, where the Court separated the issue into three different time periods. 2012 WL 8134011 at *3-5. In the first relevant time period, the Court found defendant could not point to an independent source for his purported belief, and ruled attorney-client privilege had been waived. *Id*. at *3. However, in the second relevant time period, the Court found that defendant could point to an independent source for his purported belief and found such source reasonable. *Id*. at *4. The Court noted, "[U]nlike Horn's alleged good faith understanding of Zobmondo's common law rights before 2005, which was unsupported by any evidence other than privileged information, here the Court's Order constitutes independent evidence on which Horn could reasonably rely apart from advice from his attorneys." *Id*. The Court went on to explain, "Horn could have read the Court's Order and, without the help of his attorneys, reasonably understood that the Court invalidated Plaintiffs' registration." *Id*. at *5.

In this case Mr. Wexelbaum identified two sources of his belief in its common law rights to "Stone" or "Stones": (1) the 2010 correspondence between Stone and MillerCoors' counsel regarding the trademark issue, and (2) the "historic use" of Stone or Stones dating back to the 1990s. *See* 3/11/22 PM Tr. at 41:17-42:5 (noting the 2010 letter and consistent historic use). The Court finds these are reasonable, independent sources for Mr. Wexelbaum's belief in MillerCoors' common law rights. Neither the

7

bare fact that common law rights is a legal concept, nor Mr. Wexelbaum's choice of verb "counseled" during his testimony creates an irrefutable presumption that legal counsel was the source of such information.  As such, the Court finds MillerCoors did not impermissibly use attorney-client privilege as a sword and shield during trial.[6]

Stone attempts to buttress its argument that it was prejudiced on the willfulness issue by identifying three erroneous evidentiary rulings: (1) "unproduced documents" from the MillerCoors Archive and denial of Stone's request for physical inspection of the same; (2) the Court's qualification of MillerCoors' archivist Ms. Heidi Harris as an expert and certain aspects of her testimony; and (3) the Court's admission of MillerCoors' late-disclosed sales witness Scott Whitley.  Stone Mot. at 13-18.  The Court will briefly review Stone's contentions.

1. The MillerCoors Archive.  The MillerCoors Archive was much litigated before trial.[7]  Stone continues to argue "it [is] probable that inspection of the additional material in the Archive which Stone has never seen—such as catalogs, folders, and markings— would undermine Defendant's claim . . . .of good faith belief in prior use rights."  Stone Mot. at 14.  At trial, Stone was able to identify that copyright marks often predated a particular marketing item's entry into commerce, and that many archival advertisement materials pre-dating 1995 lacked approval signatures.  *See, e.g.*, 3/22/22 AM Tr. at 123:22-124:7.  However, not only would potential additional evidence be merely cumulative, *see Anderson v. Cryovac, Inc.*, 862 F.2d 910, 924 (1st Cir. 1988), these discrepancies do not support the heart of Stone's argument.  The delay between an item's

---

[6] MillerCoors also correctly points out it did not rely on this testimony during its closing argument, which further reduces the likelihood of resulting prejudice even if the Court assumes error.  *See* ECF No. 633, 3/23/22 Tr. 76:17-142:21.

[7] *See, e.g.*, ECF No. 218, Motion to Compel; ECF No. 250, Order Granting in Part Motion to Compel; ECF No. 283 at 10-11, Report & Recommendation for Order Granting in Part and Denying in Part Motion for Discovery Sanctions; ECF No. 383, Motion in Limine to Exclude Reference to Undisclosed Archive; and ECF No. 440 at 8, Order Denying in Part Motions in Limine.

copyright date and its entry into commerce can (and likely, did) undermine the merits of MillerCoors' prior use defense.  However, the jury *already found for Stone* on this ground.  The Court is unconvinced additional evidence of this nature would undermine the *willfulness issue* because regardless of whether marketing items made their way into commerce in time to meet the definition of prior use, they still certainly could have created the *impression* of such in MillerCoors employees.  This much seems clear from the testimony.  Finally, when Stone's request for physical inspection of the MillerCoors Archive was denied, Magistrate Judge Lopez noted such request was "void of any supporting authority."  ECF No. 250 at 12.  Stone does not provide such authority in the instant motion, and the Court finds no error in the denial of this request.  Even if Stone was entitled to the additional material it identifies (which the Court does not believe it is), such attack is merely cumulative of the one it successfully launched at trial.

2. Testimony of Ms. Heidi Harris as Archivist.  Stone argues the testimony of Archivist Ms. Harris was improper because: (1) Ms. Harris should not have been qualified as an expert; (2) her testimony referenced unproduced archival materials; and (3) her testimony was a "mere conduit" for hearsay.  Stone Mot. at 16-17.  The Court is not convinced by these arguments.  First, the Court finds Ms. Harris' testimony was reliable and helpful for the jury; further, qualification of a witness as an expert is a flexible inquiry, which can be based on the witnesses knowledge or experience.  *See Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010).  Ms. Harris utilized her breadth of knowledge regarding the Archives' items to identify certain items in time and testify to general trends in the marketing materials, which was a practical approach given the sheer size and scale of archival items.  *See, e.g.*, 3/22/22 AM Tr. at 15:6-9 (noting hundreds of thousands of items in the collection); *Id.* at 33:13-17 (identification of item based on general trends).  Finally, regarding hearsay, Stone points to a "single statement in Ms. Harris' 130 pages of testimony" that represents objectionable hearsay.  *See id.* at 87:2.

This does not, in any sense of the phrase, make Ms. Harris' testimony "a mere conduit for hearsay."[8]

       3. Admission of Late Disclosed Scott Whitley.  Finally, Stone argues it was prejudiced by the late disclosure and admission of sales witness Scott Whitley.  Stone argues it had no opportunity to take discovery of any sales team member who may have been able to provide a contrary opinion or basis for impeachment.  Stone Mot. at 18.  However, this is false—during the Final Pretrial Conference on February 8, 2022, the Court offered Stone an opportunity to postpone trial and depose all other sales witnesses identified by Mr. Whitley precisely to address this issue; Stone declined this invitation.  ECF No. 529, 2/8/22 Hearing Tr. at 32:9-33:8.  Apart from Mr. Whitley's late disclosure, Stone does not point to a single line of testimony given by Mr. Whitley that prejudiced Stone.[9]  Instead, Stone repeats its misleading statement that "Mr. Whitley should not have been allowed to provide testimony of supposed prior use that Stone had no opportunity to take discovery to rebut."  Stone Mot. at 18.

     The Court previously found no bad faith in the late disclosure of Mr. Whitley.  ECF No. 716 at 6.  As MillerCoors cynically points out—Stone's strategic choice to decline the Court's offered remedy was likely due to a need to complete trial before ▮▮▮ ███████████████████████████████████.  ECF No. 752 at 18 n.7.  The Court agrees at the very least Stone's declination of remedy renders Stone's authorities on this issue inapposite (see Stone Mot. at 18); Stone cannot now claim prejudice when it freely declined an opportunity for a remedy.

---

[8] The Court additionally notes the hearsay Stone references was related to the size of marketing budget Keystone brands enjoyed, which was discussed to potentially explain the lack of prototypes and approval signatures on Keystone marketing materials.  *See* 3/22/22 AM Tr. at 86-88.  Again, this is relevant to the prior use issue on which Stone prevailed.

[9] In fact, Stone previously noted it had "completely impeached" Mr. Whitley during trial. *See* ECF No. 654, Motion for Disgorgement of Profits and Trebling of Damages at 13; *see also* 3/22/22 PM Tr. at 28:4-30:25 and 32:1-33:8.

Taken together, or separately, Stone does not convince the Court the evidentiary rulings Stone sets forth were erroneous.  Even assuming they were, the Court finds they would not equate to prejudice warranting a new trial.  Further, Stone does not adequately explain why the evidentiary errors it identifies equate to prejudice warranting the Court setting aside part of the jury's binding verdict but at the same time, does not rise to the level of warranting a new jury trial.  This issue is exemplified by the following exchange between the Court and Stone's counsel:

> The Court:  So we do we have Rule 59?

> Mr. Hagey: We have Rule 59, your Honor, to correct manifest injustice.  If there was something completely and horridly wrong with how these—how these women and man looked at the evidence, then Your Honor does have a duty to step in.  <u>But that is not what happened here.</u>

9/6/23 Hearing Tr. at 71:7-12 (emphasis added).  For the foregoing reasons, the Court **DENIES** Plaintiff's Motion for Partial New Trial.

## IV.   ANALYSIS –DEFENDANT'S MOTION FOR RENEWED JUDGMENT AS A MATTER OF LAW ("JMOL") OR IN THE ALTERNATIVE, NEW TRIAL

### A. Defendant's Renewed JMOL & Insufficiency of Evidence Claims

MillerCoors has seized on language in the Court's prior Order that if the Court had "been in the position of fact-finder in this case, [it] would have found" that a "prudent consumer" would not have been confused by the packaging.  ECF 710, Order Denying Defendant's JMOL at 4.  Additionally, the Court noted its recognition "that Defendant presented strong evidence, particularly testimony that showed the structural flaws with Plaintiff's survey evidence.  The Court was similarly unconvinced by the evidence proffered from Stone's surveys, but that goes to the weight of the evidence."  *Id*. at 5.

11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

With these quotes in hand, MillerCoors urges the Court to reconsider the evidence and accompanying arguments afresh and grant its renewed JMOL or motion for a new trial. The bulk of MillerCoors JMOL arguments focus on actual consumer confusion as well as its claim that Stone presented evidence of dilution, not trademark infringement. ECF No. 743 ("MillerCoors' Mot.") at 2-10. MillerCoors also mounts attacks on the remaining *Sleekcraft* factors, arguing it is entitled to relief under either JMOL or New Trial Standards. *Id.*

"The touchstone for trademark infringement is likelihood of confusion, which asks whether a reasonably prudent marketplace consumer is likely to be confused as to the origin of the good or service bearing the marks." *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 431 (9th Cir. 2017) (citing *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1214 (9th Cir. 2012)). Courts evaluate likelihood of confusion using the factors set forth in *AMF Inc. v. Sleekcraft Boats*: (1) the strength of plaintiff's mark, (2) whether the parties' goods are related, (3) the degree of care exercised by likely purchasers, (4) how similar defendant's mark is to plaintiff's, (5) evidence of actual confusion, (6) the marketing channels the parties use, (7) defendant's intent in selecting its mark, and (8) the likelihood of expansion of the parties' product lines. 599 F.2d 341, 348-49 (9th Cir. 1979), *abrogated on other grounds by Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792 (9th Cir. 2003). As the Ninth Circuit has noted, not all factors are created equal, and their relative weight varies based on the context of each case. *See Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1145 (9th Cir. 2011).

<u>1. Likelihood of Confusion</u>. MillerCoors places great weight on the factor of "actual confusion." Stone argues in contrast the present case actually contains unusually strong evidence of confusion, correctly noting that evidence of actual confusion is by no means a necessary factor. *See Stone Creek*, 875 F.3d at 433 (district court's focus on actual confusion "misapprehends the breadth of likelihood of confusion[.]").

12

MillerCoors begins its brief by stating, "[a]fter four years of litigation, Stone Brewing Company could not identify a single person who actually bought Keystone thinking it was made by [Stone.]"  MillerCoors Mot. at 1. MillerCoors further identifies fatal deficiencies in the evidence regarding actual confusion, pointing to Stone's "flawed" surveys, it's own shifting reports, and the "absurd" social media evidence.  *Id*. at 3-7. The Court previously agreed with MillerCoors regarding the structural flaws of Stone's surveys purporting to show actual confusion.  ECF No. 710 at 4-5.  But that does not mean there was <u>zero</u> evidence of actual confusion, which Stone takes pains to outline. *See* ECF No. 754, Opposition to Renewed Motion for JMOL or New Trial ("Stone Oppo.") at 6.  Even setting aside Stone's survey and social media evidence, there was sufficient evidence presented at trial to meet this factor, including examples from retailers and distributors.  *See* PX2044 (retailer placing sign on Keystone beer which indicated it was not from Stone); PX1985 (distributor surprised Stone was "making big cans now" referencing Keystone can); PX1984 (placing Keystone in Stone Brewing spot on beer aisle).  *See also Americana Trading Inc. v. Russ Berrie & Co.*, 966 F.2d 1284, 1289 (9th Cir. 1992) (reversing district court's grant of summary judgment, identifying testimony of retailer confusion "sufficient evidence of actual confusion which, if believed by the trier of fact, would aid Amtra's infringement claim.")

Additionally, MillerCoors essentially ignores the Court's other comments regarding likelihood of confusion, which the Court finds particularly important here in the dual JMOL/New Trial inquiry.  The Court previously found that "the marks STONE and 'STONE are nearly identical."  ECF No. 710 at 4.  While MillerCoors argues that "STONE" never appeared alone on any packaging, it cannot deny or downplay the affect of de-emphasizing the full "Keystone" mark in favor of emphasizing "a single, heroic element[.]"  PX0003.26.  As the Ninth Circuit has noted, "identical marks paired with identical goods can be case dispositive[.]"  *Stone Creek*, 875 F.3d at 432 (citing *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1056 (9th Cir. 1999)).  While the marks are not "identical", they are nearly so; and while the goods are

13

not "identical" they are certainly very closely related—both being beer, which "share the same aisle" and compete for the same space at the average grocery store. *See* ECF 574, 3/14/22 PM Tr. at 65:10-67:14; PX2441 & PX3413. Proximity of goods and similarity of marks have been identified by the Ninth Circuit as "[t]wo particularly probative factors[.]" *Stone Creek*, 875 F.3d at 432, and the Court finds them very powerful evidence here. Overall, reviewing the *Sleekcraft* factors and the evidence presented, the Court cannot say the verdict was unreasonable or against the "great weight" of the evidence.

 2. Dilution v. Infringement. MillerCoors also renews its argument that Stone presented evidence of trademark dilution, not trademark infringement, which was also previously rejected by the Court.[10] The Court's prior appraisal aside, this argument remains unavailing. Trademark dilution can occur via tarnishment or blurring. 15 USC § 1125(2)(B) & (C). Dilution via tarnishment occurs when "association arising from similarity of a [infringing] mark…and a famous mark that harms the reputation of the famous mark." 15 USC § 1125(2)(C). During the hearing, counsel for Stone described the example of the board game Candyland and the apparent pornographic website of the same name. *See* 9/6/23 Hearing Tr. at 26:23-27:9; *see also Hasbro, Inc. v. Internet Entm't Grp., Ltd.*, No. C-96-130-WD, 1996 WL 84853 (W.D. WA Feb. 9, 1996) (finding likelihood of dilution of the value of mark by using name for sexually explicit internet site). As counsel argued, while no consumer would reasonably believe Hasbro had expanded its business to include pornography (*i.e.*, there was no likelihood of confusion) the similarity in name could harm the board game's reputation. 9/6/23 Hearing Tr. at

---

[10] "MillerCoors further argues the only evidence offered is evidence of trademark dilution, not trademark infringement . . . .The Court finds Stone presented evidence to the jury that would allow them to reasonably find that Stone suffered damages as a result of trademark infringement." ECF No. 710 at 5.

27:6-9.  Likewise, dilution via blurring occurs when two marks are similar and the association "impairs the distinctiveness of the famous mark." 15 USC § 1125(2)(B).

However, Stone did not argue their mark became *less distinct*, but that consumers believed the *source* of Keystone was Stone Brewing, and the negative attributes of Keystone were transferred to Stone *from this confusion of source*.  This is in line with Ninth Circuit precedent.  *See Marketquest v. BIC Corp.*, 862 F.3d 927, 932 (9th Cir. 2017) (consumers had "come to associate the words" with defendants); *Dreamwerks Prod. Grp. V. SKG Studio*, 142 F.3d 1127, 1129-31 (9th Cir. 1998) (same); *Ironhawk Techs. V. Dropbox*, 2 F.4th 1150, 1160 (9th Cir. 2021) (reverse confusion occurs when a consumer "mistakenly thinks the senior user is the same as or is affiliated with the junior user[.]").

3. Damages Award.  "A jury's award of damages is entitled to great deference, *In re First All. Mortg. Co.*, 471 F.3d 977, 1001 (9th Cir. 2006), and must be upheld unless "the amount is grossly excessive or monstrous, clearly not supported by the evidence, or only based on speculation or guesswork."  *Los Angeles Mem'l Coliseum Comm'n v. NFL*, 791 F.2d 1356, 1360 (9th Cir. 1986), *cert. denied*, 484 U.S. 826 (1987).  Particularly in trademark cases, courts "accept crude measures of damages based upon reasonable inferences so long as those inferences are neither inexorable nor fanciful."  *Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1112 (9th Cir. 2012) (internal quotations removed, cleaned up) (citing *Intel Corp. v. Terabyte Int'l, Inc.*, 6 F.3d 614, 621 (9th Cir. 1993)).  Particularly, there is a need to distinguish between "proof of the fact of damages and the amount of damages because a mark holder is held to a lower standard in proving the exact amount of damages."  *Skydive*, 673 F.3d at 1112 (citation omitted).  To offer a remittitur, courts have to determine the "maximum amount of damages sustained by proof."  *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814 (9th Cir. 2001).

There were three categories of damages which Stone presented to the jury: (1) past lost profits ($32.7 million); (2) future lost profits ($141.4 million); and (3) corrective

15

advertising ($41.8 million).  This left the jury to consider a maximum request of $216.15 million in damages across all three categories.  The jury awarded Stone $56 million in damages, roughly 25% of the damages Stone sought.  There was no indication of what category, or combination of categories, the damages award came from.

As a preliminary matter, Stone argues that reduction in actual damages is not permitted under the Lanham Act.  Stone cites to three district court cases,[11] which all cite to the same Federal Circuit decision as the source for this proposition.  *See Go Medical Industries Pty., Ltd v. Inmed Corp.*, 471 F.3d 1264, 1274 (Fed. Cir. 2006).  MillerCoors argues in response that remittitur and reduction of damages are separate processes, and the former is permissible under the Lanham Act.  This is supported by at least one of Stone's authorities. *adidas*, 2008 WL 4279812 at *12. Accordingly, the Court will review the merits of MillerCoors' damages arguments.

MillerCoors argues the evidence cannot support the jury's award of $56 million.  MillerCoors attacks all three categories of Stone's damages as generally unsupported by the evidence, as well as other reasons unique to each category.  Additionally, MillerCoors argues the damages award should be reduced because it represents an "extreme outlier" in this Circuit.

*Past Lost Profits*.  MillerCoors argues Stone's evidence for past lost profits is deficient in two ways.  First, the damages model used by Dr. Distler was legally flawed because it was based on a trademark *dilution* theory, not trademark *infringement*.  This argument was already addressed above.  Second, MillerCoors argues Dr. Distler assumed every lost sale by Stone was due to the Keystone re-fresh.  ECF No. 604, 3/21/22 PM Tr. at 89:23-90:3 (Distler).  However, this single sentence elicited on cross-examination does

---

[11] *See D.S.P.T. Int'l v. Nahum*, No. CV 06-0308, 2007 WL 5298428 at *9 (C.D. Cal. Dec. 13, 2007), *aff'd*, 624 F.3d 1213 (9th Cir. 2010); *adidas Am. v. Payless Shoesource*, No. CV 01-1655, 2008 WL 4279812 at *12 (D. Or. Sept. 12, 2008); and *Collegenet v. XAP Corp.*, 483 F. Supp. 2d 1058, 1064 (D. Or. Mar. 26, 2007).

16

not tell the whole story.  According to Dr. Distler, her damages model accounted for factors affecting the craft brewing industry by using controls, thereby isolating the effects of the Keystone Refresh.  *Id*. at 34:2-4 ("So by measuring their performance against that control set, I can take out those other factors and identify the impact from the Keystone rebrand."); *see also id*. at 29:22-31-:14, 90:4-8, 101:2-23.  Although MillerCoors argues there were still a myriad of factors which Dr. Distler did not account for, as this Court previously noted, these critiques were raised before the jury, and the jury very well may have taken these arguments into account when awarding Stone only 25% of the damages it sought.  *See* ECF 711, 6/17/22 Hearing Tr. at 22:20-23:13.  Again while the Court may have come to a different conclusion if it had been in the role of factfinder, that is not the standard for a new trial motion based on insufficient evidence.  Here, Stone presented evidence that: it suffered a 40% drop in revenue in the wake of the 2017 Keystone refresh (*see* PX5024; ECF No. 584, 3/16/22 AM Tr. at 92:2-13; ECF No. 585, 3/16/22 PM Tr. at 47:25-49:14, 50:8-51:16 and 66:17-67:1); the revenue was likely not due to factors suffered by the craft beer industry as a whole (*see* PX5020); and associations with Keystone negatively impacted consumers' view of Stone (*see* ECF No. 597, 3/18/22 PM Tr. at 65:14-67:5).

*Future Lost Profits*.  MillerCoors makes two arguments in its attack on Stone's future lost profits.  First, it argues future profits are not cognizable for infringement cases. This argument falls flat.  MillerCoors offers only a practical law entry on infringement which fails to identify future profits as a type of damages.  Stone points to *Oracle Corp. v. SAP AG*, where the Ninth Circuit held that "even after [entity purchased by SAP] ceased operations, Oracle had lost an ongoing stream of revenue from its former customers who permanently remained with SAP" and therefore the district court should have selected the profit figure which included profits for "seven years after [entity] shut its doors . . . ." 765 F.3d 1081, 1094 (9th Cir. 2014).  This "continuation of harm" even after the cessation of infringement (indeed, the closing of the primary infringer's

company) supports Stone's theory of future lost profits.  Ultimately, neither party points to definitive authority on the issue.

Next, MillerCoors argues that Stone's theory of future lost profits was entirely speculative and therefore impermissible.  Stone argues that Dr. Distler's assessment of future damages is optimistic and actually potentially undervalues the damages sustained. *See* Stone Oppo. at 24.  Dr. Distler's analysis of lost future profits assumed Stone would cease to suffer increased loses (as Dr. Palmatier testified they would) and instead would immediately begin to grow at its pre-infringement rate after corrective advertising. 3/21/22 PM Tr. at 44:15-45:23. This analysis (purposefully conservative) does not take into account the time and effort to repair a brand and regain distribution points in a market where competitors have already taken its place.  *See generally* 3/16/22 PM Tr. at 59-68; 3/18/22 PM Tr. at 121:7-123:6.

*Corrective Advertising*.  Finally, MillerCoors attacks Stone's calculation for corrective advertising as legally infirm for two reasons: first, the purpose of corrective advertising is to "restore" a trademark, which conflicts with Stone's theory that its mark is permanently damaged; and second, there is a "cap" on corrective advertising equal to 25% of the wrong-doers advertising expenses, which in this case would amount to approximately $10.4 million.

Again, MillerCoors' first argument falls flat.  Even if harm is irreparable, the Lanham Act authorizes seeking damages for the portion of an injury that can be quantified.  15 U.S.C. § 1117.  Even if Stone may never "fully recover" and thus damage to its brand is permanent, that does not mean Stone cannot recover *part of* the lost value.  Next, MillerCoors argues that a 25% cap for corrective advertising has been adopted by the Ninth Circuit.  This is misleading.  MillerCoors cites to the case *Adray v. Adry-Mart, Inc*., where the Ninth Circuit noted in a footnote:

> We need not determine how the costs are to be calculated because the court below did not reach the issue.  We note that courts have awarded a percentage of the advertising amount spent infringing on the plaintiff's

mark, I and have acknowledged the Federal Trade Commission's rule requiring businesses who engage in misleading advertising to spend 25% of their advertising budget on corrective advertising.

76 F.3d 984, 988-89 (9th Cir. 1995) (citing *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co*., 561 F.2d 1365, 1375-76 (10th Cir. 1977)).   However, this is not the explicit adoption of a 25% ceiling on corrective advertising that MillerCoors claims.   The only explicit limit to corrective advertising damages required by *Adray* is that corrective advertising damages "do[] not exceed the damage to the value of [the] mark." *Adray*, 76 F.3d at 989.  In another case, *U-Haul Intern., Inc. v. Jartran, Inc*., the Ninth Circuit distinguished between prospective corrective advertising and actual damages relating to corrective advertising which already took place, finding the 25% cap could only arguably be applied to prospective, not actual, corrective advertising.  793 F.3d 1034, 1041 (9th Cir. 1986).  Even assuming the 25% cap applies this still leaves $10.4 million potential damages which could factor towards the $56 million total awarded by the jury.

*Remittitur Due to Extreme Outlier in Circuit*.  Generally, "courts are required to maintain some degree of uniformity in cases involving similar losses." *Clark v. City of Tucson*, 2020 WL 914524 at *18 (D. Az. Feb. 26, 2020) (citing *Shaw v. U.S.*, 741 F.2d 1202, 1209 (9th Cir. 1984)).   MillerCoors cites two cases that offered remittitur to bring damages awards into uniformity based on a survey of other awards in the Circuit.  *See Clark*, 2020 WL 914524 at *18-19; *Sooroojballie v. Port Authority of New York & New Jersey*, 816 Fed. App'x 536, 545-48 (2d Cir. 2020).  MillerCoors offers an Appendix of compensatory damages awards in this Circuit for infringement cases.[12]

---

[12] According to MillerCoors' Appendix, the next highest award in the Circuit for infringement comes from *adidas-America, Inc. v. Payless Shoesource*, where a total compensatory award of $167 million was reduced to $50.3 million.  2008 WL 4279812 at *11-12.  This is misleading, as the reduction occurred in disgorgement of defendant's profits.  *Id*. at *12.  Additionally, the Appendix omits all other categories of damages, creating the impression of lower numbers overall.

19

Here, MillerCoors did not provide alternative, competing calculations of Stone's profits for the jury to consider. Instead, MillerCoors chose to attack Stone's calculations and focus on the issue of liability. The majority of cases discussing remittitur had the benefit of the jury identifying the specific category of damages it was awarding, which in turn allowed the district court to reduce that specific category based on corresponding evidence. And while the Court agreed with MillerCoors that Stone's damages *request* was "fantasy land", 9/6/23 Hearing Tr. at 66:22-67:2, it cannot fairly say that the damages *award*, overall, is "grossly excessive" or "monstrous" given that the jury awarded 25% of Stone's request across all three categories. Nor does it represent an "extreme outlier" in the Ninth Circuit.

Ultimately, for damages and for MillerCoors' other arguments, the Court affirms the conclusion the jury reached was reasonable. The Court finds this is not a case that meets the "stringent standard" to overturn the jury's verdict based on insufficient evidence. *See Pape Lift, Inc*., 115 F.3d at 680. The Court is especially cautious here, given its difference of opinion than that of the jury, noting that should a Court be able to overturn a jury's verdict on such ground, it could very well eviscerate the right to trial by jury. Applying Ninth Circuit standards, the Court here cannot fairly say that the jury's verdict is "against the great weight" of the evidence. *Id*.

**B. Evidentiary Errors & Defendant's Motion for New Trial**

MillerCoors articulates two evidentiary errors as a basis to request a new trial: (1) Stone's late switch to Dr. Palmatier without *Daubert* scrutiny; and (2) Stone's failure to disclose ███████████████.

1. Late Switch to Dr. Palmatier. MillerCoors argues inclusion of Dr. Palmatier is legally presumed prejudicial because MillerCoors was "not allowed" to challenge Dr. Palmatier's testimony on *Daubert* grounds. In 2021, the Court disallowed further *Daubert* challenges when the issue was discussed at a Pre-Trial Conference. ECF No. 472. However, again, this citation is somewhat misleading. There was apparent confusion regarding Dr. Distler and Dr. Palmatier during the Pre-Trial Conference

20

(assuming due to the interrelated nature of their opinions); although Dr. Palmatier was initially identified by name, the ensuing discussion regarding additional *Daubert* scrutiny focused solely on Dr. Distler's damages calculations, not Dr. Palmatier's brain node opinion.  *See* ECF No. 473, 7/7/21 Hearing Tr. at 10:2-9 (discussing Distler); *id*. at 11:4-9 (same); *id*. at 11:12-13 (noting Court had allowed Dr. Palmatier's report).  Even assuming the above exchange could be characterized as MillerCoors requesting *Daubert* scrutiny of Dr. Palmatier, Stone argues MillerCoors waived any objection through a significant delay in request for *Daubert* scrutiny[13] and its lack of objection at trial to preserve the issue.  *See* Stone Oppo. at 12.  Although unimpressed with both parties' mischaracterization of citations from the record, given the complex and contentious nature of discovery in this case, the Court will not dispose of MillerCoors' argument on the basis of waiver.

MillerCoors mounts attacks on three of Dr. Palmatier's opinions: the brain node theory, the regression analysis, and the marketing studies that Dr. Palmatier "inherited" from Dr. Stewart.

*Brain Node Theory*.  MillerCoors argues Dr. Palmatier's "brain node" theory was prejudicial in three ways: (1) it was irrelevant; (2) Dr. Palmatier was not qualified to offer this testimony; and (3) Dr. Palmatier did not follow a "reliable methodology" in his brain node diagram.  MillerCoors' argument regarding relevance fails, as it is premised on the trademark dilution not infringement argument, already discussed and disposed of above.  Second, MillerCoors argues Dr. Palmatier was not qualified to offer opinions regarding "how the brain works" because Dr. Palmatier is not a neurologist.  This argument also fails.  As Stone points out—when companies want to establish relationships with

---

[13] Stone notes Dr. Palmatier's Supplemental Report was served in February 2021, and MillerCoors took Dr. Palmatier's deposition in May 2021.  The flaws MillerCoors now objects to were arguably discoverable by both, either five months or two months prior to the hearing when the issue was raised.

customers and improve their brand, they do not hire neurologists.  Further, Dr. Palmatier's education, background and current professional pursuits place his testimony squarely within his credentials.  *See* ECF No. 597, 3/18/22 PM Tr. at 51:8-19; 57:3-22.

Finally, MillerCoors argues that Dr. Palmatier's brain node opinion was prejudicial because it did not follow a "reliable methodology" and was merely his own handwritten diagram.  This is a somewhat misleading characterization of his testimony.  First, a demonstrative diagram is not the methodology or theory being challenged; it is a way to convey that scientific theory or methodology to the jury.  As Dr. Palmatier explained, the brain node diagram was meant as a visual representation of the associative network model, which he described as "the leading psychological model for how brands work in the mind. . . ."  *Id*. at 61:17-25.  The Court also notes MillerCoors did not cross-examine Dr. Palmatier regarding any lack of peer-review or acceptance of the associative network model; MillerCoors cross examination was limited to the bare fact that Dr. Palmatier drew the brain diagram himself (taken from a textbook he authored) and that he lacked a specific degree in neuropsychology or neurology.  *Id*. at 126:3-22.  These are the same arguments they reprise in the instant motion.  The Court cannot conclude such testimony was prejudicial on this basis.

*Regression Analysis*.  Next, MillerCoors argues the regression analysis Dr. Palmatier presented did not adequately control major factors, making it unreliable.  *Id*. at 101:7-110:21. Dr. Palmatier testified his single variant regression models accounted for the following variables: Stone's prices (*id*. at 102:16-21); Stone's promotional offers (*id*. at 103:4-6); trends in the craft brewing industry (*id*. at 105:2-13); Keystone advertising (*id*. at 106:5-9); and cumulative advertising (*id*. at 107:2-12).  Dr. Palmatier also ran a multi-variant model, which was a combination of the above variables into a single model. *Id*. at 107:21-108:19.  Dr. Palmatier further testified that MillerCoors' regression analysis noted Stone's change in IPA recipe had no significant impact on sales.  *Id*. at 109:11-15. Although MillerCoors' expert may have characterized accounting for these factors as "play[ing] around with some other things[,]" *see* 3/22/22 PM Tr. at 97:23-25, the Court

cannot say that Dr. Palmatier's regression analysis was "so incomplete that it is inadmissible." *See In Re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1273 (S.D. Cal. 2010); *Baker v. SeaWorld Ent.*, 423 F. Supp. 3d 878, 903-04 (S.D. Cal. 2019). *Cf. Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013).

*Dr. Stewart's Market Surveys*. Dr. Stewart's market surveys were the subject of a *Daubert* motion from MillerCoors, which the Court denied. *See* ECF No. 399 at 20-24. Again, although the Court criticized *Dr. Stewart's* surveys post-trial, *see* ECF No. 710 at 5, the Court cannot fairly say that such surveys, having undergone both *Daubert* scrutiny and cross examination, rendered *Dr. Palmatier's testimony* prejudicial error.

2. ███████. MillerCoors argues Stone's failure to disclose ███████ ███████████████████ was prejudicial discovery misconduct that warrants a new trial. The ██████████ was not disclosed until █████████ ████████████████. *See* ECF No. 580, 3/15/22 AM Tr. at 3:4-4:2. The Court's questioning revealed ████████████████████████████ ████████████████████████. *Id*. MillerCoors requested an instruction that the jury disregard the evidence, and the Court granted MillerCoors' request. ECF No. 583, 3/16/22 AM Tr. at 36:11-37:18, 51:24-52:6.

MillerCoors argues that evidence of ███████████ would have undermined key aspects of Stone's case, including that Stone's damages are based on consumers' negative associations between ██████████████████████████. Because ████████████████████ MillerCoors argues it could have used ████ ████████ to undermine Stone's arguments. Stone argues in turn that MillerCoors received exactly the remedy it asked for during trial (a limiting instruction), and there is a presumption that "curative instructions…[are] followed by the jury." *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1270 (9th Cir. 2000).

Ultimately, the Court concludes that non-disclosure of ████████████ does not warrant a new trial. Although the Court feels Stone engaged in a certain level of gamesmanship through this concealment, the Court also finds the offer does not directly

3:18-cv-00331-BEN-MDD

impact the issues presented at trial in the way MillerCoors argues.  Mr. Koch testified █

███████████████████████████████████████████████.  *See* ECF 580, 3/15/22 AM Tr. at 4:1-

2.  This puts ███████████████ at the end of the infringement period.  Although if

disclosed, MillerCoors may have used ████████ to undercut some of Plaintiff's *thematic*

arguments regarding ██████████████████████████ and perhaps argued

additional attacks on Stone's future damages, it is not relevant to the issue of

infringement itself.  The Court declines to grant a new trial on the basis of Stone's

concealment of the ██████████.

## V.      CONCLUSION

For the reasons set forth above, the Court **ORDERS** as follows:

1. The Defendant's Motion for Judgment as a Matter of Law or in the Alternative, a New Trial is **DENIED**.

2. The Plaintiff's Motion for Partial New Trial is **DENIED**.

**IT IS SO ORDERED.**

DATED:     September 27, 2023

**HON. ROGER T. BENITEZ**
United States District Judge

3:18-cv-00331-BEN-MDD